UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ODS CAPITAL LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>     vs.<br><br>JA SOLAR HOLDINGS CO., LTD., BAOFANG JIN, and SHAOHUA JIA,<br><br>                      Defendants. | Case No.  1:18-cv-12083-ALC<br><br><u>CLASS ACTION</u><br><br>**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................................... 9

III.    PARTIES AND OTHER KEY ACTORS ................................................................ 10

        A.      Lead Plaintiffs ............................................................................................ 10

        B.      Defendants .................................................................................................. 11

        C.      The Special Committee ............................................................................... 12

        D.      The Buyer Group ........................................................................................ 13

        E.      Tianye Tonglian .......................................................................................... 14

IV.     SUBSTANTIVE ALLEGATIONS ......................................................................... 15

        A.      Overview of JA Solar's Business ............................................................... 15

        B.      Defendant Jin's Multiple and Conflicting Ties to The Company ............. 16

        C.      History of the Merger ................................................................................. 18

        D.      The Misleading Proxy Materials ................................................................ 22

                1.      Dissenting From the Merger Was Difficult and Discouraged ......... 23

                2.      Houlihan Lokey's Analysis of the Merger ...................................... 24

                3.      Assurances That no Relisting was Contemplated ........................... 28

        E.      The Shareholder Vote and Completion of the Merger ............................... 32

        F.      JA Solar Completes the Merger .................................................................. 34

        G.      The Proxy Materials Understated JA Solar's Financial Performance ........ 35

        H.      JA Solar's Relisting ................................................................................... 38

                1.      Many Sources Confirm That the Buyer Group Planned All Along
                        to Relist JA Solar ........................................................................... 38

                2.      JA Solar Announces Relisting Just Three Days After the Merger
                        Closed ............................................................................................. 43

3.    The Announcement of the Relisting Agreement was the Result of Many Months of Planning .................................................................. 49

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................... 56

A.    The Announcement of the Merger ................................................. 59

B.    The Preliminary Proxy Materials ................................................. 60

1.    Statements Concerning Intention Not to Relist ...................... 61

2.    Promotion of the Merger Price ............................................... 64

3.    False Representations that the Transaction Was Fair .............. 64

4.    Statements Concerning the Basis for the Board's, Special Committee's, Buyer Group's, and Houlihan Lokey's Determinations ........................................................................ 66

C.    Statements on JA Solar's Website ................................................ 71

D.    The Amended Proxy Materials ..................................................... 72

1.    Statements Concerning Intention Not to Relist ...................... 73

2.    Promotion of the Merger Price ............................................... 74

3.    False Representations that the Transaction Was Fair .............. 74

4.    Statements Concerning the Basis for the Board's, Special Committee's, Buyer Group's, and Houlihan's Determinations ............... 75

E.    Second Amended Proxy Materials ............................................... 77

1.    Promotion of the Merger Price ............................................... 78

2.    Statements Concerning Intention Not to Relist ...................... 78

3.    False Representations that the Transaction Was Fair .............. 78

4.    Statements Concerning the Basis for the Board's, Special Committee's, Buyer Group's and Houlihan's Determinations ............... 79

F.    Announcement of Shareholder Vote ............................................. 79

VI.    CONTROL PERSON ALLEGATIONS ................................................ 81

VII.    ADDITIONAL SCIENTER ALLEGATIONS ...................................... 83

A.     Defendant Jin Had the Motive and Opportunity to Defraud the Class ................ 84

B.     The Timing of the Relisting Transaction Shows Defendants' Scienter ............... 85

C.     Defendant Jin's November 2017 Speech Reveals His State of Mind at That Key Time ...................................................................................... 87

D.     Other Documents and Statements Reveal the Relisting Plan Existed Prior to the Merger ........................................................................................ 88

E.     The Divergence Between the Proxy Materials and the 2017 Annual Report Shows Defendants' Scienter ............................................................... 89

F.     Additional Allegation Regarding JA Solar's Knowledge .................................... 91

VIII.     LOSS CAUSATION ............................................................................................. 91

IX.     ALLEGATIONS OF INSIDER TRADING ....................................................... 93

X.     NO SAFE HARBOR .......................................................................................... 96

XI.     CLASS ACTION ALLEGATIONS .................................................................. 97

XII.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS ............................... 100

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ............................................................... 102

COUNT II Violation of § 20A of the Exchange Act Against Defendants JA Solar and Jin ...... 104

COUNT III Violation of § 20(a) of the Exchange Act Against the Individual Defendants ....... 105

XIII.     PRAYER FOR RELIEF ..................................................................................... 107

XIV.     DEMAND FOR JURY TRIAL ......................................................................... 107

Lead Plaintiffs Altimeo Asset Management ("Altimeo") and ODS Capital LLC ("ODS," and, collectively, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through Lead Plaintiffs' undersigned counsel, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, (a) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (b) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding JA Solar Holdings Co., Ltd. ("JA Solar" or the "Company"); (c) analysts' reports and advisories about the Company; (d) consultation with individuals with expertise in Chinese M&A and capital markets transactions; (e) statements made by confidential witnesses; and (f) information readily obtainable on the Internet. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       NATURE OF THE ACTION

1.      This action arises out of Defendants' scheme to depress the price of JA Solar ADS and stock (together, "JA Solar Securities") in order to avoid paying a fair price to JA Solar Securityholders during a transaction to take the Company private in 2017 (the "Merger"). Defendants executed this scheme by publishing false and misleading statements about the Merger.

2.      First, Defendants told the market that JA Solar had no plans to relist the Company on any other stock exchange after the Merger and instead would keep JA Solar a private company, but they lied. They had a plan to relist the Company on the Chinese stock exchange

all along, and in fact announced this plan *just three days* after the Merger was completed at a value of at least *three times the Merger consideration*.

3.       Second, Defendants told the market that JA Solar's share price value leading up to the Merger was depressed for various reasons, including the supposedly weak outlook for the solar industry in general, weak demand for the Company's products in particular, and China's economic slowdown.  This too was false because right after shareholders voted to approve the Merger, the Company announced that "industry demand revived in 2015 and 2016 due to the development of emerging markets, such as China and the U.S." and that the Company "expect[ed] industry demand [to have] significant growth in 2017 and 2018."

4.       Third, despite these facts (known to Defendants at the time), Defendants claimed that JA Solar Securityholders would receive "fair" consideration for their securities in the Merger; simply put, they did not, and instead suffered at least hundreds of millions of dollars in damages as they traded in their securities for far less than their value.  In the meantime, the individuals and entities that acquired JA Solar through the Merger—a group that was led by Defendant Jin (the Company's Chairman, CEO, and founder)—profited enormously by acquiring JA Solar for far less than its fair value.

5.       Finally, Defendants falsely claimed that the Merger might not be completed because of the number of JA Solar Securityholders that dissented from the merger.  Defendants, however, failed to provide the update that they said they would concerning this Merger condition.  Rather, they planned all along to push the Merger through regardless of the amount of dissenting shareholders.  Moreover, these false and misleading statements further depressed the price of JA Solar Securities leading up to the Merger by suggesting that the Merger might not be

completed, and gave investors the false impression that the Merger was an arms'-length transaction that provided "fair" value to JA Solar Securityholders.

6.     JA Solar is a Chinese solar power company.  It primarily designs, develops, manufactures, and sells solar power products that convert sunlight into electricity for a variety of uses.  JA Solar is purported to be one of the world's largest manufacturers of high-performance solar power products.  JA Solar sells its products to customers in over 90 countries.  According to the Company, in 2017, 51.5% of its total revenues were generated from sales to customers outside China.  From 2015 to 2017, JA Solar generated approximately $2 billion to $2.9 billion in revenue.

7.     Defendant Jin founded JA Solar in 2005.  JA Solar completed its initial public offering in February 2007 by offering American Depositary Shares ("ADS") that it listed on the NASDAQ.  JA Solar's ADS listed on the NASDAQ were the Company's only publicly traded securities from the time of its IPO through the completion of the Merger.  From December 10, 2012 through the completion of the Merger, each JA Solar ADS represented five of the Company's ordinary shares.

8.     Defendant Jin maintained unusually tight control of JA Solar from its IPO through the Merger.  He was JA Solar's single largest individual shareholder during the Class Period through his direct ownership of JA Solar shares and his control of another company called Jinglong Group Co., Ltd. ("Jinglong Group BVI"); he led the group that took JA Solar private in the Merger; he owned approximately 80% of the newly private JA Solar following the Merger; and he controlled several entities associated with Jinglong Group BVI that did substantial business with JA Solar in related-party transactions.  Defendant Jin was therefore uniquely

situated to shepherd the Merger along at a depressed valuation so that he could reap outsize profits by relisting the Company in China at a much higher value.

9.      The group of buyers that took JA Solar private (the "Buyer Group")—led by Defendant Jin—initially tried to purchase the Company in June 2015 for $9.69 per ADS.  At that point, JA Solar established a Special Committee of the Board of Directors (the "Special Committee"), led by Defendant Jia, to evaluate the proposed going-private transaction.

10.      According to JA Solar, the going private transaction was "put on hold" from October 27, 2015 to May 3, 2017 because the Buyer Group could not secure adequate financing for the transaction.  On June 6, 2017, the Buyer Group submitted a new proposal to take the Company private at a lower offering price of $6.80 per ADS in cash.

11.      The Buyer Group and the Special Committee ultimately agreed to conduct the Merger at a price of $7.55 per ADS (and $1.51 per share)—over 22% *below* the price that the Buyer Group offered in June 2015.  Houlihan Lokey (China) Limited ("Houlihan Lokey"), the Special Committee's financial advisor, purportedly determined on November 16, 2017 that the consideration of $7.55 per ADS was "fair, from a financial point of view" to JA Solar Securityholders.  That same day, the Special Committee and the Board "expressly adopted" Houlihan Lokey's analysis, determined that the Merger price was "fair" to JA Solar Securityholders, and recommended that the Merger be approved.  Based on this price, the proposed Merger implied an equity value for JA Solar of approximately $360 million.

12.      The following day, on November 17, 2017, Company and Buyer Group executed the Merger Agreement and related documentation for the proposed transaction.  The Class Period begins on November 20, 2017, when JA Solar filed with the SEC its press release announcing the Merger.

13.     Defendants then proceeded to publish proxy materials advising JA Solar Securityholders of the key components of the Merger, including the determination by the Special Committee, the Board, the Buyer Group, and Houlihan Lokey that the Merger was "fair" to JA Solar Securityholders.  (These materials are referred to collectively as the "Proxy Materials.")

14.     On December 11, 2017, Defendants published the initial transaction statement for the Merger on Schedule 13E-3, which attached the Company's Preliminary Proxy Statement and a draft of Houlihan Lokey's November 16, 2017 presentation to the Special Committee (collectively, the "Preliminary Proxy Materials").

15.     Defendants then published an amended version of the Proxy Materials on January 11, 2018 (the "Amended Proxy Materials," which included a revised proxy statement (the "Amended Proxy Statement")).  On February 1, 2018, Defendants published a second amended version of the Proxy Materials (the "Second Amended Proxy Materials") that included the final version of the proxy statement that JA Solar Securityholders relied on at the March 12, 2018 shareholder vote on the Merger (the "Final Proxy Statement").

16.     Significantly, the Proxy Materials told the market that JA Solar had no plans to relist the Company on any stock exchange.  For example, they assured investors that "[i]f the Merger is completed, the Company will continue its operations as a privately held company and will be wholly owned by the Buyer Group."

17.     On March 12, 2018, JA Solar held the extraordinary shareholder meeting at which shareholders voted on whether to approve the Merger based on the recommendations and/or fairness determinations in the Proxy Materials of the Special Committee, the Board, Houlihan Lokey, and the Buyer Group.  The Merger passed with only 56.5% of the Company's total outstanding ordinary shares voting at the meeting.

18.     On July 16, 2018, the last day of the Class Period, the Merger closed.[1]  JA Solar then became a newly private company owned by the Buyer Group, and the Company's ADS stopped being listed on the NASDAQ.  Defendants also provided JA Solar Securityholders instructions for how they could exchange their JA Solar Securities for the Merger consideration following the closing of the Merger.

19.     *Just three days later*, on July 19, 2018, JA Solar signed a letter of intent with Qinhuangdao Tianye Tonglian Heavy Industry Co., Ltd. ("Tianye Tonglian"), a manufacturer of heavy equipment based in the People's Republic of China, for Tianye Tonglian to acquire JA Solar.  This deal, operating as a "backdoor listing," would allow JA Solar to return to the stock market in China by relisting on the Shenzhen Stock Exchange.  However, JA Solar would relist at a multiple of *at least 3 times its prior value*.  This fact was not known by JA Solar's former Securityholders at the time they voted to approve the Merger.  The relisting was thus to the detriment of JA Solar's former Securityholders, who had unknowingly agreed to sell their JA Solar Securities at substantially deflated values during the Class Period.  Following the Merger, Defendant Jin would become CEO of the publicly listed Tianye Tonglian, which would serve as a vehicle for JA Solar being listed in the Chinese market.

20.     The backdoor listing is continuing to progress toward completion. Tianye Tonglian currently plans to acquire JA Solar for 7.5 billion yuan, or $1.1 billion.  That is over three times the approximately $360 million that Defendant Jin and the rest of the Buyer Group paid to take JA Solar private in the Merger.

21.     Contrary to their affirmative statements that there was no relisting plan in the works, Defendants had been secretly planning the relisting all along. The timing of the

---

[1] See the "Class Action Allegations" section below for the description of which JA Solar Securityholders are included in the Class.

announcement of the relisting agreement is telling.  The announcement occurred just three days after the Merger closed.   Before reaching the backdoor listing agreement, JA Solar would have needed to engage advisors for the transaction, find viable entities on Chinese stock exchanges to acquire JA Solar, reach an agreement with one of those companies, have both sides conduct due diligence on one another, conduct regulatory and accounting analyses, and agree to the initial terms of the deal that were announced on July 19, 2018.  These numerous complicated steps that go into reaching a backdoor listing agreement typically take at least a full year, if not longer.  In addition, the particular intricacies of JA Solar's agreement with Tianye Tonglian, such as Tianye Tonglian's agreement to strip itself of its pre-existing assets, would make the deal process take even longer than usual.  That timeframe puts the start of the relisting process from Defendants' perspective here in July 2017, if not earlier.

22.     In addition, other sources corroborate that Defendants were planning on the backdoor listing transaction at the same time they were telling the market there were no relisting plans, and long before the March 12, 2018 shareholder vote on the Merger.  For example, during a speech in China to a select group of people on November 19, 2017, Defendant Jin said that JA Solar had plans to return to the Chinese capital markets in publicly traded form within the following two or three years.

23.     Defendants' many descriptions of the Merger price as "fair" were also false and misleading.  The fact that JA Solar was being relisted in China at a multiple of the Merger price itself shows that JA Solar's value was much higher than the consideration paid to its Securityholders.  Furthermore, several aspects of Houlihan Lokey's, the Special Committee's, the Board's, and the Buyer Group's analysis are highly suspect, and sought to justify this lower valuation of JA Solar (while keeping the relisting secret).

24.     First, the Special Committee and the Board explained in the Proxy Materials that negative business conditions for JA Solar, the solar industry in general, and in China supported the low transaction price.

25.     Second, Houlihan Lokey based its analysis on Company management's outdated projections for the Company's performance in 2017.  By the time Houlihan Lokey considered those projections, there were only one-and-a-half months left in 2017.  Defendants then repeated those projections in the Proxy Materials that it provided to shareholders leading up to, and after, their March 12, 2018 vote on whether to approve the Merger.

26.     Third, Houlihan Lokey disclaimed any reliance on the traditional valuation methods that compare JA Solar to comparable companies (i.e., "selected companies analysis") and that compare the transaction at issue to comparable transactions involving similar companies (i.e., "selected transactions analysis").  This sort of analysis is a mainstay of "fairness opinion" valuations.  While its absence was disclosed and, therefore, not directly fraudulent, it also casts serious doubts on the legitimacy of Houlihan Lokey's motivations and analysis.

27.     Then, on April 30, 2018, approximately three months after JA Solar published the Final Proxy Statement and less than two months *after* shareholders voted to approve the Merger based on the representations contained therein, JA Solar disclosed in its Annual Report for 2017 that (1) its results for 2017 were significantly better than projected in the Proxy Materials and (2) JA Solar's business conditions were much more positive than described in the Proxy Materials. Defendants had misrepresented these factors in the Proxy Materials to justify the artificially low Merger price.  By this point, however, it was too late for JA Solar Securityholders to dissent from the Merger or exercise their appraisal rights.

28.     Defendants further depressed the price of JA Solar Securities by warning JA Solar Securityholders that the Company or the Buyer Group might terminate the Merger after the shareholder vote because the holders of over 10% of JA Solar Securities had objected to the Merger.  In reality, neither the Company nor the Buyer Group planned to exercise such a right because they wanted the Merger to proceed so that the Company could then be relisted in China for a much higher value.  But Defendants entertained this unfounded concern and never provided JA Solar Securityholders with the notice that was promised concerning the waiver of this termination right.

29.     As a result of the Merger and subsequent relisting, the Buyer Group stands to receive three times what they paid to take JA Solar private.  At a valuation in China of $1.1 billion, that means that they are due to receive over $550 million in profit above what they paid in the Merger (after accounting for the 25.7% ownership stake that they had in the Company before the Merger).  Defendant Jin alone stands to earn at least $440 million in profit for his 79.8% stake in JA Solar following the Merger.

## II.    JURISDICTION AND VENUE

30.     The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

31.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. The Defendants engaged in a scheme that violated United States securities law. In doing so, the Defendants engaged in conduct that was directed toward the United States. JA Solar registered its ADS with the SEC pursuant to Section 12(b) of the Exchange Act and these securities traded on the NASDAQ stock

exchange.  The Bank of New York Mellon, whose corporate headquarters and trust office from which the ADS program is administered, is located in New York, New York, served as the ADS Depositary for JA Solar's ADS.

32.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

33.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ stock exchange.

### III.     PARTIES AND OTHER KEY ACTORS

#### A.     Lead Plaintiffs

34.     On March 7, 2019 this Court appointed Altimeo and ODS to serve as the Co-Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). (Dkt. No. 15).

35.     Altimeo is an institutional asset manager that manages investment assets through separate funds and is authorized to bring legal action on their behalves.  Prior to seeking appointment as Lead Plaintiff, Altimeo obtained valid assignments of the claims of the funds Altimeo Optimum and Altimeo Investissement.

36.     Between Altimeo Optimum and Altimeo Investissement, Altimeo purchased 401,110 JA Solar securities (including ADS on the NASDAQ) during the Class Period and sold 347,311 JA Solar securities (including ADS on the NASDAQ) during that time.  After accounting for JA Solar securities that Altimeo held prior to the start of the Class Period, it retained 303,095 JA Solar securities (including ADS) through the Merger.  These 303,095

securities have now been paid in exchange for the Merger consideration, with those transactions clearing on July 18 and 19, 2018.

37.     Lead Plaintiff ODS Capital LLC is a Florida limited liability company with its primary office and business address in Jupiter, Florida. ODS purchased a total of 1,329,633 ADS on the NASDAQ during the Class Period, sold 664,930 ADS during the Class Period, and retained 664,703 ADS through the Merger.  These 664,703 ADS have now been paid in exchange for the Merger consideration, with that transaction clearing on July 18, 2018.  ODS's transactions in JA Solar's ADS were completed through a New York-based brokerage.

**B.     Defendants**

38.     Defendant JA Solar is a Cayman Islands corporation with its principal executive offices located at Building No.8, Noble Center, Automobile Museum East Road, Fengtai, Beijing 100070, The People's Republic of China.  JA Solar's common stock is not registered with the SEC.  Rather, JA Solar registered ADS that were listed and traded on the NASDAQ under the ticker symbol "JASO."  The only public market for JA Solar Securities was for the Company's NASDAQ-listed ADS.  Each ADS was redeemable for five shares of JA Solar's ordinary stock. The Bank of New York Mellon served as the ADS Depositary for JA Solar's ADS.

39.     Defendant Baofang Jin ("Jin") served as the JA Solar's Executive Chairman of the Board of Directors since July 2009, as Chairman since he founded JA Solar in 2005, and as Chief Executive Officer from August 2009 to January 2010 and since January 2013.

40.     Defendant Jin has also been the Chairman and Chief Executive Officer of Jinglong Industry and Commerce Group Co., Ltd. ("Hebei Jinglong") since 2003.  As discussed further below, Hebei Jinglong does substantial business with JA Solar and is controlled by Jinglong BVI.  Jinglong BVI, in turn, is a British Virgin Islands company that is controlled by Defendant Jin, who serves as its sole director.   Jinglong BVI was JA Solar's largest

11

Securityholder prior to the Merger and was part of the Buyer Group that took JA Solar private in the Merger.

41.    Defendant Shaohua Jia ("Jia") has served as a member of JA Solar's Board of Directors since October 2012.  He served as Chairman of the Special Committee of the Board that approved the Merger, as described further below.  Jia also served on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee of JA Solar's Board.

42.    Defendants Jin and Jia are collectively referred to hereinafter as the "Individual Defendants."

43.    JA Solar and the Individual Defendants are collectively referred to herein as "Defendants."

**C.    The Special Committee**

44.    In June 2015, JA Solar's Board of Directors formed a special committee that consisted of directors that the Company described as "independent directors" to advise the Board about a potential going-private transaction that was being considered at that time (the "Special Committee").  The Special Committee consisted of just two members: Defendant Jia, who served as its Chairman, and Mr. Yuwen Zhao.  The Special Committee remained intact when it came time to consider the Merger in 2017.

45.    The Special Committee was instructed to "to take any actions it deems appropriate to assess the fairness and viability of" the proposed Merger.  The Board did not place any limitations on the authority of the Special Committee regarding its investigation and evaluation of the proposed Merger.

### D.     The Buyer Group

46.     Defendant Jin led the group of buyers that took JA Solar private in the Merger and owned 100% of the private company following the Merger (the "Buyer Group").  The other members of the Buyer Group included Mr. Chin Tien Huang, Ms. Pak Wai Wong, Ms. Chi Fung Wong, Jinglong BVI, and other entities that were created solely for purposes of the Merger.  The members of the Buyer Group other than these newly formed entities are known as the "Rollover Shareholders" because their prior ownership interests in the Company would continue through the Merger and they would collectively proceed to own 100% of the Company in its newly private form after the Merger.

47.     The entities that were created solely for the Merger included JASO Holdings Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Holdco"); JASO Parent Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands, and a wholly owned subsidiary of Holdco ("Parent"); JASO Acquisition Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands, and a wholly owned subsidiary of Parent ("Merger Sub"); and JASO Top Holdings Limited ("JASO Top"), a Cayman Islands company that wholly owned Holdco prior to the Merger and was wholly owned by Defendant Jin.  Holdco, Parent and Merger Sub are collectively referred to as the "Parent Parties."

48.     In the Merger, Merger Sub would be merged with and into JA Solar, with the Company continuing as the surviving company and becoming a wholly owned subsidiary of JASO Parent Limited.

49.     ***The stated goal of the Merger was for JA Solar to continue its operations as a privately held company and to be wholly owned by the Buyer Group, with JA Solar's ADS retired and no longer publicly listed on the NASDAQ.***

50.    Prior to the Merger, the Buyer Group beneficially owned 61,036,142 shares (including shares represented by ADS) of JA Solar stock, which represented approximately 25.7% of the Company's approximately 238 million total issued and outstanding pre-Merger shares.  Defendant Jin and Jinglong BVI (which was 32.96% owned by Jin, who was Jinglong BVI's sole Director) together owned 16.5% of the Company's total outstanding pre-Merger shares, and the remaining members of the Buyer Group (Mr. Chin Tien Huang, Ms. Pak Wai Wong, and Ms. Chi Fung Wong) together owned 9.2%.  Mr. Bingyan Ren, who owned 4.79% of Jinglong BVI, was also a Director of JA Solar.[2]

51.    As a result of the Merger, Defendant Jin, Jinglong BVI, and Mr. Chin Tien Huang, Ms. Pak Wai Wong, and Ms. Chi Fung Wong would own 79.8% (including 5.4% indirectly owned by Mr. Jin through his 32.96% equity interest in Jinglong BVI), 16.3%, 4.3%, 3.8%, and 1.2% of the surviving Company, respectively, totaling 100% of the equity in the newly private Company.

E.    **Tianye Tonglian**

52.    On July 19, 2018, just three days after the Merger closed, it was revealed that Tianye Tonglian, a manufacturer of heavy equipment based in the People's Republic of China, would acquire JA Solar in a deal that would also involve Jingao Solar Energy, Co., Ltd, a wholly owned subsidiary of the Jinglong entities that Defendant Jin controlled.  Tianye Tonglian was a publicly traded company on the Shenzhen Stock Exchange in China.  Pursuant to the agreement that Tianye Tonglian and JA Solar reached, Tianye Tonglian would issue shares in exchange for 100% of JA Solar's equity. This deal operated as a "backdoor listing" that would allow JA Solar

_____

[2] The other owners of Jinglong BVI were Mr. Huixian Wang, Mr. Binguo Liu, Mr. Jicun Yan, Mr. Rongrui Liu, Mr. Huiqiang Liu Mr. Ruiying Cao, Mr. Guichun Xing, Mr. Ning Wen, and Mr. Ruchang Wen.

to return to the stock market in China by relisting on the Shenzhen Stock Exchange at a multiple of its prior value, to the detriment of its former Securityholders who had unknowingly sold their JA Solar Securities at substantially deflated values during the Class Period.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Overview of JA Solar's Business

53.    JA Solar is a Chinese solar power company.  It primarily designs, develops, manufactures and sells solar power products that convert sunlight into electricity for a variety of uses.  JA Solar is purported to be one of the world's largest manufacturers of high-performance solar power products

54.    The Company is incorporated in the Cayman Islands, with its principal executive offices located at Building No.8, Noble Center, Automobile Museum East Road, Fengtai, Beijing 100070, The People's Republic of China.

55.    Defendant Jin founded JA Solar in 2005 as an entity called JA Hebei.  The Company restructured in 2006 to operate through various subsidiaries under the holding company JA Solar.  JA Solar completed its initial public offering in February 2007 and had its ADS listed on the NASDAQ.  Through the IPO, its ADS sold for $15 each, raising $258,750,000 in cash on an implied equity valuation of $414,810,000 (after accounting for shares that were held through the IPO).  JA Solar's ADS listed on the NASDAQ were the Company's only publicly traded securities from the time of its IPO through the completion of the Merger.  From December 10, 2012 through the completion of the Merger, each JA Solar ADS represented five of the Company's ordinary shares.  The only public market for JA Solar's equity was through its NASDAQ-listed ADS.

56.    JA Solar's primary business has been the manufacturing and sales of solar cells. In the fourth quarter of 2009, it expanded its business to silicon wafers manufacturing and

manufacturing and sales of solar modules.  The Company sells its products mainly under its "JA Solar" brand name, and also produces original equipment for third parties under their brand names.

57.     JA Solar further expanded its business in 2013 to engage in project development activities and it started to sell electricity in 2015.  JA Solar's website showcases some of its major projects, such as a solar power station in Southwark, UK capable of producing 49 megawatts of electricity; a 132.5 megawatt capacity solar power station in the Philippines; and an 80 megawatt station in Utah.  It also engaged in smaller projects, including many high profile projects in the United States, ranging from the installation of a two megawatt project on the roof of Lincoln Stadium, where the Philadelphia Eagles professional football team plays, a 1.1 megawatt project on the roof of a Macy's department store in New Jersey, and a 9.5 megawatt capacity project in Tennessee, which was then the largest solar installation in the state.

58.     JA Solar sells its products to customers in over 90 countries, including China, the U.S., Japan, United Kingdom, India, Thailand, the Netherlands, Australia, Switzerland and Guatemala.  According to the Company, in 2017, 51.5% of its total revenues were generated from sales to customers outside China.  For the years ended December 31, 2015, 2016 and 2017, JA Solar generated approximately 13.5 billion RMB (or approximately $2 billion), 15.7 RMB (or approximately $2.3 billion), and 19.7 RMB in total revenue (or approximately $2.9 billion), respectively.

**B.      Defendant Jin's Multiple and Conflicting Ties to The Company**

59.     Defendant Jin and his related entities played a central role in JA Solar.  Jin controlled the Jinglong group of entities that (1) owned the largest stake in JA Solar prior to the Merger; (2) were part of the Buyer Group that continued to own a substantial stake in the

Company after the Merger; (3) did substantial business with JA Solar in related-party transactions; and (4) facilitated the relisting transaction following the Merger.

60.    Jinglong BVI—which was part of the Jinglong group of entities—was JA Solar's largest shareholder prior to the Merger (owning approximately 16.3% of the Company) and would continue to own that stake following the Merger.  Defendant Jin controlled Jinglong BVI, owning approximately 32.96% of that company and serving as its sole director.

61.    Jinglong BVI also shared several other close connections with the Company. Mr. Bingyan Ren, who owned 4.79% of Jinglong BVI, was also a Director of JA Solar.  In addition, Jinglong BVI shared the same address as JA Solar at Building No. 8, Noble Center, Automobile Museum East Road, Fengtai, Beijing 100070, People's Republic of China.

62.    Defendant Jin also controlled Hebei Jinglong through Jin's control of Jinglong BVI.  Hebei Jinglong did substantial business with JA Solar.  Defendant Jin was the Chairman and largest shareholder of Hebei Jinglong.  JA Solar considered Hebei Jinglong to be a "related party" to the Company.  Defendant Jin owned 78.45% of Hebei Jinglong, and Mr. Bingyan Ren, a JA Solar Director, owned a 4.79% stake in Hebei Jinglong.

63.    Hebei Jinglong and its subsidiaries are one of JA Solar's main suppliers of polysilicon and silicon wafers, which are essential materials for the Company's products.  In 2017 alone, JA Solar spent 2.8 billion RMB (or approximately $406 million) on the purchase of products from subsidiaries of Hebei Jinglong, among JA Solar's many other related-party transactions with the Jinglong entities.

64.    JA Solar also leased properties from Hebei Jinglong (including for $5.5 million in 2017) and received guarantees from it for certain of its loans.

65.     Several of JA Solar's directors also served various roles in the Jinglong entities, including Yuhong Fan, a JA Solar Director who was the deputy general manager of Jinglong Group from July 2009 to 2016; Bingyan Ren, a JA Solar Director who served as a director and vice chairman of Hebei Jinglong since 2003; and Erying Jia, a JA Solar Director who also served as the chief operating officer and director of Hebei Jinglong since January 2006.

66.     Overall, JA Solar explained that "Jinglong BVI may exert significant influence on our affairs through our board of directors" and may have interests that conflict with the Company's interests, including in the Merger and in the Company's substantial transactions with Hebei Jinglong.  Even so, these connections did not stop Defendant Jin from simultaneously controlling JA Solar and the Jinglong entities before, during, and after the Merger.

### C.     History of the Merger

67.     The Buyer Group, led by Defendant Jin, initially tried to buy JA Solar in June 2015.  On June 5, 2015, the Buyer Group submitted a preliminary non-binding proposal letter to JA Solar's Board of Directors to indicate its intention to acquire all of the outstanding shares of the Company not already owned by the Buyer Group in a going private transaction for $9.69 per ADS in cash.  The Buyer Group engaged Skadden, Arps, Slate, Meagher & Flom LLP as its "international legal counsel" in connection with its proposed transaction.

68.     JA Solar initially established the Special Committee to consider the Buyer Group's proposal in 2015.  The Board of Directors gave the Special Committee "the power and authority to, among other things, (i) investigate, evaluate, discuss, and negotiate the Proposed Transaction, (ii) make reports and recommendations to the Board as the Special Committee considers appropriate with respect to the Proposed Transaction, (iii) retain any advisors, including independent legal counsel, financial advisors, and outside counsel, as the Special Committee deems appropriate to assist the Special Committee in discharging its responsibilities,

and (iv) exercise any other power that may be otherwise exercised by the Board and that the Special Committee may determine is necessary or advisable to carry out and fulfill its duties and responsibilities through the abandonment or completion of the Proposed Transaction."

69.     The Special Committee engaged Houlihan Lokey as its "independent financial advisor" and Gibson, Dunn & Crutcher LLP as its "independent U.S. legal advisor."

70.     According to JA Solar, the going private transaction was "put on hold" from October 27, 2015 to May 3, 2017 because the Buyer Group could not secure adequate financing for the transaction.

71.     On June 6, 2017, the Buyer Group submitted a new proposal to take the Company private, lowering its offering price to $6.80 per ADS in cash.  The Buyer Group gave the following reasons to justify its lowered offering price, including, among others, "(i) significant volatility in global financial markets hindering the Buyer Group's ability to secure financing, (ii) poor short term outlook for the solar industry, (ii) increased uncertainty in trade policy and government subsidies affecting the Company's growth prospects, and (iv) economic slowdown and challenges in China."

72.     After negotiations with the Special Committee, on October 27, 2017, the Buyer Group raised its offer to $7.55 per ADS (and $1.51 per share).  The Buyer Group described this offer of as its "best and final" offer.

73.     On November 16, 2017, following negotiations between the Buyer Group and the Special Committee over the price and terms of the transaction, Houlihan Lokey told the Special Committee that it determined that the consideration of $7.55 per ADS was "fair, from a financial point of view."

74.     Based on this price, the Proposed Transaction implied an equity value of the Company of approximately $360 million.

75.     That same day, both members of the Special Committee approved the proposed Merger and recommended that the Company's Board of Directors authorize and approve the transaction.

76.     Shares owned by shareholders that validly exercised their right to dissent from the Merger under Cayman Islands law, and the shares of the Rollover Shareholders that were part of the Buyer Group were excluded from receiving the Merger consideration.

77.     The Board, excluding Defendant Jin, then met and unanimously approved of the proposed Merger.  The Board concluded that the Merger was "fair to and in the best interests of the Company and the Unaffiliated Security Holders" (i.e., ordinary shareholders including ADS holders that were not affiliated with the Company, including the Buyer Group).

78.     The following day, on November 17, 2017, the Company and Buyer Group executed the Merger Agreement and related documentation for the proposed transaction.

79.     The Special Committee and the Board promoted the Merger as advisable by marching out a parade of horribles regarding the economic condition of JA Solar and the market it operated within, including:

    a.  The weak outlook for the solar industry due to overcapacity and slowing demand;

    b.  Weak demand and lower prices for the Company's products in China and the expectation that there will be similar declines in key growth markets, including South America and India;

    c.  Uncertainty surrounding ongoing trade cases in the U.S. and India and the existing and potential additional sanctions on solar panel products from China;

d.  China's economic slowdown generally, and slowdown in the Chinese solar industry specifically, including decreased demand for photovoltaic modules and overcapacity in the Chinese solar industry;

e.  The lack of other potentially interested buyers; no interested bidder submitted an indication of interest during the "market check" process conducted by Houlihan Lokey after receipt of the original going private proposal on June 5, 2015, and the Company had received no alternative proposals following the public disclosure of the Company's receipt of the revised going private proposal on June 6, 2017;

f.  The Special Committee's knowledge of the Company's business, financial condition, results of operations, prospects and competitive position and their belief that the Merger is financially more favorable to the Unaffiliated Security Holders than any other alternative reasonably available to the Company and the Unaffiliated Security Holders;

g.  Estimated forecasts of the Company's future financial performance prepared by the Company's management, together with the Company's management's view of the Company's financial condition, results of operations, business, prospects and competitive position;

h.  The current and historical market prices of ADSs, and the fact that the Per ADS Merger Consideration of US$7.55 offered to the Unaffiliated Security Holders represented a premium of 18.2% over the closing price on June 5, 2017, the last trading day prior to the Company's announcement that it had received a revised going private proposal, and a premium of 24.6% to the average closing price of the Company's ADSs during the 3-month period prior to its receipt of the revised going private proposal;

i.  The possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded entity and the perceived risks of that alterative), the range of potential benefits to its shareholders of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account the likelihood of execution as well as business, competitive, industry and market risks;

j.  The financial analysis reviewed by Houlihan Lokey with the Special Committee, as well as the oral opinion of Houlihan Lokey rendered to the Special Committee on November 16, 2017.

80.     On November 20, 2017, the Company issued a press release that it filed with the SEC announcing the proposed Merger.

81.     In order for the Merger to take place, it would have to be approved by the Company's Securityholders at a shareholder vote that would take place at an extraordinary general meeting that was scheduled for March 12, 2018.

82.     Approval of the Merger required an affirmative vote of Securityholders representing at least two-thirds of the Company's shares that were present and voting (as opposed to total outstanding Shares) in person or by proxy as a single class at the extraordinary general meeting where the shareholder vote on the Merger would take place.

83.     The SEC noted in a December 29, 2017 comment letter that the shareholder vote required "***two thirds of shares <u>present</u> (as opposed to a percentage of shares outstanding)***" for the Merger to pass.  Because the Rollover Shareholders owned only 25.7% of the total voting rights in the Company, the Merger still required Securityholders that were unaffiliated with the Buyer Group to approve the Merger in order for it to pass.  If all outstanding shares of the Company would be present and voting at the extraordinary general meeting, 55.2% of the total issued and outstanding shares entitled to vote that were owned by unaffiliated Securityholders would need to be voted in favor of the Merger in order for it to be approved.

**D.      The Misleading Proxy Materials**

84.     Between November 17, 2017 and February 1, 2018, in order to convince JA Solar Securityholders to vote in favor of the Merger, Defendants authorized the filing of materially false and misleading Proxy Materials with the SEC, in violation of Sections 10(b) and 20(a) of the Exchange Act.  As described further below, the Proxy Materials contained materially false and misleading statements and failed to provide all material information related to the Merger.

### 1.  Dissenting From the Merger Was Difficult and Discouraged

85.  Shareholders had a right to dissent from the proposed Merger and to exercise their appraisal rights "to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law."  But Defendants warned in the Proxy Materials that dissenting was a very risky proposition because "[t]he fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do not exercise dissenters' rights with respect to their Shares.  These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy the procedural requirements of the Cayman Islands Companies Law, you will lose your Dissenters' Rights."  Defendants further warned that "[t]he provisions of Section 238 of the Cayman Islands Companies Law are technical and complex.  If you fail to comply strictly with the procedures set forth in Section 238, you will lose your dissenters' rights.  You should consult your Cayman Islands legal counsel if you wish to exercise dissenters' rights."[3]

86.  And dissenting was even more difficult because, as Defendants warned in the Proxy Materials, "THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO."  According to the Proxy Materials, in order to validly dissent, ADS holders were required to go through extra complicated procedural steps and bear the extra costs of doing so.

---

[3] These steps are recounted here to explain what investors were told, but are not necessarily indicative of Lead Plaintiffs' position as to the actual steps necessary to exercise appraisal rights under the applicable law.

87.     These steps included their surrendering ADS to the ADS Depositary; paying the ADS Depositary's fees required for cancelling ADS; providing instructions for the registration of the underlying shares in the Company's register of members; certifying that they held ADS as of the ADS record date and would not give voting instructions for their ADS before 5:00 pm on February 9, 2018; and becoming registered holders of shares before the March 12, 2018 shareholder vote on the Merger.

88.     Investors were told that, only after all of these difficult and costly steps, could ADS holders object to and dissent from the shareholder vote.

89.     The false and misleading Proxy Materials that Defendants issued in connection with the Merger convinced most JA Solar Securityholders that there was no reason for them to take the risk and burden of dissenting from the Merger.

### 2.      Houlihan Lokey's Analysis of the Merger

90.     The Special Committee relied upon Houlihan Lokey's financial analysis in reaching the conclusion that the Merger was fair to JA Solar Securityholders that were unaffiliated with the Company (including the Buyer Group) and that the Board should authorize and approve the Merger.  The Special Committee and the Board expressly adopted Houlihan Lokey's analysis and opinions in reaching their respective determinations as to the fairness of the Merger.

91.     In conducting its analysis, Houlihan Lokey relied on information that the Company provided to it.  For example, Houlihan Lokey stated in its written Fairness Opinion that "[w]e have relied upon and assumed, without independent verification, the accuracy and completeness of all data, material and other information furnished, or otherwise made available to us, discussed with or reviewed by us, or publicly available, and do not assume any responsibility with respect to such data, material and other information.   In addition,

management of the Company has advised us, and we have assumed, that the financial projections reviewed by us have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such management as to the future financial results and condition of the Company, and we express no opinion with respect to such projections or the assumptions on which they are based."

92.     Houlihan Lokey further explained that "[w]e understand that the Rollover Shareholders (as defined in the Agreement) have indicated that they are only willing to consider entering into an agreement with Holdco and Parent and amongst themselves in relation to the Transaction and have no interest in entering into any agreement, arrangement or understanding with other parties as an alternative thereto."

93.     In addition, Houlihan Lokey expressly disclaimed any analysis of alternatives to the Merger.  Houlihan Lokey stated:

- We have not been requested to, and did not advise the Committee, the Board or any other party with respect to alternatives to the Transaction. This Opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. We have not undertaken, and are under no obligation, to update, revise, reaffirm or withdraw this Opinion, or otherwise comment on or consider events occurring or coming to our attention after the date hereof.

- We have not been requested to opine as to, and this Opinion does not express an opinion as to or otherwise address, among other things: . . . (iv) the relative merits of the Transaction as compared to any alternative business strategies or transactions that might be available for the Company or any other party or the effect of any other transaction in which the Company or any other party might engage, (v) the fairness of any portion or aspect of the Transaction to any one class or group of the Company's or any other party's security holders or other constituents vis-à-vis any other class or group of the Company's or such other party's security holders or other constituents (including, without limitation, the allocation of any consideration amongst or within such classes or groups of security holders or other constituents), (vi) whether or not the Company, its security holders or any other party is receiving or paying reasonably equivalent value in the Transaction.

94.    In a presentation that Houlihan Lokey gave to the Board dated November 16, 2017, it conducted a "selected companies analysis," whereby it compared JA Solar to other solar companies and valued JA Solar at a far-lower multiple as compared to these other companies along several key financial metrics.  Houlihan Lokey explained this discrepancy by providing several ways in which it claimed that JA Solar differed from these other solar companies.  Had Houlihan Lokey valued JA Solar similarly to these other solar companies (as it should have), it would have determined that the merger consideration substantially undervalued JA Solar.

95.    Similarly, Houlihan Lokey conducted a "selected transactions analysis" that involved looking at other merger and acquisition transactions involving solar companies, which also had higher multiples along key financial metrics than the Merger here.  Houlihan Lokey again explained away these discrepancies by claiming that these other companies were different than JA Solar in various ways.

96.    The Preliminary Proxy Statement stated only that the Special Committee and the Board adopted Houlihan Lokey's analysis, without noting that Houlihan Lokey ignored these basic valuation methods until the more-detailed description of Houlihan Lokey's analysis that came later in the Preliminary Proxy Statement.  By the Amended Proxy Statement and the Final Proxy Statement, in response to the SEC's comments suggesting that this explanation was deficient, Defendants revised their statements to explain that:

> The Special Committee and the Board noted that the financial analyses performed by Houlihan Lokey relied only on a discounted cash flows analysis while also presenting analyses with respect to selected companies and selected transactions for informational purposes only.  The Special Committee and the Board also noted Houlihan Lokey's view that the results derived from the selected companies analysis and selected transactions analysis do not provide a meaningful comparison to the Company. The Special Committee and the Board adopted Houlihan Lokey's financial analyses as a whole, including its determinations that the selected companies analysis and the selected transactions analysis did not result in meaningful comparisons with respect to the Company and the proposed

Merger. Accordingly, the Special Committee and the Board did not rely on such analyses in reaching their conclusion that the Per Share Merger Consideration to be received by holders of Shares (other than Excluded Shares) and the Per ADS Merger Consideration to be received by holders of ADSs (other than ADSs representing Excluded Shares) are fair, from a financial point of view, to such holders.

97.     A typical valuation analysis assesses the company at issue along several common measures, including a "discounted cash flow" analysis that focuses on the company's projected future cash flow based on key financial metrics; a "selected companies" analysis, which compares the company at issue other similar companies; and a "selected transactions" analysis, which compares the transaction at issue with other merger and acquisition transactions involving similar companies.

98.     Houlihan Lokey's analysis was extremely limited.  At best, it relied solely on a discounted cash flow ("DCF") analysis.  The only data that Houlihan Lokey based its conclusion on was the financial data provided by Company management (including management's flawed projections), assumptions that Houlihan Lokey built into that analysis, and "Selected Market Observations" that reviewed rudimentary public information about the Company (such as its trading history, ownership structure, and the estimates of analysts who did not have the benefit of confidential Company information).  This is outside of normal market practice and means that the fairness opinion was not backed by the accepted techniques that typically support such a valuation.  That is not to say that DCF analysis cannot be a suitable valuation technique, or that DCF can never stand alone as a suitable technique.  But it was highly misleading for Houlihan Lokey to offer what was packaged as a conventional "fairness opinion," when its opinion was not supported by the techniques typically used in such contexts.  Ultimately, Houlihan Lokey concluded: "it is our opinion that, as of [November 16, 2017], the Per Share Merger Consideration to be received by holders of Shares (other than Excluded Shares and Dissenting

Shares) and the Per ADS Merger Consideration to be received by holders of ADSs (other than

ADSs representing Excluded Shares) are fair, from a financial point of view, to such holders."

But Houlihan Lokey's thin analysis failed to serve as any meaningful check on Defendants'

efforts to depress the value of JA Solar Securities leading up to the Merger.

### 3.    Assurances That no Relisting was Contemplated

99.    In addition to the previously described efforts to discourage dissent and

undervalue the Company, JA Solar's biggest act of deception was hiding its plans to engage in a

relisting in China following the transaction.  Toward this end, the Proxy Materials expressly

disclaimed that any such transaction was in the works.

100.    For example, on December 11, 2017, Defendants published and signed the

"Preliminary Proxy Materials," which made numerous assurances that no transaction was under

consideration, such as by stating that:

    a.  "If the Merger is completed, the Company will continue its operations as a privately held company and will be wholly owned by the Buyer Group."

    b.  "[T]he Buyer Group anticipates[4] that the Company's operations will be conducted substantially as they are currently being conducted, except that the Company will cease to be a publicly traded company and will instead be a wholly owned subsidiary of Parent, which itself is wholly owned by Holdco."

    c.  "The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company."

    d.  "Other than as described in this proxy statement and transactions already under consideration by the Company, there are no present plans or proposals that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a Merger, reorganization,

---

[4] Statements designated from the perspective of the Buyer Group, necessarily purport to convey the position of Defendant Jin, as he was the controlling member of the Buyer Group.

          liquidation, relocation of any material operations, or sale or transfer of a material amount of assets."

    e.   "[A]n equity investment in the Surviving Company by the Buyer Group following the Merger will involve substantial risk resulting from the limited liquidity of such an investment" given that "following the Merger, there will be no trading market for the Surviving Company's equity securities."

    f.   "The Company is not aware of any firm offers made by any unaffiliated person, other than the filing persons, during the past two years for (i) a Merger or consolidation of the Company with or into another company, (ii) a sale of all or a substantial part of the Company's assets or (iii) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company."

101.   The Preliminary Proxy Statement also noted the warranty that the Parent Parties made to the Company of "the absence of undisclosed agreements or arrangements involving Holdco, Parent, Merger Sub, or any of their respective affiliates, shareholders, directors, officers, employees or other affiliates of the Company or any of its subsidiaries, in each case relating to the Merger."   And the Preliminary Proxy Statement similarly assured investors that the listed factors that had been considered—which did not describe any potential relisting—were "believed" by the Buyer Group to "include all material factors considered."

102.   These limitations also informed Houlihan Lokey's analysis and fairness opinion. The Preliminary Proxy Statement stated that "Houlihan Lokey understood that the Rollover Shareholders had indicated that they were only willing to consider entering into an agreement with Holdco and Parent and amongst themselves in relation to the Merger and had no interest in entering into any agreement, arrangement or understanding with other parties as an alternative thereto."   Additionally, Houlihan Lokey made a number of representations that there were not any other "interested potential buyers."   Similarly, the Preliminary Proxy Statement affirmed that

"the Special Committee determined that there was no viable alternative to the proposed sale of the Company to the Buyer Group."

103.    After publishing the Proxy Materials, JA Solar posted an unusual notice on the front page of its corporate website in December 2017 that further assured investors that it had no plans to relist its shares in China.  This notice is believed, based on a search of Internet archives, to have remained on JA Solar's website for at least several months, into March 2018, if not later. The message assured investors that:

> JA Solar Co. Ltd. currently does not have plans to list domestically.  JA Solar Co. Ltd. and its related parties have not and will not issue any fundraising notices, announcements, or internal messages in relation to a relisting, much less will it take any public placement actions in relation to a relisting. Any fundraising behavior in relation to a relisting by JA Solar Co. Ltd. is not being done by JA Solar Co. Ltd. or Jinglong Industrial Group Co. Ltd. and does not have their approval. Such fundraising behavior may be committing the crimes of illegal fundraising or fraud. We ask that society and the public not allow themselves to be cheated.

104.    This emphatic denial effectively—but falsely—quelled any speculation as to whether JA Solar was planning to relist in China following the Merger.  This disavowal referred not only to the Company's activities as of the announcement, but also affirmed that the Company "will not" undertake any relisting actions going forward.  The following image, from an archived version of JA Solar's website, shows how prominently this message was displayed, in the top-right corner:



105.    The Amended Proxy Materials, published January 11, 2018, continued the fraudulent scheme by reproducing the false and misleading statements concerning the intention of the Buyer Group not to relist JA Solar following the Merger.  It assured investors that the Amended Proxy contained "all material factors considered by the Special Committee and the Board."  The Preliminary Proxy Statement contained a similar statement as to the Buyer Group, which is also in the Amended Proxy Statement, but not as to the Special Committee and the Board.  The Amended Proxy Statement was revised to add this statement as to the Special Committee and the Board only because the SEC specifically called out the Preliminary Proxy Statement for failing to clarify whether it "disclosed all material factors considered in reaching a fairness determination instead of 'a number' of those factors."[5]

106.    On February 1, 2018, JA Solar published the Second Amended Proxy Materials and reproduced the false statements that had appeared in the Proxy Materials and Amended Proxy Materials.

_____

[5] The SEC's correspondence can be found in a December 29, 2017 letter (filed with the SEC on January 3, 2018) and JA Solar's response that it filed with the SEC on January 11, 2018.

E.      The Shareholder Vote and Completion of the Merger

107.    On March 12, 2018, JA Solar announced that at the extraordinary general meeting of shareholders held that day, the Company's shareholders voted in favor of the Merger.

108.    JA Solar announced that day that approximately 56.5% of the Company's total outstanding ordinary shares presented in person or by proxy at the meeting.  The Merger was approved by over 90% of the ordinary shares that voted.   While this 90% number could superficially appear as a vote of confidence, the low turnout meant that only about 30% of the outstanding non-affiliated shares voted in favor of the transaction, with the remaining roughly 70% either voting against the Merger or, for approximately 43.5% of the Company's total outstanding shares, abstaining from the vote.  If JA Solar Securityholders knew the truth about the Merger, they could have prevented it from taking place by voting against it, instead of abstaining.

109.    While the Merger passed, holders of over 10% of the Company's ordinary shares exercised their dissenting rights under Section 238(2) of the Cayman Islands Companies Law and objected to the Merger.

110.    Because holders of over 10% of the Company's ordinary shares objected to the Merger, both the Company and the Parent Parties (who were closely associated with the Buyer Group) had the right to terminate the transaction unless the Parent Parties irrevocably waived that condition within 10 business days. This type of clause is often referred to as a "Blow Provision."

111.    The Company stated when announcing the results of the shareholder vote that it would "update its shareholders if and when it receives from the Parent Parties their decision with respect to their granting of the waiver in due course."  But the Company never ended up making

any further disclosures on this topic even though the Merger would successfully close with neither the Company nor the buyers taking any steps to terminate the Merger.

112.    The dissenting shareholders and JA Solar were unable to agree on a price for the dissenting shares during the 30-day negotiation period provided for under Cayman Islands law. An appraisal action was therefore commenced in the Grand Court of the Cayman Islands on August 23, 2018.  Other than the appraisal petition that JA Solar filed pursuant to Cayman Islands law, the records from that proceeding are not publicly available.

113.    Immediately following the completion of the Merger, the members of the Buyer Group owned 100% of the surviving Company through their interests in Holdco as follows:

| Party | Ownership Interest[6] |
|---|---|
| Defendant Jin | 79.8%[7] |
| Jinglong BVI<br>(which Defendant Jin was the sole director of and owned 32.96%) | 16.3% |
| Mr. Chin Tien Huang | 4.3% |
| Ms. Pak Wai Wong | 3.8% |
| Ms. Chi Fung Wong | 1.2% |

114.    The Merger thus raised Jin's stake in the Company from 5.4% to 79.8%, at the expense of ordinary unaffiliated JA Solar Securityholders, while leaving the ownership interests of the other members of the Buyer Group the same as before the Merger.  The overall purpose of the Merger was to allow Company insiders, led by Defendant Jin, to take over 100% of JA Solar at a substantial discount to its actual value so that—unbeknownst to ordinary JA Solar

---

[6] After subtracting the 5.4% of Defendant Jin's ownership through Jinglong BVI from his 79.8% share to avoid double-counting, these parties' ownership percentages of the newly private JA Solar add up to 100%.

[7] Defendant Jin's 79.8% stake includes 74.4% that he owned through his sole ownership of JASO Top and 5.4% that he owned indirectly through his 32.96% equity interest in Jinglong BVI.

Securityholders—they could proceed to relist the Company in China for several times what they paid to take it private in the United States.

115.    In addition, Defendant Jin substantially increased his stake in the Company through the Merger, so that he owned approximately 80% of the surviving private Company. On the other hand, the other members of the Buyer Group simply maintained their same level of ownership as before the Merger, though they also stood to benefit from the plan to relist the Company in China at a higher valuation. This further highlights the extent of Defendant Jin's control over JA Solar and the Merger.

116.    Following the Merger, Defendant Jin would continue to serve as the Chairman of the Board and CEO of the surviving Company.

### F.    JA Solar Completes the Merger

117.    On July 16, 2018, JA Solar completed the Merger. As a result, the Company ceased to be a publicly traded company and became a wholly owned subsidiary of an entity owned entirely by Defendant Jin and the rest of the Buyer Group. Each of the Company's ordinary shares was cancelled in exchange for the right to receive $1.51 in cash per share and each of the Company's ADS was cancelled in exchange for the right to receive US$7.55 in cash per ADS—other than shares held by the Buyer Group (which were rolled over into shares in the newly private JA Solar) and shares held by Securityholders that validly exercised their right under Cayman Islands law to dissent from the Merger.

118.    Also on July 16, 2018, JA Solar issued its final amendment to the Proxy Materials, which described the completion of the Merger and incorporated the Final Proxy Statement that JA Solar had published on February 1, 2018. JA Solar also issued a press release on July 16, 2018 that it filed with the SEC announcing the completion of the Merger. In that press release, the Company explained how Securityholders could tender their JA Solar Securities

and assent to the sale, in order to receive the Merger consideration.  The Company explained: "Each registered shareholder as of the effective time of the merger who is entitled to the merger consideration will receive a letter of transmittal and instructions from the paying agent on how to surrender their share certificates (or affidavits and indemnities of loss in lieu of the share certificates) or non-certificated shares represented by book entry in exchange for the merger consideration. . . .  Each registered shareholder will receive in exchange of the shares or ADSs surrendered a check in an amount equal to the merger consideration to which such holder is entitled. Merger consideration is not payable to untraceable shareholders unless such shareholders properly notify the paying agent or the depositary of their current contact details prior to the effective time."

119.    In addition, on July 16, 2018, JA Solar gave notice to the SEC of the removal of its shares from listing and of the termination of its registration under the Exchange Act.

**G.    The Proxy Materials Understated JA Solar's Financial Performance**

120.    On April 30, 2018, just seven weeks after the March 12, 2018 shareholder vote on the Merger, JA Solar released its financial results and Annual Report for 2017.  The Company's statements in these disclosures concerning its business outlook and financial results were a marked contrast from the statements that the Company disclosed to Securityholders in the Proxy Materials that it published less than six weeks before the shareholder vote.

121.    The Proxy Materials painted a bleak picture of the Company's business prospects because of, among other things, what Defendants described as "[t]he weak outlook for the solar industry due to overcapacity and slowing demand," "[w]eak demand and lower prices for the Company's products in China and the expectation that there will be similar declines in key growth markets, including South America and India," and  "China's economic slowdown

generally, and slowdown in the Chinese solar industry specifically, including decreased demand for photovoltaic modules and overcapacity in the Chinese solar industry."

122.    The 2017 Annual Report, however, painted a very different picture.  The 2017 Annual Report assured that although there was a "severe downturn" in global industry demand for solar power products in 2012 and 2013, "industry demand revived in 2015 and 2016 due to the development of emerging markets, such as China and the U.S."  The Company further "expect[ed] industry demand [to have] significant growth in 2017 and 2018, because of the development of China, India and emerging markets."

123.    JA Solar also expected in the 2017 Annual Report that its "sales of solar power products in China . . . [will] benefit from the recently promulgated PRC laws, regulations and government policies regarding solar energy and other renewable energy, which are intended to provide incentives or otherwise encourage the development of the solar or other renewable energy sectors in China."

124.    JA Solar's financial results that it disclosed in the 2017 Annual Report were also notably better than the "projections" that the Company provided in the Proxy Materials and that formed the basis for Houlihan Lokey's financial analysis for the Special Committee.  The Proxy Statements that JA Solar released on January 11, 2018 and February 1, 2018 (after the Company's fiscal 2017 was completed) stated that the Company's estimated total revenue for 2017 would be $2.596 billion and its estimated net income for 2017 would be $39 million. (When JA Solar had earlier issued its Preliminary Proxy Statement on December 11, 2017, its financial projections for 2017 were provided in RMB instead of U.S. dollars.)

125.    When the Company released its actual financial results for 2017 on April 30, 2018, less than two months after the March 12 shareholder vote, it disclosed its total revenue for

2017 to be $3.022 billion and its net income to be $46 million.[8] These figures were approximately 16% and 18% higher, respectively, than the total revenue and net income estimates for 2017 that formed a crucial basis for JA Solar Securityholders to decide whether to vote in favor of the Merger.

126.    The divergence between JA Solar's projections in the Proxy Materials and actual results that followed shortly after is even more striking when focusing specifically on the fourth quarter of 2017.  This is the most meaningful perspective because when JA Solar gave its 2017 projections to Houlihan Lokey, the first three quarters of the year were already complete and only half of the fourth quarter remained.  Houlihan Lokey explained in its November 16, 2017 presentation to the Special Committee that Houlihan Lokey's estimates for 2017 "[r]epresent[ed] a 1.5 month stub period ending 12/31/2017 considering FY2017E projections minus nine months ended 9/30/2017 actual results."  The following table shows the projections that JA Solar gave to Houlihan Lokey for the fourth quarter of 2017[9] as compared to the actual results that it reported for that quarter[10]:

---

[8] In RMB, JA Solar estimated in the Preliminary Proxy Statement that its total revenue for 2017 would be 17.263 billion RMB and its net income would be 259 million RMB.  Its actual total revenue, as disclosed in the 2017 Annual Report was 19.658 billion RMB and its actual net income was 300 million RMB.

[9] These projections are derived by subtracting JA Solar's actual results that it reported for the first three quarters of 2017 (in a November 15, 2017 press release that it filed with the SEC as an exhibit to a Form 6-K) from the full year projections that JA Solar gave to Houlihan Lokey during the fourth quarter (as reported in the Proxy Materials).

[10] JA Solar reported its results for the fourth quarter of 2017 in an April 30, 2018 press release that it filed with the SEC as an exhibit to a Form 6-K and in its 2017 Annual Report.

|  | Projected | Actual | % Understated |
|---|---|---|---|
| Total Revenue (USD) | $494 million | $871.8 million | 76% |
| Total Revenue (RMB) | RMB 3.276 billion | RMB 5.7 billion |  |
| Net Income (USD) | $11.25 million | $17.8 million | 58% |
| Net Income (RMB) | RMB 74.18 million | RMB 115.5 million |  |

127.    This shows that the projections that the Company gave to Houlihan Lokey for the fourth quarter of 2017, and that Houlihan Lokey used as a basis for its analysis once that quarter was already half over, understated the actual revenue for that quarter by approximately 76% and understated the net income for that quarter by approximately 58%.

128.    Those projections were all-the-more important to the Merger, because Houlihan expressly disclaimed any reliance on the standard "selected companies" and "selected transactions" analyses that are typically done in merger valuations.  Houlihan relied, instead, exclusively on its financial analysis of JA Solar "based on the financial projections prepared by the management of the Company."

129.    This created the perfect storm whereby JA Solar Securityholders were forced to decide whether to approve the Merger based entirely on the recommendations and/or fairness determinations in the Proxy Materials of the Special Committee, the Board, Houlihan Lokey, and the Buyer Group that, in turn, were based solely on Company management's false financial projections and inaccurate characterizations of JA Solar's business conditions.

H.    JA Solar's Relisting

1.    Many Sources Confirm That the Buyer Group Planned All Along to Relist JA Solar

130.    Prior to announcing the Merger, on November 19, 2017, in a speech spoken in Chinese at the "2017 Entrepreneur 'To Conscience' (Beijing) Forum" in Beijing, China, Defendant Jin stated that JA Solar had plans to return to the Chinese capital markets in a publicly traded form within the following two or three years.

131.    This statement at the "2017 Entrepreneur 'To Conscience' (Beijing) Forum" did not notify JA Solar Securityholders of the Company's intent to relist immediately following the Merger because these informal remarks were by no means a definitive statement of the Company's plans.  And because these statements were made in a foreign language in China, they were not accessible to ADS holders, whose securities traded on the NASDAQ in the U.S. Furthermore, even if these statements would have been enough to inform investors of the plans at the time, the statements in the Proxy Materials, JA Solar's website, the Amended Proxy Materials, and the Second Amended Proxy Materials, were all published after this speech. Investors were entitled to take at face value the assurance in those later statements that the Company had no plans to relist.  Defendant Jin's November 2017 statement does, however, show when put in the context of all of the other evidence described herein that it was his intent as of that time to relist the Company following the Merger.

132.    Within the Company, the relisting plans were being widely discussed, further confirming that it was always Defendants' goal to relist in China.  Several reports by former JA Solar employees confirm this point:

133.    Confidential Witness ("CW") 1 was a sales manager in JA Solar's Shanghai office from before the start of the Class Period to 2018 and reported to a senior member of the Sales group for mainland China.  CW 1 recalled hearing about the delisting plan at the beginning of 2018 at the same time that he[11] heard about the relisting plan.   He further explained that he heard that JA Solar would probably be relisted on the A-Shares market in China at the beginning of 2018.

---

[11] CWs are referred to with male pronouns regardless of their gender.

134.    CW 2 was a financial analyst responsible for budget analysis within JA Solar's Beijing office from 2015 until after the Merger closed in July 2018, and reported to a senior member of the financial analysis team.  CW 2 stated that he first heard about the delisting plan sometime in 2017 and heard that JA Solar probably would be relisted on the A-shares market after hearing about the delisting plan.

135.    CW 3 worked on financial analysis, including JA Solar's financial reports, in JA Solar's Beijing office from before the start of the Class Period to 2018.  CW 3 reported to a senior member of JA Solar's financial analysis group.  CW 3 recalled visiting JA Solar's website and seeing a message that said there was a rumor that JA Solar will be relisted in Chinese capital markets and telling people not to believe the rumors.[12]  CW 3 said that even after this message was posted the internal rumors regarding JA Solar's relisting continued.  CW 3 also explained that in May or June of 2018 (*i.e.*, before the Merger closed), an audit team from BDO China came to JA Solar's Beijing office.  CW 3 asked one of the people from BDO China which capital market the Company was going to be relisted in, and one of the auditors told him that it was not decided.  CW 3 then asked, how they could issue the audit report (*i.e.*, without a particular market), and the person from BDO China told him that they would audit each single subsidiary first, and then wait for the company's decision on corporate structure before they produced a consolidated audit.  CW 3 added that it was possible BDO China already knew the decision, but did not want to tell him the answer, since he was planning to leave the Company.

136.    This shows that by May or June of 2018, JA Solar was already far enough along in its relisting plans to have its Chinese auditor begin its audit that would be necessary for the transaction to take place.  Having an independent auditor such as BDO China visit to conduct an

---

[12] This appears to be a reference to the message discussed in Paragraphs 103-04 above.

onsite audit would typically not occur until the final stages of the type of backdoor listing process.  Otherwise the company undergoing the relisting would risk wasting resources on an intensive audit that might not be necessary or that might be obsolete and need to be redone by the time the relisting transaction is materially agreed upon, or if the relisting occurred in a jurisdiction with different audit requirements.

137.    Counsel has also reviewed a translated resume from a former employee of BDO China indicating that beginning in May 2018, this former employee worked on an audit of a JA Solar subsidiary for an "IPO listing."  This not only corroborates CW 3's account, but provides further proof that BDO was in fact preparing JA Solar for a major capital markets listing.  The following image shows the relevant excerpt of the original version of that resume:

工作经历

2015.08 – 2018.09   立信会计师事务所（特殊普通合伙）天津分所　　（3年 1个月）
高级审计员 | 8001-10000元/月
其他

工作描述:　　立信会计师事务所（特殊普通合伙）天津分所 高级审计员 2015/8－2018/9（熟练掌握审计底稿及内控底
　　　　　　　稿编制及审计流程，能熟练编制财务报表及审计报告。曾接触过两家上市公司的内控年度审计，
　　　　　　　及负责两家上市公司部分审计工作。曾接触过不同行业的财务审计及内控审计工作，曾参与过IPO审计重要
　　　　　　　审计核心工作，可独立带队对一般企业进行审计。）

项目经历

2018.05 – 至今   晶澳（扬州）太阳能科技有限公司　　（11个月）

责任描述:　　财务审计工作
项目描述:　　ipo上市，重要子公司

138.    CW 4 worked on JA Solar's Sales staff from 2016 to 2018, including as a key customer manager in the Company's power plant business unit.  CW 4 said that he first heard about the delisting plan in Spring of 2018, and added that he heard the news quite late.  When asked what were the reasons given internally for taking the Company private and delisting from NASDAQ, CW 4 explained that he heard from his colleagues that JA Solar wanted to go back to

mainland China and added that there were successful precedents such as Trina Solar and Longi Group, whose valuations were dramatically higher after they returned to domestic capital markets. CW 4 also explained that he first heard about JA Solar's relisting plan on April 20, 2018, when attending an industry conference (SNEC PV Power Expo). One of his colleagues in the power plant business unit told him about the relisting plan at that event.

139.     Counsel has also reviewed a translated resume from a former employee of China Dragon Securities Co. Ltd. This employee was a Senior Manager in that firm's investment banking department. He worked in their Beijing office from May 2015 through March 2017. More specifically, he reported working on strategic planning for Jinglong Industry and Commerce Group Co. Ltd. from June 2015 through May 2016. He described himself as a Project Manager and said that his role was to make development plans for each company affiliated to the actual controller of the U.S.-listed JASO (*i.e.*, JA Solar). He then explained that he streamlined the ownership relationship between Jinglong Group and its subsidiaries, designed the operation plan for the privatization of the U.S.-listed JASO (a company under the Jinglong Group's actual controller), and designed the operation plan for Jinglong Group and JASO's relisting on the A-shares market after privatization. This resume shows that the Jinglong Group had plans to relist JA Solar on the A-Shares market after privatization that dated all the way back to the 2015-2016 time period.   (That timing coincides with the Buyer Group's original offer to take JA Solar private, before the transaction was "put on hold.")  The following image shows the relevant excerpts of the original version of that resume:

华龙证券股份有限公司   2015/05–2017/03(1年10个月)

基金/证券/期货/投资    北京-丰台区    2000-5000人    国有企业

投行部高级经理

所在部门：投资银行并购重组   下属人数：2
部

职责业绩：1、负责制定、实施承做项目的各项工作计划；

　　　　　2、负责承做项目的质量控制和风险防范；

　　　　　3、负责组织承做项目的案卷建档、管理工作，对项目案卷的真实性、完整性全面负责；

　　　　　4、负责企业改制、辅导、上市发行、再融资、股权分置改革、并购、重组、债券承销、财务顾问等各项投行业务的具体实
施工作

晶龙实业集团有限公司战略规划   2015/07–2016/05(10个月)

项目职务：项目负责人

所在公司：华龙证券股份有限公司

项目简介：美股上市公司晶澳股份（JASO）实际控制人旗下的各公司发展规划进行梳理

项目职责：全面梳理晶龙集团及下属各公司的股权关系，对晶龙集团实际控制人旗下的美股上市公司晶澳股份（JASO.O）私有化设计
操作方案，并对回归后晶龙集团及晶澳股份在A股上市设计操作路径。

### 2.   JA Solar Announces Relisting Just Three Days After the Merger Closed

140.    On July 19, 2018, *just three days after the Merger closed*, JA Solar and Tianye Tonglian signed their agreement for Tianye Tonglian to acquire JA Solar by issuing shares in exchange for 100% of JA Solar's equity.  This deal, operating as a "backdoor listing," would allow JA Solar to return to the stock market by relisting on the Shenzhen Stock Exchange at a multiple of the value at which it was taken private, to the detriment of its prior securityholders, who unknowingly sold their JA Solar Securities at substantially deflated values during the Class Period.

141.   Further emphasizing the significance of the publicly filed agreement, on that same day (July 19, 2018), Tianye Tonglian published a "Public Notice on Trade Suspension Brought by Significant Event" and its stock was suspended from trading.  In other words, this was such a big deal that Tianye Tonglian chose to suspend trading in its stock to prevent a major price swing in reaction to the news.

142.   Then, on July 23, 2018, Tianye Tonglian published a "Public Notice on Material Asset Restructurings Agreement" announcing that on July 19, 2018, Tianye Tonglian and JA Solar had signed a letter of intent to conduct the backdoor listing of JA Solar through Tianye Tonglian.  This notice announced that Tianye Tonglian would purchase a 100% stake in JA Solar via stock issuance.  After the deal would close, Defendant Jin would become the head of Tianye Tonglian and would hold "more than 5% shares of the listed company."

143.   As a July 24, 2018 Bloomberg article titled "JA Solar Seeks Backdoor China Listing After Retreating From U.S." explained, the newly private JA Solar "plans to sell all its shares to Shenzhen-listed Qinhuangdao Tianye Tolian Heavy Industry Co. as the Chinese panel maker seeks a backdoor listing in China.  The two companies signed a letter of intent, under which Tianye will issue shares in a private placement to pay for the deal, Tianye said in a statement to the Shenzhen stock exchange . . . .  JA Solar's chairman Jin Baofang will become controller of the listed company after the deal."

144.   This Bloomberg article further explained that "[a] backdoor listing is a way for a company to go public without the hassle and costs of a traditional initial public offering by moving assets into an already-listed stock."

145.   Following the July 2018 notice of the relisting agreement between JA Solar and Tianye Tonglian, the two companies continued to finalize the details of the relisting.

146.    On November 4, 2018, STCN, part of the national financial media in China, reported that the relisting plan was well underway and that JA Solar could place an estimated CNY 7 billion ($1 billion) worth of net assets into Tianye Tonglian.  This was multiple times the value at which JA Solar went private and its unaffiliated security holders were paid in the Merger.  STCN estimated that after the relisting would be completed, JA Solar's market cap would reach CNY 20 billion (or $2.883 billion).

147.    Bloomberg further reported on January 21, 2019 that "JA Solar Holdings Co. moved forward with a backdoor listing in mainland China after Qinhuangdao Tianye Tolian Heavy Industry Co. said it would buy the cell maker in a 7.5 billion yuan ($1.1 billion) deal. Tianye will acquire JA Solar's equity interest by issuing almost 953 million shares at 7.87 yuan apiece through a private placement, according to a filing to the Shenzhen stock exchange on Monday. The two companies signed a letter of intent in July after JA Solar completed a deal valued at about $360 million to delist its American depository receipts. Tianye rose by the exchange-set limit of 10 percent to close at 9.37 yuan per share. 'China has relatively higher valuations for solar manufacturers, prompting overseas-listed producers to return,' said Hong Kong-based Bloomberg NEF analyst Jiang Yali."  Through this deal, "China-based JA Solar will become a unit of Tianye . . . and shareholders of the cell maker will become holders of Tianye."

148.    Being able to capture this higher valuation for JA Solar by relisting in China was Defendant Jin's and the rest of the Buyer Group's primary motivation for conducting the Merger. Because Defendants made false and misleading statements to JA Solar Securityholders stating that there were no plans in place for such a relisting, and assuring them that the transaction price was fair (including because of what they claimed to be poor market conditions for JA Solar and

in the Chinese market), the Buyer Group was able to purchase JA Solar Securities at deflated values from the unsuspecting JA Solar Securityholders.

149.    Similarly, on January 22, 2019, China Business News reported that through this relisting plan, JA Solar planned "to triple its value through a CNY7.5 billion (USD1.1 billion) reverse merger with Shenzhen-listed Tianye Tolian Heavy Industry after quitting the Nasdaq last year."

150.    In addition, Bloomberg reported on January 22, 2019 that, according to Tianye Tonglian, in the relisting transaction, Tianye would purchase all of JA Solar's "equity for CNY7.5 billion (USD1.1 billion), which is around 11 times JA Solar's net profit in 2017[.] . . . *It is also more than three times JA Solar's earlier valuation.* The deal would offer a backdoor listing for the solar firm on the Shenzhen bourse."  (Emphasis added.)  This article noted, as a basis for comparison, "[a]s of Jan. 18, Shanghai-based Jinko Solar [NYSE: JKS] had a market value of USD498 million and a price[-to-]earnings ratio of 10.9, while that of Guelph-based solar module behemoth Canadian Solar [NASDAQ: CSIQ] was USD1.1 billion and 5.6, public data of the two companies with major links to China show."  These multiples were indicative of the fact that JA Solar should also have been valued in the Merger at a greater multiple of its key financial metrics as well.

151.    However, as noted above, in its analysis for the Special Committee, Houlihan Lokey ignored any analysis that compared JA Solar to similar companies or transactions.  (*See supra* ¶¶ 94-98).  Instead, Houlihan Lokey relied solely on a financial analysis of just JA Solar in which it applied a multiple to JA Solar's financial results that was significantly lower than the multiple that applied to other solar companies.  That decision artificially depressed the value of

JA Solar in the Merger and assisted in the scheme to relist JA Solar in China at a much higher value than what its Securityholders were told was fair in the Merger.

152.    JA Solar, Jin, and Tianye Tonglian have continued to prepare for the relisting.  In the restructuring report that JA Solar and Tianye Tonglian have issued in connection with the relisting, JA Solar reported operating income for 2015 through 2017 that far exceeds what it reported in the Proxy Materials and other SEC filings when it was listed on the NASDAQ. Specifically, JA Solar reported its operating income for 2015 through 2017 to be 14.019 billion RMB, 16.940 billion RMB, and 20.55 billion RMB, respectively, and net income to be 713 million RMB, 800 million RMB, and 721 million RMB, respectively.  In its U.S. financial disclosures. however, it reported operating income (or revenue) to be 13.525 billion RMB, 15.737 billion RMB, and 19.659 billion RMB, and net income to be 624 million RMB, 684 million RMB, and 300 million RMB for 2015 through 2017, respectively.   The following chart shows the extent of these discrepancies:

|  | Operating Income Reported in U.S. | *Operating Income Reported in Connection With Relisting* | Net Income Reported in U.S. | *Net Income Reported in Connection With Relisting* |
|---|---|---|---|---|
| **2015** | 13.525 billion RMB | *14.019 billion RMB* | 624 million RMB | *713 million RMB* |
| **2016** | 15.737 billion RMB | *16.940 billion RMB* | 684 million RMB | *800 million RMB* |
| **2017** | 19.659 billion RMB | *20.55 billion RMB* | 300 million RMB | *721 million RMB* |

153.    The understated figures that JA Solar reported in the U.S. for 2015 through 2016 were included in the Proxy Materials.  The final 2017 figures were not reported in the Proxy Materials because the Proxy Materials included projections for 2017.  Those projections were substantially deflated even as compared to the full-year 2017 figures that JA Solar reported in the

U.S. shortly after the shareholder vote, as explained above.  (*See supra* ¶¶ 125-27).  It is now clear that those projections (including the **actual results for the first three quarters of 2017**) were even more deflated in comparison to the financial figures that JA Solar has reported in China in connection with the relisting.

154.    The Shenzen stock exchange, where Tianye Tonglian is listed, has noted these irregularities and questioned the discrepancy in JA Solar's reported operating income in the relisting proposal as compared to what it reported in the U.S. before privatization.  While JA Solar has attributed these inconsistencies in its 2017 figures to timing issues related to its JA Solar Germany subsidiary, that is not a plausible explanation for why these figures would have been consistently understated in the U.S. for three consecutive years, particularly where JA Solar's net income in 2017—the year that was most important to Merger—that it reported in its relisting report showed more than double the net income that it reported in the U.S. before the Merger (721 million RMB as compared to 300 million RMB).

155.    In addition, at a March 12, 2019 meeting, Defendant Jin justified JA Solar's 7.5 billion RMB valuation by citing the Company's "steady performance" from 2015 through the first three quarters of 2018.  That description stands in stark contrast to his description in the Proxy Materials of the Company's performance during the vast majority of that same time period (2015 through 2017) in disappointing terms.  When seeking to justify the relisting in March 2019, however, Jin described the far-higher 7.5 billion RMB valuation as "a conservative and fair valuation of JA Solar."

156.    As of the date of this filing, the relisting continues to progress through the Chinese regulatory approval process and remains on track to be completed for 7.5 billion RMB.

### 3.    The Announcement of the Relisting Agreement was the Result of Many Months of Planning

157.    The announcement of a relisting agreement in China through a Memorandum of Understanding ("MoU") is a significant transaction step that can be achieved only after a lengthy period of deal-making.   An expert in Chinese M&A and capitals market transactions further explains the work that would ordinarily be required before reaching the MoU, which was disclosed just three days after the Merger here closed. The remaining paragraphs in this subsection are all pled with confirmation from this expert regarding their accuracy.

158.    It is important to recognize that an MoU regarding major asset restructuring—as was the case here—is not announced without careful planning and deliberations among all stakeholders.  The China Security Regulatory Commission ("CSRC") issued the "Provisions on Issues Concerning Regulating the Material Asset Reorganizations of Listed Companies" in 2014 (revised in 2016) to ensure that companies do not use corporate restructuring announcements as a means to manipulate stock prices.  Individuals and organizations are held legally liable, if they try to use private information about asset restructuring to manipulate stock prices.  As a result, investors tend to react very positively upon announcements of asset restructuring MoUs.  In this particular case, Tianye Tonglian halted the trading of its stock on July 19, 2018, before the announcement of its deal with JA Solar, and resumed trading on November 5, 2018.  The stock price for Tianye Tonglian skyrocketed and hit the daily price limit (10% increase) for three days consecutively following this resumption of trading.

159.    Following the publication of an MoU, if the negotiation fails or if the proposal for asset restructuring fails to receive final approval from CSRC and other governing agencies, the stock price for the listed company would suffer a significant loss.  There are many incidents, and significant empirical evidence, showing that a company's stock price can experience large drops

if the announced asset restructuring fails to materialize.  In other words, due to the large price impact and strict regulation, companies are very unlikely to announce an asset restructuring MoU without first conducting extensive due diligence.  It is reasonable to assume that JA Solar and Tianye Tonglian were fairly confident about the outcome of their restructuring deal before announcing the MoU to the public.  The premature filing of the MoU would have exposed JA Solar and Tianye Tonglian to serious litigation risk, including the risk of shareholder litigation by those investing in Tianye Tonglian following this news, if the deal subsequently failed.  In fact, the MoU itself begins by stating: "The company and all members of the board of directors guarantee the truthfulness, accuracy and completeness of the announcement."

160.   While the exact details of JA Solar's behind-closed-doors deal-making are largely unknown, the deal-making necessary to reach the point where the MoU was published could not possibly have occurred in anywhere near just a few days.  In fact, there are many lengthy steps to such deal-making, which indicate that JA Solar and its management had been planning a relisting for many months.  Those steps include:

161.   Hiring a Financial Advisor or Investment Bank and a Legal Advisor.   A preliminary step before reaching an MoU is the hiring of an investment advisor to help the company understand the process of listing in the Chinese stock exchange.  After a company decides it wants to embark on the relisting process, it then takes a few weeks to a few months to identify an investment bank. Typically, the investment bank will advise the company throughout the whole relisting process, from shell company identification to final public listing.  Once an investment bank is identified, it will be necessary to schedule a meeting with the firm to discuss all feasible solutions (*e.g.,* the advantages and disadvantages of direct IPO or backdoor listing through an existing shell company).  It is also necessary to get signed engagement letters with

the investment bank defining their compensation and the scope of the work they will perform. Lawyers will typically be involved in the negotiation of those engagement letters, which are often subject to several drafts. ***Even in a very fast-moving process, this negotiation might be completed in a few weeks***, and it is unlikely any other deal-making would occur prior to the completion of this step.

162.   <u>Identifying a Potential Transaction Counterparty.</u>   To conduct a backdoor relisting, one needs to identify a potential target company for the relisting.  This is typically done in the first instance by the investment bank and requires that advisor to analyze listed companies that have low valuations, limited liabilities, a simple ownership structure, business models that would allow for a backdoor relisting to make sense, and the proper positioning as a listed company in a desired market. ***Even in a very-rushed process, it would be unreasonable to expect this to be completed in less than one month.*** The outcome of this step will be a list of viable companies to use as the relisting shell.

163.   <u>Finding the Appropriate Relisting Shell.</u>  The next step in the process would be to contact the potential companies identified in the prior step.  Not all companies that initially appear to be viable options will have interest in serving as a shell for another company's relisting.  This is typically handled by the financial advisor in the first instance, who will try to make formal introductions between the company seeking the relisting and the potential shell companies.   The potential shell companies will typically take many days, if not weeks, to respond to initial inquiries and will then need to engage their own counsel and investment advisors, before they can engage in any serious conversation.   Only then can there be the necessary discussions between the owners of the newly (or, in this case, soon-to-be) privatized company and potential shell companies, including major stakeholders of each company.   It

would be unreasonable to expect this process to take less than a month, even in the unlikely event that the first potential shell company contacted is interested in the proposed transaction. More common, however, is that the company seeking relisting negotiates with many potential shells and fails to reach any meaningful agreement. *A more typical process would therefore involve reaching out to many potential shell firms over at least three months, if not longer.*

164.    Before any serious discussion, the parties to the potential transaction then need to draft and sign a confidentiality agreement. The shell company wants to sell the shell for high fees and has leverage in the negotiation. In many cases, the existing controlling shareholders of the shell company might want to take equity positions in the new post-relisting firm. *The initial negotiation between the company seeking backdoor listing and the shell company can be expected to take several weeks, if not months.*

165.    <u>Auditing and Accounting Compliance</u>. Depending on the market being targeted by the company seeking relisting, it will need to ensure that its accounting records conform to the requirements of that market. Typically, Chinese firms are required to show three years of proper accounting records before listing on a public exchange. While this precise requirement can be relaxed through the relisting process, the company will still need to conform its accounting standards to the required format on a going-forward basis. Thus, the company will need to hire an appropriate accountant capable of either reviewing the company's accounting records or, at the very least, to provide the company with comfort that its existing accounting systems can be conformed without insurmountable problems. This step generally takes months, as the company ensures compliance with the relevant standards on a going-forward basis. *At a minimum, it would take several weeks to hire an appropriate auditor and get comfort from*

***them about the viability of the proposed relisting transaction, prior to the announcement of the MoU.***[13]

166.   <u>Performing Diligence on Potential Transaction Counterparty</u>.   Once the two companies have begun negotiations, they will both want to begin performing diligence on each other to understand the risks involved in any transaction.   One such risk is that, through the relisting, the company will be taking on the corporate form of the target—which could expose it to the shell companies' outstanding legal liabilities.   For example, Tianye Tonglian in its 2018 annual report disclosed an ongoing legal battle with IMI Fondi Chiusi SGR S.P.A.   The Shenzhen Stock Exchange issued an inquiry concerning the status of this lawsuit and the potential loss that it might cause Tianye Tonglian to suffer.   Before signing on to the MoU, JA Solar would need to get comfortable that this type of legal risk would not undermine the relisting transaction.   While diligence would continue after the MoU is issued, it would not be reasonable for the companies to issue an MoU without first completing significant diligence to understand the risks.   This pre-MoU diligence typically involves opening a data room to share documents, which means the target must first determine which documents to share.   ***Altogether, the diligence process leading up to the point at which both sides would be comfortable signing an MoU will typically take at least a few months.***   It can be at least partially completed, while other negotiations are occurring.

167.   <u>Conducting Regulatory Assessments</u>.  Once it is determined that there is a viable relisting deal, it will be necessary to determine that there will not be any major regulatory roadblocks and, as is often the case, whether local government support is needed.   Final regulatory approval will require significant additional work that will occur after the MoU is

---

[13] Major auditing and accounting compliance work may then be completed after the announcement of the MoU.  The analysis above does not include those post-MoU steps.

issued.  ***Even before the MoU is issued, however, the company seeking relisting will need to assess potential regulatory obstacles.  This will take at least several weeks.***

168.    <u>Negotiating Preliminary Transaction Terms</u>.  Meaningful negotiations between the parties are required to reach the preliminary transaction terms set out in an MoU.  This typically involves each party's legal advisor and normally requires several drafts as both sides to the transaction develop their positions.  For example, the MoU here states that Tianye Tonglian agreed to issue new shares to acquire 100% of JA Solar's shares.  The parties also agreed that upon the completion of the transaction, Defendant Jin would own over 5% of the newly relisted company's shares.  ***Even in a very fast process, these negotiations would take several weeks to complete.***

169.    <u>Removal of VIE Structure.</u>  One of the first steps that would be taken in preparing for the privatization would be the removal of the "variable interest entity" ("VIE") structure.  The VIE is a complex ownership structure used by Chinese firms to enable foreign investment in companies that would not otherwise be open to foreign investment in China.  The removal of VIE structure can be done after the announcement of the MoU.  But before that point, the company's management still needs to seek legal advice with respect to the process and timing of VIE removal, and prepare for the new ownership structure change.  JA Solar removed its VIE structure in October 2018.  This was achieved through a transaction wherein two new companies bought JA Solar's ownership structure.  One of those companies was Jingtaifu Technology, which was established in June 2018—before the Merger closed—and was controlled by Defendant Jin and his wife.[14]  The removal of the VIE structure is not necessary if a company is

---

[14] The other company involved in this transaction was called Qichang Electronics.

going to remain privately owned within China.   This step shows that JA Solar was taking necessary preparations before delisting from NASDAQ to expedite its backdoor listing in China.

170.   <u>Divesting the Shell Company of Its Assets.</u>   In addition, on November 2, 2018, Tianye Tonglian announced that its business would be sold to Huajian Xingye Investment Co. Ltd. in an all-cash transaction. This restructuring would allow Tianye Tonglian to clear out other assets in preparation for the relisting transaction with JA Solar.   Because this step involves such a fundamental restructuring of Tianye Tonglian, it would have been part of the agreement between JA Solar and Tianye Tonglian, before they signed the MoU in July 2018. This complicating feature of the transaction means that the process leading up to the MoU would have tended to take on the longer side of the general timeline provided above.

171.   <u>Total Timeline.</u>   ***In total, it would ordinarily take more than 12 months for a company such as JA Solar to be able to agree to announce an asset restructuring deal such as the deal with Tianye Tonglian that they announced in the MoU here.***   Similar transactions usually take more than a full year—if not several years—to complete. For example, Giant Interactive Group completed privatization and delisted from NYSE in July 2014, and then announced an asset restructuring MoU with New Century Cruise listed on Shenzhen Stock Exchange on September 30, 2015.   That case took over a year to find the shell company and reach a preliminary agreement, before announcing the asset restructuring MoU.

172.   Given that JA Solar and Tianye Tonglian reached their backdoor listing agreement on July 19, 2018, it is completely implausible that the process for that transaction had not already begun, while the Merger process was still underway.   ***Based on just the timing typically involved in these types of transactions, JA Solar's plan to relist must have been***

*underway by July 2017, and thus predated the announcement of the Merger on November 17,*

*2017 and the publication of the Preliminary Proxy Materials on December 11, 2017.*

### V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

173.    During the Class Period, Defendants made numerous materially false and misleading statements and omissions.  The specific false and misleading statements are detailed below and reference is made therein to the following subparagraphs, which explain the reasons those statements are false and misleading.[15]

(a)     **Statements     Concerning     Intention     Not     to     Relist.** Defendants made statements throughout the Proxy Materials stating clearly that there were no plans in place for JA Solar to undergo a transaction following the Merger that would cause the Company's structure to be changed in any way, such as through being relisted in the public markets in China through a backdoor listing. These assurances provided to JA Solar Securityholders were false and misleading because when these statements were made, the Buyer Group had already taken steps to proceed with the relisting transaction.

(b)     **Statements That Presented the Transaction in a Positive Light, or As "Fair."** These statements were false and misleading because they conveyed that the consideration of $7.55 per ADS (and $1.51 per share of common stock) was a fair price for the JA Solar Securities when in fact, the JA Solar Securities were undervalued, causing the price to be unfair.  The $7.55 per ADS price was based on Houlihan Lokey's undervalued financial analysis that, in turn, was based on outdated assumptions that Company management, the Special Committee, and the Buyer Group provided concerning JA Solar's business conditions and

---

[15] The statements that are ***bolded and italicized*** in this section are statements alleged to be false and misleading.

financial projections. These assessments were false and had no basis, as was revealed by statements that Defendants made in JA Solar's 2017 Annual Report, shortly after the shareholder vote on the Merger and—more recently—in connection with its relisting in China, concerning the Company's much higher financial performance and business conditions (which existed at the time, Houlihan Lokey was reviewing the outdated and undervalued projections). In addition, Houlihan Lokey's financial analysis was fundamentally flawed because it ignored, entirely basic valuation methods that compare the company and transaction at issue to peer companies and transactions. Furthermore, the $7.55 per ADS price, and related statements that this transaction price was "fair," were misleading because Defendants failed to disclose that the Buyer Group had already begun to proceed with the relisting transaction that would secure a much higher valuation.

(c)     **Statements Concerning Houlihan Lokey's, the Special Committee's, the Board's, and the Buyer Group's Basis for Determining That the Transaction Price was "Fair".** To support the overall assessment of the transaction price of $7.55 per ADS (and $1.51 per share of common stock) as "fair" to JA Solar Securityholders, Defendants repeatedly based that determination on Company management's, the Special Committee's, and the Buyer Group's descriptions of the business conditions that JA Solar faced and on their wholesale adoption of the analysis that Houlihan Lokey relied on in reaching its fairness opinion. These statements were false and had no basis for the reasons described in the subparagraph (b) immediately above. These statements were also false and misleading because they repeatedly described the lack of alternatives to the Merger and the absence of any plan to relist the Company as reasons for supporting the Merger.

(d)   **Statements Concerning Dissenting Shareholders.** Defendants made multiple statements concerning what they called a "Dissenting Shareholder Condition" in the Merger Agreement that allowed the Buyer Group or the Company to terminate the Merger, if "more than ten percent (10%) of the Shares shall have validly served a notice of objection under Section 238(2) of the Cayman Islands Companies Law." Then, after the shareholder vote on the Merger, Defendants disclosed that the Dissenting Shareholder Condition was triggered, which could lead to the termination of the Merger, and that "[t]he Company intends to update its shareholders if and when it receives from the Parent Parties their decision with respect to their granting of the waiver in due course." These statements, as well as subsequent statements that Defendants made between the announcement of the shareholder vote approving the Merger and the closing of the Merger on July 16, 2018, were false and misleading because the Company and the Buyer Group had no intention of terminating the transaction and Defendants never updated JA Solar Securityholders as to the waiver of this condition.  Rather, these parties to the Merger intended to proceed with the transaction so that the Buyer Group, led by Defendant Jin, could go on with relisting the Company in China, at multiple times the value of the Merger.  Defendants made these false and misleading statements concerning the Dissenting Shareholder Condition in order to portray the Merger as an ordinary transaction that was not concealing the fact that the relisting was already planned and would be announced just three days after the Merger closed. In addition, Defendants' statements related to the Dissenting Shareholder Condition further artificially depressed the price of JA Solar Securities by warning of a supposed risk to the Merger's closing that did not actually threaten the completion of the transaction.  This caused the price of JA Solar Securities to be artificially depressed below the Merger price—which itself was

already artificially depressed below its fair value—based on an unfounded risk that the Merger might not close.

174.    To the extent that it is determined that any of the statements detailed below are statements of opinions, these opinion statements were false and misleading. Statements of opinion conveying that the Merger was fair or advisable were false and misleading, because they were not actually held by Defendants and failed to disclose information that a reasonable shareholder would assume formed the basis for them. Rather, these statements were part of a fraudulent scheme to deprive JA Solar Securityholders of the fair value of their securities.

A.    **The Announcement of the Merger**

175.    JA Solar issued a press release on November 17, 2017, announcing that the Company had agreed to the Merger.  This press release was published by JA Solar and was filed on November 20, 2017 with the SEC with an accompanying Form 6-K that was signed by Defendant Jin.

176.    This announcement promoted the Merger by disclosing the deal price and pointing to a premium as compared to the Company's recent trading price, without also disclosing that the JA Solar Securities were worth far more than that deal price. Specifically, the press release explained that:

> Pursuant to the terms of the Merger Agreement, at the effective time of the merger (the "Effective Time"), *each ordinary share of the Company issued and outstanding immediately prior to the Effective Time (each a "Share") will be cancelled and cease to exist in exchange for the right to receive $1.51 in cash without interest, and each American depositary share (each an "ADS") of the Company, representing 5 Shares, will be cancelled in exchange for the right to receive $7.55 in cash without interest . . . .  The merger consideration represents a premium of  18.2% to the closing price of the Company's ADSs on June 5, 2017, the last trading day prior to the Company's announcement of its receipt of a revised "going-private" proposal, and a premium of 17.2% to the average closing price of the Company's ADSs during the 3-month period prior to its receipt of a revised "going-private" proposal.*

177.     These statements were false and misleading for the reasons stated in ¶ 173(b).

178.     The deal announcement further stated that the Transaction had been approved by the Board upon recommendation by the Special Committee and that the Board recommended shareholders approve the Transaction. Specifically, the press release explained that:

> *The Company's board of directors (the "Board"), acting upon the unanimous recommendation of a committee of independent and disinterested directors established by the Board (the "Special Committee"), approved the Merger Agreement and the merger and resolved to recommend that the Company's shareholders vote to authorize and approve the Merger Agreement and the merger.*

179.     These statements were false and misleading for the reasons stated in ¶ 173(b).

180.     Lastly, the press release intentionally conveyed to investors that there had been a robust negotiation by the Special Committee with the assistance of an independent financial advisor. Specifically, the press release stated that *"[t]he Special Committee negotiated the terms of the Merger Agreement with the assistance of its financial and legal advisors."*

181.     These statements were false and misleading for the reasons stated in ¶ 173(b)-(c).

**B.     The Preliminary Proxy Materials**

182.     On December 11, 2017, JA Solar filed with the SEC the Preliminary Proxy Materials on Form 13E-3 (including the Preliminary Proxy Statement) explaining the proposed Merger to holders of JA Solar Securities.  The Preliminary Proxy Statement was directed to all "Shareholders of JA Solar" and the Preliminary Proxy Materials were signed by Defendant Jin, Defendant Jia (on behalf of JA Solar), and the remaining members of the Buyer Group.

183.     In signing the Preliminary Proxy Materials, Defendant Jin, Defendant Jia, and the remainder of the Buyer Group each affirmed that "*[a]fter due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.*"

184.    These statements were false and misleading for the reasons stated in ¶ 173(a)-(d).

185.    In addition, the Preliminary Proxy Materials included the misleading statements or omissions described in the following sections (1) through (4).

### 1.    Statements Concerning Intention Not to Relist

186.    The Preliminary Proxy Statement described the Company's plans following the Merger as follows, stating that there were "no present plans or proposals" involving changes to the Company's structure:

> If the Merger is completed, ***the Company will continue its operations as a privately held company*** and will be wholly owned by the Buyer Group and, as a result of the Merger, the American depositary shares ("ADSs"), each representing five Shares, will no longer be listed on the NASDAQ Stock Market LLC ("NASDAQ")
>
> ***
>
> After the Effective Time, ***the Buyer Group anticipates that the Company's operations will be conducted substantially as they are currently being conducted, except that the Company will cease to be a publicly traded company*** and will instead be a wholly owned subsidiary of Parent, which itself is wholly owned by Holdco.
>
> ***
>
> The ***Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company*** as described above and because the Buyer Group was able to secure sufficient equity and debt financing in connection with the Merger.
>
> ***
>
> Other than as described in this proxy statement and transactions already under consideration by the Company, ***there are no present plans or proposals that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure***, business, or management, such as a Merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of assets.

187.    These statements were false and misleading for the reasons stated in ¶ 173(a).

188.    The Preliminary Proxy Statement further stated that one of the primary detriments of the Merger to the Buyer Group included the risk that "***an equity investment in the Surviving Company by the Buyer Group following the Merger will involve substantial risk resulting from the limited liquidity of such an investment***;" that "***following the Merger, there will be no***

61

*trading market for the Surviving Company's equity securities*"; and that there would be "*no certainty*" that the Buyer Group would have "*an opportunity to sell its shares in the Surviving Company at an attractive price.*"

189.    These statements were false and misleading for the reasons stated in ¶ 173(a).

190.    Similarly, the Preliminary Proxy Statement assured investors that neither the Company nor the Buyer Group was aware of any offers or proposals made by any unaffiliated person "*with respect to (a) a Merger or consolidation of the Company with or into another company, (b) a sale of all or a substantial part of the Company's assets or (c) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company.*"

191.    These statements were false and misleading for the reasons stated in ¶ 173(a).

192.    The Preliminary Proxy Statement also noted the warranty that the Parent Parties made to the Company of "*the absence of undisclosed agreements or arrangements involving Holdco, Parent, Merger Sub, or any of their respective affiliates, shareholders, directors, officers, employees or other affiliates of the Company or any of its subsidiaries, in each case relating to the Merger.*"

193.    These statements were false and misleading for the reasons stated in ¶ 173(a).

194.    The Preliminary Proxy Statement also warranted that its list of factors that the Buyer Group considered in determining that the Merger was fair and in the interests of JA Solar shareholders was "*believed to include all material factors considered.*"

195.    These limitations also informed Houlihan Lokey's analysis and fairness opinion. The Preliminary Proxy Statement stated that "*Houlihan Lokey understood that the Rollover Shareholders had indicated that they were only willing to consider entering into an agreement*

*with Holdco and Parent and amongst themselves in relation to the Merger and had no interest*
*in entering into any agreement, arrangement or understanding with other parties as an*
*alternative thereto.*"

196.    In addition, the Preliminary Proxy Statement affirmed that "***the Special***
***Committee determined that there was no viable alternative to the proposed sale of the***
***Company to the Buyer Group.***"

197.    To further the impression that there was no "viable alternative" to the Merger, the
Preliminary Proxy Statement described the Buyer Group's history, including what was
characterized as the group's initial attempt in June 2015 to purchase JA Solar for a higher price
of $9.69 per ADS.  Similarly, the Preliminary Proxy Statement described Houlihan's supposed
efforts to find other potential purchasers.  For example, the Preliminary Proxy Statement
described the following factors as supporting the Board's and Special Committee's
determinations that the Merger was fair:

   a.    "*The lack of other potentially interested buyers; no interested bidder*
         *submitted an indication of interest during the 'market check' process*
         *conducted by Houlihan Lokey after receipt of the original going private*
         *proposal on June 5, 2015 and the Company has received no alternative*
         *proposals following the public disclosure of the Company's receipt of the*
         *revised going private proposal on June 6, 2017;*"

   b.    "*[T]he Special Committee's knowledge of the Company's business,*
         *financial condition, results of operations, prospects and competitive*
         *position and their belief that the Merger is financially more favorable to*
         *the Unaffiliated Security Holders than any other alternative reasonably*
         *available to the Company and the Unaffiliated Security Holders;*" and

   c.    "*[T]he possible alternatives to the Merger (including the possibility of*
         *continuing to operate the Company as an independent publicly traded*
         *entity and the perceived risks of that alterative), the range of potential*
         *benefits to its shareholders of the possible alternatives and the timing*
         *and the likelihood of accomplishing the goals of such alternatives, and*
         *the assessment by the Special Committee that none of these alternatives*
         *was reasonably likely to present superior opportunities for the Company*
         *or to create greater value for its shareholders than the Merger, taking*

> *into account the likelihood of execution as well as business, competitive,*
> *industry and market risks[.]*"

198.    The statements referenced in ¶¶ 194 through 197 were false and misleading for the reasons stated in ¶ 173(a) and (c).

### 2.    Promotion of the Merger Price

199.    The Preliminary Proxy Statement promoted the Merger by *describing the merger consideration of $1.51 per common share and $7.55 per ADS*.

200.    These statements were false and misleading for the reasons stated in ¶ 173(b).

### 3.    False Representations that the Transaction Was Fair

201.    The Preliminary Proxy Statement included many false and misleading assertions that the Merger was fair or in the best interests of the holders of JA Solar Securities who were unaffiliated with the Buyer Group.

202.    The Special Committee declared the Merger to be fair.   According to the Preliminary Proxy Statement:

> At a meeting on November 16, 2017,  the Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) *determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Security Holders, and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger and the Transactions, including the Merger,* and (b) recommended that the Board approve and authorize the Merger Agreement, the Plan of Merger and the Transactions, including the Merger.

203.    This statement was false and misleading because the merger was not fair or in the best interests of JA Solar Securityholders, for the reasons stated in ¶ 173(b).

204.    JA Solar's Board of Directors, in turn, described, "after careful consideration," the Merger as fair and recommended that it be approved.  According to the Preliminary Proxy Statement:

On November 16, 2017, the Board, acting upon the unanimous recommendation of the Special Committee and on behalf of the Company, unanimously *(a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Security Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger and the Transactions, including the Merger,* . . . and (c) resolved to recommend in favor of the authorization and approval of the Merger Agreement, the Plan of Merger and the consummation of the Transactions, including the Merger, to the shareholders of the company and directed that the Merger Agreement, the Plan of Merger and the consummation of the Transactions, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

205.    This statement was false and misleading because the merger was not fair or in the best interests of JA Solar Securityholders, for the reasons stated in ¶ 173(b).

206.    The Preliminary Proxy Statement also affirmed that "*[e]ach member of the Buyer Group believes that the Merger is fair to the Unaffiliated Security Holders.*"

207.    This statement was false and misleading because the merger was not fair or in the best interests of JA Solar Securityholders, for the reasons stated in ¶ 173(b).

208.    The Preliminary Proxy Statement also included Houlihan's opinion that the Merger was "*fair*." While these statements were in some sense originally made by Houlihan, they are attributable to Defendants for two reasons: first, they are part of the Preliminary Proxy Statement, which was signed by Defendant Jin and Defendant Jia (on behalf of JA Solar); second, Defendants "expressly adopted" Houlihan's analysis as a basis for their conclusion that the Merger was fair to the Unaffiliated Security Holders and their recommendation that the Merger should be approved; and third, the Buyer Group relied on the Special Committee's and Board's assessments of the Merger, including Houlihan Lokey's role in advising the Special Committee.[16]

---

[16] The Preliminary Proxy Statement stated that the "Special Committee expressly adopted" Houlihan's "analyses and opinions" in the course of "reaching its determination as to the fairness

209.   This statement was false and misleading because the Merger was not fair or in the best interests of JA Solar Securityholders, for the reasons stated in ¶ 173(b)-(c).

210.   The Preliminary Proxy Statement also appended Houlihan's written fairness opinion, which concluded that the Merger was fair from a financial point of view, stating specifically:

> The Committee has requested that Houlihan Lokey (China) Limited ("Houlihan Lokey") provide an opinion (this "Opinion") to the Committee as to whether, as of the date hereof, the Per Share Merger Consideration to be received by holders of Shares (other than Excluded Shares and Dissenting Shares) and the Per ADS Merger Consideration to be received by holders of ADSs (other than ADSs representing Excluded Shares) are fair, from a financial point of view, to such holders. . . .   ***Based upon and subject to the foregoing, and in reliance thereon, it is our opinion that, as of the date hereof, the Per Share Merger Consideration to be received by holders of Shares (other than Excluded Shares and Dissenting Shares) and the Per ADS Merger Consideration to be received by holders of ADSs (other than ADSs representing Excluded Shares) are fair, from a financial point of view, to such holders.***

211.   This statement was false and misleading because the merger was not fair or in the best interests of JA Solar Securityholders, for the reasons stated in ¶ 173(b)-(c).

### 4.   Statements Concerning the Basis for the Board's, Special Committee's, Buyer Group's, and Houlihan Lokey's Determinations

212.   The Preliminary Proxy Statement included many false and misleading descriptions of the basis for the Board's, Special Committee's, Buyer Group's and Houlihan Lokey's determinations that the Merger was fair or in the best interests of the holders of JA Solar Securities.

213.   Both the Preliminary Proxy Statement and Houlihan Lokey's fairness opinion that was included with the Preliminary Proxy Statement explained that Houlihan "relied upon and assumed, without independent verification, the accuracy and completeness of all data, material

of the Transactions, including the Merger" and that the Board decided unanimously that the Merger was fair and recommended the Merger "acting upon the unanimous recommendation of the Special Committee."

and other information furnished, or otherwise made available to it, discussed with or reviewed by it, or publicly available, and does not assume any responsibility with respect to such data, material and other information. In addition, management of the Company has advised Houlihan Lokey, and Houlihan Lokey has assumed, that the financial projections reviewed by Houlihan Lokey have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such management as to the future financial results and condition of the Company . . . .   Houlihan Lokey has relied upon and assumed, without independent verification, that there has been no change in the business, assets, liabilities, financial condition, results of operations, cash flows or prospects of the Company since the respective dates of the most recent financial statements and other information, financial or otherwise, provided to Houlihan Lokey that would be material to its analyses or its opinion, and that there is no information or any facts that would make any of the information reviewed by Houlihan Lokey incomplete or misleading. Further, management of the Company has advised Houlihan Lokey that (i) the financial projections used by Houlihan Lokey are the most up-to-date currently available projections prepared by management of the Company (or any affiliated entity)."

214.   Houlihan Lokey also "relied upon and assumed, without independent verification, that . . . the representations and warranties of all parties to the Merger agreement and all other related documents and instruments that are referred to therein are true and correct."

215.   These statements show the role of JA Solar management, including Defendants JA Solar and Jin, in providing Houlihan Lokey with the financial information that it relied on in reaching its fairness opinion.

216.    The Preliminary Proxy Statement described the following financial projections that Company management gave to Houlihan Lokey in or around November 2017 and that Houlihan Lokey relied on in its analysis of the Merger:

**Certain Financial Projections**

| | | | Management Projections | | |
| | | | Fiscal Year Ending December 31, | | |
| | **2017E** | **2018E** | **2019E** | **2020E** | **2021E** |
| | | | (in millions RMB except percentage) | | |
| **Total Revenue** | 17,263 | 19,053 | 22,797 | 23,917 | 24,574 |
| *Growth* | | *10%* | *20%* | *5%* | *3%* |
| **Gross Profit** | 2,250 | 2,431 | 2,789 | 2,972 | 3,076 |
| *% revenue* | *13%* | *13%* | *12%* | *12%* | *13%* |
| **EBIT(1)** | 682 | 643 | 654 | 781 | 830 |
| *% revenue* | *4%* | *3%* | *3%* | *3%* | *3%* |
| **EBITDA(2)** | 1,709 | 1,760 | 1,773 | 1,884 | 1,921 |
| *% revenue* | *10%* | *9%* | *8%* | *8%* | *8%* |
| **Net Income** | 259 | 218 | 240 | 331 | 403 |
| *% revenue* | *2%* | *1%* | *1%* | *1%* | *2%* |

217.    This statement was false and misleading for the reasons stated in ¶ 173(c).  In particular, when JA Solar gave its 2017 projections to Houlihan Lokey, the first three quarters of the year were already complete and only half of the fourth quarter remained.  The following table shows the projections that JA Solar gave to Houlihan Lokey for the fourth quarter of 2017 as compared to the actual results that it reported for that quarter in the 2017 Annual Report:

| | **Projected[17]** | **Actual[18]** |
|---|---|---|
| **Total Revenue (RMB)** | RMB 3.276 billion | RMB 5.7 billion |
| **Net Income (RMB)** | RMB 74.18 million | RMB 115.5 million |

218.    The Preliminary Proxy Statement also described a negative business environment as supporting the low price that JA Solar shareholders would receive in the Merger.  In

[17] These projections are derived by subtracting JA Solar's actual results for the first three quarters of 2017 from the full year projections that JA Solar gave to Houlihan Lokey.

[18] JA Solar reported its results for the fourth quarter of 2017 in an April 30, 2018 press release that it filed with the SEC as an exhibit to a Form 6-K.

particular, the Preliminary Proxy Statement stated that "*[i]n the course of reaching its determination, the Special Committee and the Board considered the following factors and potential benefits of the Merger, each of which the Special Committee and the Board believe supported their decision to recommend the Merger Agreement and that the Merger is substantially fair to the Unaffiliated Security Holders.*"

219.     These statements were false and misleading for the reasons stated in ¶ 173(c).

220.     These factors included what the Preliminary Proxy Statement described, on behalf of the Board and Special Committee, as:

     a.  "*The weak outlook for the solar industry due to overcapacity and slowing demand;*"

     b.  "*Weak demand and lower prices for the Company's products in China and the expectation that there will be similar declines in key growth markets, including South America and India;*"

     c.  "*Uncertainty surrounding ongoing trade cases in the U.S. and India and the existing and potential additional sanctions on solar panel products from China;*"

     d.  "*China's economic slowdown generally, and slowdown in the Chinese solar industry specifically, including decreased demand for photovoltaic modules and overcapacity in the Chinese solar industry;*"

     e.  "*[T]he Special Committee's knowledge of the Company's business, financial condition, results of operations, prospects and competitive position and their belief that the Merger is financially more favorable to the Unaffiliated Security Holders than any other alternative reasonably available to the Company and the Unaffiliated Security Holders;*"

     f.  "*[E]stimated forecasts of the Company's future financial performance prepared by the Company's management, together with the Company's management's view of the Company's financial condition, results of operations, business, prospects and competitive position;*" and

g. "*The financial analysis reviewed by Houlihan Lokey with the Special Committee, as well as the oral opinion of Houlihan Lokey rendered to the Special Committee on November 16, 2017.*"

221.    These statements were false and misleading for the reasons stated in ¶ 173(c).

222.    In the course of Houlihan Lokey's financial analysis, it conducted a "selected companies analysis," which is a traditional type of analysis performed by investment banks giving fairness opinions on mergers and acquisitions, whereby it compared JA Solar to other solar companies.  This analysis resulted in a higher valuation for JA Solar than the Merger price reflected.  But Houlihan Lokey discounted this analysis because, according to Houlihan Lokey, "*determining multiples ranges from the selected companies analysis and deriving an implied per ADS reference range for the Company, as compared to the proposed Per ADS Merger Consideration, would not result in a meaningful comparison in light of the limited comparability of the Company to the selected companies due to size, business focus, geographic areas of focus, and product prices, amongst other issues.  Accordingly, Houlihan Lokey did not view the results derived from the selected companies analysis as providing a meaningful comparison to the Company.*"

223.    The same pattern emerged in Houlihan's "selected transactions analysis," where Houlihan compared the Merger to other comparable transactions involving solar companies. Houlihan "*concluded that determining multiples ranges from the selected transactions analysis and deriving an implied per ADS reference range for the proposed Merger, as compared to the proposed Per ADS Merger Consideration, would not result in a meaningful comparison in light of the limited comparability of the proposed Merger to the selected transactions due to business focus, geographic areas of focus, and financial performance, amongst other issues, of the target companies. Accordingly, Houlihan Lokey did not view the*

*results derived from the selected transactions analysis as providing a meaningful comparison to the proposed Merger.*"

224.    In addition, the Preliminary Proxy Statement included a draft copy of the presentation that Houlihan Lokey gave to the Special Committee when presenting its fairness opinion on November 16, 2017.  This presentation showed the basis for Houlihan Lokey's analysis, including its financial analysis based on the financial projections that JA Solar management gave to Houlihan and the selected companies analysis and selected transactions analysis that Houlihan ignored because of purported differences between JA Solar and the comparable companies.

225.    As noted above, while these statements were in some sense originally made by Houlihan Lokey, they are attributable to Defendants for two reasons: first, they are part of the Preliminary Proxy Materials, which were signed by Defendant Jin and Defendant Jia (on behalf of JA Solar); second, Defendants "expressly adopted" Houlihan's analysis as a basis for their conclusion that the Merger was fair to the Unaffiliated Security Holders and their recommendation that the Merger should be approved; and third, the Buyer Group relied on the Special Committee's and Board's assessments of the Merger, including Houlihan Lokey's role in advising the Special Committee.

226.    These statements referenced in ¶¶ 222 through 225 concerning Houlihan Lokey's methodology and the Special Committee's, the Board's, and the Buyer Group's reliance on that analysis were false and misleading for the reasons stated in ¶ 173(c).

C.      **Statements on JA Solar's Website**

227.    In December 2017, JA Solar posted an announcement on its corporate website stating that "*JA Solar Co. Ltd. currently does not have plans to list domestically.  JA Solar Co. Ltd. and its related parties have not and will not issue any fundraising notices,*

*announcements, or internal messages in relation to a relisting, much less will it take any public placement actions in relation to a relisting. Any fundraising behavior in relation to a relisting by JA Solar Co. Ltd. is not being done by JA Solar Co. Ltd. or Jinglong Industrial Group Co. Ltd. and does not have their approval. Such fundraising behavior may be committing the crimes of illegal fundraising or fraud. We ask that society and the public not allow themselves to be cheated.*"   Based on a search of Internet archives, this notice is believed to have remained on JA Solar's website for at least several months, into March 2018, if not later.

228.    This emphatic statement falsely quelled any thought that Defendants might have been planning to relist in China following the Merger.  Moreover, this denial referred not only to the Company's activities as of the announcement in December 2017, but also affirmed that the Company "will not" undertake any relisting actions going forward.   In addition, this statement was false and misleading for the reasons stated in ¶ 173(a).

**D.    The Amended Proxy Materials**

229.    On January 11, 2018, JA Solar published amended proxy materials as an amendment to its earlier filed Form 13E3 (the "Amended Proxy Materials").  The Amended Proxy Materials included an updated preliminary proxy statement (the "Amended Proxy Statement") and the final version of Houlihan Lokey's November 16, 2017 presentation to the Special Committee.

230.    As with the Preliminary Proxy Statement, the Amended Proxy Statement was directed to all "Shareholders of JA Solar" and was signed by Defendant Jin, Defendant Jia (on behalf of JA Solar), and the remaining members of the Buyer Group.

231.    The Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary

Proxy Materials and adding several additional false and misleading statements, as described in the sections that follow.

232.    In addition, as with the Preliminary Proxy Materials, when signing the Amended Proxy Materials, Defendant Jin, Defendant Jia, and the remainder of the Buyer Group each affirmed that *"[a]fter due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct."*

233.    These statements were false and misleading for the reasons stated in ¶ 173(a)-(d).

234.    In addition, the Amended Proxy Materials included the misleading statements or omissions described in the following sections (1) through (4).

### 1.    Statements Concerning Intention Not to Relist

235.    The Amended Proxy Materials continued the fraudulent scheme by reproducing the false and misleading statements concerning the intention of the Buyer Group not to relist JA Solar following the Merger, as described in Section V.B.1 above.

236.    These statements were false and misleading for the reasons stated in ¶ 173(a)-(c).

237.    In addition, the Amended Proxy Statement added that the factors that it listed the Special Committee and the Board as having considered in deciding whether to support the Merger *"includes all material factors considered by the Special Committee and the Board."* The Preliminary Proxy Statement contained a similar statement as to the Buyer Group, which is also in the Amended Proxy Statement, but not as to the Special Committee and the Board.  The Amended Proxy Statement was revised to add this statement as to the Special Committee and the Board only because the SEC specifically called out the Preliminary Proxy Statement for failing to clarify whether it *"disclosed all material factors considered in reaching a fairness determination instead of 'a number' of those factors"* (emphasis in original).

238.    These statements were false and misleading for the reasons stated in ¶ 173(a)-(c).

### 2.      Promotion of the Merger Price

239.    The Amended Proxy Statement continued the fraudulent scheme by continuing to promote the Merger by describing the merger consideration of $1.51 per common share and $7.55 per ADS.

240.    These statements were false and misleading for the reasons stated in ¶ 173(b).

### 3.      False Representations that the Transaction Was Fair

241.    The Amended Proxy Statement also continued the fraudulent scheme by reproducing the false and misleading statements concerning the supposed fairness of the Merger for the holders of JA Solar Securities who were unaffiliated with the Buyer Group, as summarized in Section V.B.3 above.

242.    These statements were false and misleading for the reasons stated in ¶ 173(b)-(c).

243.    In addition, the Amended Proxy Statement added, again in response to the SEC's comments, that "*[t]he Special Committee and the Board expressly adopted [Houlihan's] analyses and opinions, among other factors considered, in reaching their respective determination as to the fairness of the Transactions, including the Merger.*"  (The Preliminary Proxy Statement had made a similar statement only as to the Special Committee.)

244.    The Amended Proxy Statement also added in response to the SEC's comments that the reason why the proposed transaction stalled when first discussed with the Buyer Group in 2015 was because "*the Buyer Group was unable to achieve any substantive progress in securing adequate financing,*" which the Amended Proxy Statement attributed to "*various factors, including uncertainties about China's economy and the solar industry in particular, enhanced foreign exchange control by the Chinese government over outbound investments, and fluctuations in the exchange rate of RMB to USD.*"

245.    These statements were false and misleading for the reasons stated in ¶ 173(b)-(c).

### 4.    Statements Concerning the Basis for the Board's, Special Committee's, Buyer Group's, and Houlihan's Determinations

246.    The Amended Proxy Statement also continued the fraudulent scheme by reproducing the false and misleading statements concerning the basis for the Board's, Special Committee's, Buyer Group's, and Houlihan Lokey's determinations that the Merger was fair or in the best interests of the holders of JA Solar Securities, as summarized in Section V.B.4 above.[19]

247.    These statements were false and misleading for the reasons stated in ¶ 173(c).

248.    In addition, the Amended Proxy Statement included additional detail concerning the basis for these determinations concerning the fairness of the Merger.

249.    The Amended Proxy Statement spelled out, in response to the SEC's comments, that "*[t]he Special Committee and the Board also noted Houlihan Lokey's view that the results derived from the selected companies analysis and selected transactions analysis do not provide a meaningful comparison to the Company. The Special Committee and the Board adopted Houlihan Lokey's financial analyses as a whole, including its determinations that the selected companies analysis and the selected transactions analysis did not result in meaningful comparisons with respect to the Company and the proposed Merger. Accordingly, the Special Committee and the Board did not rely on such analyses in reaching their conclusion that the Per Share Merger Consideration to be received by holders of Shares (other than Excluded Shares) and the Per ADS Merger Consideration to be received by holders of ADSs (other than ADSs representing Excluded Shares) are fair, from a financial point of view, to such holders.*"

---

[19] The Amended Proxy Materials included the final copy of the presentation that Houlihan gave to the Special Committee when presenting its fairness opinion on November 16, 2017 (rather than the draft copy that was included with the Preliminary Proxy Materials).

250.     The Amended Proxy Statement included this statement only because the SEC had noted that the Preliminary Proxy Statement failed to explain what effect Houlihan Lokey's decision to rely solely on its discounted cash flow analysis had "***on the special committee's and the board's assessment of the value of Houlihan Lokey's opinion.***"  (Emphasis in original).

251.     These statements were false and misleading for the reasons stated in ¶ 173(c).

252.     The Amended Proxy Statement also now gave JA Solar's financial projections that were provided to Houlihan in U.S. dollars, as follows:

| (in millions USD except percentage) | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | 2017E | 2018E | 2019E | 2020E | 2021E |
| **Total Revenue** | 2,596 | 2,865 | 3,507 | 3,543 | 3,625 |
| *Growth* | | *10%* | *22%* | *1%* | *2%* |
| **Gross Profit** | 338 | 366 | 429 | 440 | 454 |
| *% Revenue* | *13%* | *13%* | *12%* | *12%* | *13%* |
| **EBIT(1)** | 103 | 97 | 101 | 116 | 123 |
| *% Revenue* | *4%* | *3%* | *3%* | *3%* | *3%* |
| **EBITDA(2)** | 257 | 265 | 273 | 279 | 283 |
| *% Revenue* | *10%* | *9%* | *8%* | *8%* | *8%* |
| **Net Income** | 39 | 33 | 37 | 49 | 60 |
| *% Revenue* | *2%* | *1%* | *1%* | *1%* | *2%* |

253.     These statements were false and misleading for the reasons stated in ¶ 173(c).  In particular, when JA Solar gave its 2017 projections to Houlihan Lokey, the first three quarters of the year were already complete and only half of the fourth quarter remained.  The following table shows the projections that JA Solar gave to Houlihan Lokey for the fourth quarter of 2017 as compared to the actual results that it reported for that quarter in the 2017 Annual Report:

| | **Projected[20]** | **Actual[21]** | **% Understated** |
|---|---|---|---|
| **Total Revenue (USD)** | $494 million | $871.8 million | 76% |
| **Total Revenue** | RMB 3.276 billion | RMB 5.7 billion | |

[20] These projections are derived by subtracting JA Solar's actual results for the first three quarters of 2017 from the full year projections that JA Solar gave to Houlihan Lokey.

[21] JA Solar reported its results for the fourth quarter of 2017 in an April 30, 2018 press release that it filed with the SEC as an exhibit to a Form 6-K.

| (RMB) | | | |
|---|---|---|---|
| **Net Income (USD)** | $11.25 million | $17.8 million | 58% |
| **Net Income (RMB)** | RMB 74.18 million | RMB 115.5 million | |

254.    In addition, the Amended Proxy Statement added, again in response to SEC comments, that the "***perpetuity growth rates***" that Houlihan Lokey used in its discounted cash flow analysis "***gave consideration to a number of factors, including the expected long-term growth prospects of the Company, industry growth expectations, and estimated inflation and GDP growth rates.***"

255.    This statement was false and misleading for the reasons stated in ¶ 173(c), particularly because these assumptions underlying JA Solar's business conditions were directly contradicted by the much more positive description of those conditions that were disclosed in the 2017 Annual Report shortly after the shareholder vote.

### E.    Second Amended Proxy Materials

256.    On February 1, 2018, JA Solar published and filed with the SEC another set of amended proxy materials as an amendment to its earlier filed Form 13E-3 (the "Second Amended Proxy Materials").  The Second Amended Proxy Materials included the Final Proxy Statement to shareholders in connection with the Merger.

257.    As with the Preliminary Proxy Materials and the Amended Proxy Materials, the Second Amended Proxy Materials were directed to all "Shareholders of JA Solar" and were signed by Defendant Jin, Defendant Jia (on behalf of JA Solar), and the remaining members of the Buyer Group.

258.    The Second Amended Proxy Materials continued the fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary Proxy Materials and Amended Proxy Materials, and adding several additional false and misleading statements, as described in the sections that follow.

259.    In addition, as with the Preliminary Proxy Materials and Amended Proxy Materials, when signing the Second Amended Proxy Materials, Defendant Jin, Defendant Jia, and the remainder of the Buyer Group each affirmed that "*[a]fter due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.*"

260.    These statements were false and misleading for the reasons stated in ¶ 173(a)-(d).

261.    In addition, the Second Amended Proxy Materials included the misleading statements or omissions described in the following sections (1) through (4).

### 1.    Promotion of the Merger Price

262.    The Second Amended Proxy Materials continued the fraudulent scheme by continuing to promote the Merger by describing the merger consideration of $1.51 per common share and $7.55 per ADS.

263.    These statements were false and misleading for the reasons stated in ¶ 173(b).

### 2.    Statements Concerning Intention Not to Relist

264.    The Second Amended Proxy Materials continued the fraudulent scheme by reproducing the false and misleading statements concerning the intention of the Buyer Group not to relist JA Solar following the Merger, as summarized in Section V.D.1 above regarding the Amended Proxy Materials.

265.    These statements were false and misleading for the reasons stated in ¶ 173(a)-(c).

### 3.    False Representations that the Transaction Was Fair

266.    The Second Amended Proxy Materials also continued the fraudulent scheme by reproducing the false and misleading statements concerning the supposed fairness of the Merger for the holders of JA Solar Securities, as summarized in Section V.D.3 above regarding the Amended Proxy Materials.

267.     These statements were false and misleading for the reasons stated in ¶ 173(b)-(c).

> ### 4.     Statements Concerning the Basis for the Board's, Special Committee's, Buyer Group's and Houlihan's Determinations

268.     The Second Amended Proxy Materials also continued the fraudulent scheme by reproducing the false and misleading statements concerning the basis for the Board's, Special Committee's, Buyer Group's, and Houlihan Lokey's determinations that the Merger was fair or in the best interests of the holders of JA Solar Securities, as summarized in Section V.D.4 above regarding the Amended Proxy Materials.

269.     These statements were false and misleading for the reasons stated in ¶ 173(c).

### F.     Announcement of Shareholder Vote

270.     On March 12, 2018, JA Solar issued a Form 6-K signed by Defendant Jin and attaching a press release announcing the "Shareholders' Approval of Merger Agreement."

271.     This press release explained that "*[p]rior to the extraordinary general meeting held today, the Company has received written notices of objection validly served by certain shareholders according to Section 238(2) of the Cayman Islands Companies Law. These shareholders together hold more than 10% of the Company's total outstanding ordinary shares. Pursuant to Section 7.02(d) and Section 8.02(d) of the Merger Agreement, if at the time when the shareholders' approval is obtained, the holders of more than 10% of ordinary shares have validly served notices of objection, and within 10 business days the Parent Parties have not granted an irrevocable waiver of this condition, either the Company or the Parent Parties may terminate the Merger Agreement. The Company intends to update its shareholders if and when it receives from the Parent Parties their decision with respect to their granting of the waiver in due course.*"

272.    In the several disclosures that Defendants made after the shareholder vote, however, they never disclosed whether the Parent Parties granted this waiver.

273.    On April 30, 2018, JA Solar issued, and filed with the SEC, its Annual Report on Form 20-F for 2017 (the "2017 Annual Report").  The 2017 Annual Report was signed by Ying Li, the Company's Finance VP.

274.    The 2017 Annual Report stated that "*[o]ur board of directors, acting upon the unanimous recommendation of the special committee, which was comprised solely of independent and disinterested directors unaffiliated with any members of the management of our Company, approved the Merger Agreement and the Merger and resolved to recommend that our shareholders vote for authorization and approval of the Merger Agreement and the Merger. The special committee negotiated the terms of the Merger Agreement with the assistance of its financial and legal advisors.*"

275.    The Annual Report also warned that "*[a]lthough the merger agreement has been authorized and approved at the extraordinary general meeting held on March 12, 2018, the merger is subject to various closing conditions and we cannot assure you the result of the going private transaction. . . .  If the going private transaction is not closed and the merger agreement is terminated, our business and the trading price of our ADSs may be adversely affected.*"

276.    Then, without providing any update as to the status of the Dissenting Shareholder Condition, JA Solar announced on July 16, 2018 that the Merger was completed.  JA Solar made this announcement in a press release that accompanied a Form 6-K that the Company filed with the SEC and that was signed by Defendant Jin.

277.    All of these statements described in this Section V.F were false and misleading for the reasons stated in ¶ 173(d).

278.    Also on July 16, 2018, JA Solar filed a final amendment to its proxy materials on Schedule 13E-3 that was signed by Defendant Jin, Defendant Jia (on behalf of JA Solar), and the remaining members of the Buyer Group.  This final amendment announced the completion of the Merger.

279.    Even at this last possible moment, Defendants said nothing about whether the Buyer Group formally waived the Dissenting Shareholder Condition.

280.    This statement was false and misleading for the reasons stated in ¶ 173(d).

281.    In addition, as with the prior versions of the Proxy Materials, this amendment also stated for each signatory that "*[a]fter due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.*"

282.    This statement was false and misleading for the reasons stated in ¶ 173(a)-(d).

283.    In addition, this final amendment to the Proxy Materials incorporated the Final Proxy Statement that had been filed on February 1, 2018.  All of the statements from the Final Proxy Statement, which was included with the Second Amended Proxy Materials, that are described in Section V.E above, which were false and misleading for the reasons explained in that section, are reproduced in this final amendment to the Proxy Materials.

## VI.    CONTROL PERSON ALLEGATIONS

284.    The Individual Defendants, by virtue of their senior positions at JA Solar, directly participated in the management and oversight of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the distribution of

misleading information and the failure to convey material information to the public was the result of their collective actions and knowing inactions.

285.    As JA Solar's Chairman, CEO, and Founder, Defendant Jin was closely involved in all aspects of the Company's business operations.  Defendant Jin had control over JA Solar during the Class Period, through these positions and his stake in the Company.  Defendant Jin and Jinglong BVI (which was 32.96% owned by Jin) together owned 16.5% of the total outstanding shares of JA Solar prior to the Merger.  Defendant Jin also controlled the Jingling group of companies that conducted substantial business with JA Solar and on which JA Solar was dependent for essential materials, real estate, and financing.

286.    Defendant Jin also had control over the Buyer Group and Parent Parties through his position as the individual person with the largest stake in JA Solar in those groups both before and after the Merger.

287.    As a JA Solar director and Chairman of the two-person Special Committee, Defendant Jia had considerable ability to control the Company during the Class Period. Defendant Jia exercised further control over the Company in his roles on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee of the Board of Directors.

288.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of JA Solar, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by JA Solar, the Special Committee, the Board, and the Buyer Group during the Class Period.  The Individual Defendants were undoubtedly provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations which were being made were then materially false and/or misleading.

289.    Moreover, Defendants Jin and Jia signed SEC filings that contained the material misstatements or omissions at issue here. Accordingly, they are responsible for the accuracy of the public statements detailed herein.

290.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. Each of the Individual Defendants were culpable for this deceit insofar as they acted with the requisite scienter, as explained throughout, and especially in the following Section.

291.    The Individual Defendants are further liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

292.    At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter. Furthermore, Defendant Jin had the motive and opportunity to commit the fraud.

## A.    Defendant Jin Had the Motive and Opportunity to Defraud the Class

293.    As JA Solar's CEO and the Chairman of its Board, it is clear that Defendant Jin had the opportunity to commit the fraudulent acts described herein.   He had the ability to influence the information contained in the Proxy Materials and the information that management provided to Houlihan, and he made public statements about the Company's prospects. Defendant Jin also signed the Proxy Materials and had the ability to influence their preparation. He also had the opportunity to vote his substantial amount of shares as he saw fit as to the acceptance of the Merger.

294.    As the leading member of the Buyer Group who would own 79.8% of the Company following the Merger, Defendant Jin had an enormous motivation for the Merger to be completed at as low a transaction price as possible.   By deflating the value of the JA Solar Securities through the fraudulent scheme described herein, Defendant Jin was able to reduce the amount of money he needed to spend to acquire JA Solar.   In fact, by defrauding the holders of JA Solar Securities, he received a windfall from them of *at least* $440 million.[22]   Defendant Jin also stood personally to gain through the completion of the Merger because the transaction would give him private control of the Company.   Ultimately, Jin was motivated to see to it that

---

[22] This $440 million figure is derived by taking Defendant Jin's share (79.8%) of the difference in value between (a) the 74.3% of JA Solar that the Buyer Group (or, more precisely, the Rollover Shareholders) did not own before the Merger (and therefore purchased at a deflated price) and (b) the publicly disclosed valuation of that portion of the Company (which the Buyer Group now owned) after the Merger.   This is a very conservative estimate of Defendant Jin's (and the Buyer Group's more generally) gain because it (1) excludes the portion of JA Solar that the Buyer Group owned before the Merger and that increased in value through the relisting; (2) does not attribute any gains to the pre-Merger value of the portion of Defendant Jin's ownership that he acquired through the Merger through little, if any, personal risk or expenditure; and (3) is based on JA Solar's relisting value reported in the financial press as opposed to larger measures of JA Solar's fair value as a publicly listed company in China.   This calculation is therefore provided just for demonstrative purposes and does not preclude Lead Plaintiffs from offering other assessments of these values in this action.

the Merger be completed at the agreed-upon transaction price so that he could capitalize on the deflated share price and reap millions in profits when the private Company would then be relisted in China as a public company with a far higher value.

295.     The other members of the Buyer Group had the same motive to commit fraud. They would own the remainder of the Company following the Merger that Defendant Jin did not own.  They therefore also stood to reap profits by completing the Merger at a deflated price so that they could then sell their shares at higher prices when the Company would be relisted in China.  The other members of the Buyer Group also signed the Proxy Materials and had the opportunity to influence the statements contained therein supporting the Merger.

### B.     The Timing of the Relisting Transaction Shows Defendants' Scienter

296.     On July 19, 2018, just three days after the Merger closed, the newly private JA Solar and Tianye Tonglian formally agreed to engage in the backdoor listing transaction that would result in JA Solar relisting in the Chinese public markets.

297.     As explained in Section IV.H.3 above, this is not a decision that could have been reached in just three days.  In total, it would ordinarily take more than 12 months for a company such as JA Solar to be able to agree to announcing an asset restructuring deal such as the deal with Tianye Tonglian that they announced in the MoU here.  Given that JA Solar and Tianye Tonglian reached their backdoor listing agreement on July 19, 2018, it is completely implausible that the process for that transaction had not already begun while the Merger process was underway.  Based on just the timing of a typical relisting transaction—without accounting for all of the other evidence described above—the plan to relist predated the announcement of the Merger on November 17, 2017 and the publication of the Preliminary Proxy Materials on December 11, 2017 by at least several months.

298.    Many time-consuming steps on the part of both JA Solar and Tianye Tonglian would have gone into their being able to agree to terms of the backdoor listing that they announced on July 19, 2018.  Moreover, the particularly complex nature of the backdoor listing here means that it would have taken longer than more straightforward transactions.

299.    This timing is further confirmed by CW3's statements.  CW3 recalled that in May or June of 2018, well before the Merger was completed, an audit team from BDO China visited JA Solar's office in Beijing for work that appeared to be in connection the planned upcoming relisting.  CW 3 was told that the audit team planned to audit each of the Company's subsidiaries before issuing its final consolidated audit report, which would depend in part on the final details of the relisting that had not yet been announced.  Counsel has also reviewed a translated resume from a former employee of BDO China indicating that beginning in May 2018, this former employee worked on an audit of a JA Solar subsidiary for an "IPO listing."  This not only corroborates CW 3's account, but provides further proof that BDO was in fact preparing JA Solar for a major capital markets listing.

300.    This shows that by May or June of 2018, JA Solar was already far enough along in its relisting plans to have its Chinese auditor begin its audit that would be necessary for the transaction to take place.  This step would typically not occur until the final stages of the backdoor listing process.  Otherwise the company undergoing the relisting (such as JA Solar) would risk wasting resources on an intensive audit that might not be necessary or that might be obsolete and need to be redone by the time the relisting transaction is finally agreed upon.

301.    Defendant Jin was the single largest individual shareholder of JA Solar before the Merger, controlled the Company in all the ways described above, owned approximately 80% of JA Solar following the Merger, and is set to be the CEO of Tianye Tonglian after the backdoor

listing is complete.  He therefore would have not only been involved in, but would have led, the backdoor listing efforts on behalf of JA Solar.

302.    Defendant Jia, by virtue of his role as a director, Chairman of the Special Committee, and member of every Board committee that JA Solar had, would also have been apprised of these backdoor listing negotiations that coincided with the Merger process that he was so heavily involved in.

### C.    Defendant Jin's November 2017 Speech Reveals His State of Mind at That Key Time

303.    Defendant Jin's scienter is further evidenced by his November 19, 2017 speech at the "2017 Entrepreneur 'To Conscience' (Beijing) Forum" in Beijing.  Defendant Jin stated in that speech that JA Solar had plans to return to the Chinese capital markets in publicly traded form within the following two or three years.

304.    This statement at the "2017 Entrepreneur 'To Conscience' (Beijing) Forum" did not notify JA Solar shareholders of the Company's intent to relist immediately following the Merger for the reasons explained above.  (*See supra* ¶ 131).  But this speech, in the context of all of the other facts alleged plainly shows that Defendant Jin had the relisting transaction in mind since at least November 19, 2017.

305.    Moreover, this November 19, 2017, speech occurred just two days after Defendants signed the Merger Agreement and the day before the start of the Class Period when JA Solar filed its announcement of the Merger with the SEC.  Defendant Jin's discussion of his plans to relist JA Solar in China just as the terms of the Merger were being finalized and announced shows what was on his mind at that crucial time.

**D.      Other Documents and Statements Reveal the Relisting Plan Existed Prior to the Merger**

306.      Several of the previously discussed CWs recalled knowing about the relisting plan prior to the close of the merger.  CW 1 recalled hearing about the delisting plan at the beginning of 2018 at the same that he heard about the relisting plan.   He further explained that he heard that JA Solar would probably be relisted on the A-Shares market at the beginning of 2018 and clarified that it was a rumor circulated among employees.  CW 2 stated that he first heard about the delisting plan sometime in 2017 and, after hearing about the delisting plan, heard that JA Solar probably would be relisted on the A-shares market. CW 3 recalled visiting JA Solar's official website and seeing a message that said there was a rumor that JA Solar will be relisted in Chinese capital markets and telling people not to believe the rumors.[23]  CW 3 said that even after this message was posted, the internal rumors regarding JA Solar's relisting continued.  CW 4 said that he first heard about the delisting plan in Spring of 2018, and added that he heard the news quite late.   When asked what were the reasons given, internally, for taking the Company private and delisting from NASDAQ, CW 4 explained that he heard from his colleagues that JA Solar wanted to go back to mainland China and added that there were successful precedents such as Trina Solar and Longi Group, whose valuations were dramatically higher after they returned to domestic capital markets.  CW 4 also explained that he first heard about JA Solar's relisting plan on April 20, 2018, when attending an industry conference, and was told about the relisting plan by a colleague in the power plant business unit.

307.      Counsel has also reviewed a translated resume from a former employee of China Dragon Securities Co. Ltd.  This resume indicates that the employee assisted the Jinglong group

_____

[23] This appears to be a reference to the message discussed in Paragraphs 103 to 104 above.

in developing its plans to relist JA Solar on the A-Shares market after privatization, dating all the way back to the 2015-2016 time period.

### E.    The Divergence Between the Proxy Materials and the 2017 Annual Report Shows Defendants' Scienter

308.    The financial projections and descriptions of JA Solar's business conditions that were described in the Proxy Materials deviated significantly from the corresponding statements that JA Solar disclosed in the 2017 Annual Report.  The statements in the Proxy Materials, which formed the basis for Houlihan Lokey's, the Special Committee's, the Board's, and the Buyer Group's determinations that the Merger was fair, significantly understated the Company's financial projections for 2017 and downplayed its overall business outlook.

309.    These misstatements were exacerbated by the fact that (1) Houlihan Lokey relied solely on its financial analysis of JA Solar and ignored other traditional valuation metrics; (2) the Special Committee and the Board "expressly adopted" Houlihan Lokey's analysis; and (3) the Buyer Group relied on the Special Committee and the Board, including Houlihan Lokey's role in advising the Special Committee.

310.    In addition, the timing of these statements shows that they were not simply an instance of financial results turning out better than projected or of business conditions changing. The financial projections were provided to Houlihan Lokey in late 2017, once JA Solar's fiscal 2017 was nearly complete.  Houlihan Lokey's November 16, 2017 presentation to the Special Committee even incorporated JA Solar's actual financial results through September 30, 2017. The projections that JA Solar gave to Houlihan Lokey were therefore really just projections for the fourth quarter of 2017, which was already halfway done when JA Solar gave its presentation to the Special Committee on November 16, 2017.

311.    As described above, the projections that the Company gave to Houlihan Lokey for the fourth quarter of 2017, and that Houlihan Lokey used as a basis for its analysis once that quarter was already half over, understated the actual revenue for that quarter by approximately 76% and understated the net income for that quarter by approximately 58%.  (*See supra* ¶¶ 126-27).

312.    Despite having actual data that contradicted this information, Defendants also repeated these outlandish projections in the Proxy Materials that they published on December 11, 2017, January 11, 2018, February 1, 2018, and July 16, 2018, well after the fourth quarter ended.

313.    Furthermore, Defendants supported these projections in all of the Proxy Materials by describing JA Solar's business prospects in extremely negative ways.

314.    Then, when JA Solar announced its actual results for the full year 2017 on April 30, 2018, which was less than two months after the March 12, 2018 shareholder vote, the Company not only disclosed results that far surpassed projections for the fourth quarter of 2017, but also described JA Solar's business conditions in much more positive terms.

315.    The short time between when Houlihan Lokey conducted its financial analysis and when JA Solar's full-year 2017 financial results were complete does not support such a drastic shift in results and overall business environment.  The only realistic explanation of this incongruity is the fact that the March 12, 2018 shareholder vote fell squarely between the false statements made in the Proxy Materials and the actual results in the 2017 Annual Report.

316.    This incongruity is further highlighted by how JA Solar and Defendant Jin have described the Company's *past performance* far-more positively in connection with its relisting process.  (*See supra* ¶¶ 152-55).

317.    The only plausible explanation of this sequence of events is that JA Solar's management—led by Defendant Jin—sought to understate the Company's financial condition in the Proxy Materials in order to depress the transaction price for the Merger so that Jin could then reap enormous profits from relisting the Company in China at a much higher value.

### F.    Additional Allegation Regarding JA Solar's Knowledge

318.    JA Solar has the knowledge of its employees. It therefore knew of the fraud insofar as any of the Individual Defendants knew of the fraud.  Furthermore, several of JA Solar's other high-ranking employees (in addition to the Individual Defendants) would have known that the backdoor listing was already well underway when the Merger process began, that JA Solar's 2017 financial results would be much greater than projected, that the Company's business conditions were far better than described in the Proxy Materials, and there was never any possibility that the Company or the Buyer Group would terminate the Merger after the shareholder vote.  All of these facts were misstated or improperly omitted from the Proxy Materials.

## VIII.   LOSS CAUSATION

319.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of JA Solar Securities and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein. This course of conduct misled the Class members and caused them, in reliance on the misrepresentations and on the market price of JA Solar Securities during the Class Period, to sell their shares at a depressed price.  The far higher price that the Company is being valued at in the relisting shows that the Class members did not receive fair value for their shares in the Merger.  The fact that the deal's alleged fairness was evaluated only with the use of financial information that Defendants knew was depressed, and the eventual

disclosure of financial results that far-outpaced the financial information used in evaluating the transaction, also show that the true value of the ADS far exceeded the Merger consideration. Class members who sold their JA Solar Securities during the Class Period were damaged thereby because they sold their shares at prices that were lower than the true value of the Company (i.e., Class members suffered damages under the federal securities laws).

320.    Those Class members who sold their JA Solar Securities during the Class Period and prior to the Merger being completed on July 16, 2018, suffered economic loss because their securities were sold at a depressed value.  Defendants' fraud caused JA Solar's ADS to trade at artificially deflated levels throughout the Class Period and caused the holders of JA Solar Securities to be deprived of the true value of their shares. According to data on Bloomberg, the closing price of JA Solar's ADS on each date during the Class Period ranged from $6.26 per ADS to $8.04 per ADS.  On the day before the start of the Class Period, JA Solar's ADS closed at $7.45.  The Class members who sold their JA Solar Securities prior to the completion of the Merger on July 16, 2018, were deprived of the fair value of their shares through this fraudulent depression of their shares by Defendants' false and misleading statements and omissions.

321.    With respect to those Class members who sold their JA Solar Securities prior to July 16, 2018, the availability of the right of appraisal under Cayman Islands law is relevant in the following sense.  But for the fraud, the market price for JA Solar Securities would have more closely reflected its true value, including because the availability of appraisal as a remedy would have prevented the deal price from serving as a ceiling limiting the upper-price of the JA Solar Securities.

322.    In addition, Defendants' false and misleading statements caused shareholders to forego their right to dissent prior to the shareholder vote and exercise their appraisal rights.

Defendants' false and misleading statements concealed the true value of JA Solar Securities and therefore prevented JA Solar Shareholders from making an informed decision as to whether they should dissent and seek appraisal.  Defendants' descriptions in the Proxy Materials of how difficult it would be for shareholders to cancel their ADS and register their corresponding shares before they would be able to exercise their dissenting rights further deterred them from dissenting absent knowledge of Defendants' fraud.

323.    Class members who held their JA Solar Securities through the close of the Class Period ultimately sold their JA Solar Securities for either $7.55 per ADS or $1.51 per common share.  Each of these holders of JA Solar Securities was deprived of the fair value of their shares through the fraudulent depression of the value of their shares by Defendants' false and misleading statements and omissions.  These shares were worth far more than the transaction price, as evidenced by the fact that the relisting in China values JA Solar at multiple times the Merger price.

324.    Lead Plaintiffs both sold ADS during the Class Period at a deflated price and were injured thereby and held ADS through the close of the Merger, and ultimately sold those ADS by tendering them for the deflated Merger consideration.

## IX.    ALLEGATIONS OF INSIDER TRADING

325.    Defendants JA Solar and Jin engaged in insider trading to the detriment of the Class members, who were forced to tender their shares in the Merger or who voluntarily sold their shares contemporaneous with JA Solar.  Through this insider trading, Defendants JA Solar and Jin are liable under Section 20A of the Exchange Act, 15 U.S.C. § 78t–1, as explained in Count 2 below.  Furthermore, to the extent that JA Solar is liable for insider trading, the Individual Defendants are liable as control persons under Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a), and as expressly permitted by Section 20A(b)(3) of the Exchange Act, 15 U.S.C. § 78t–1(b)(3), as explained in Count 3 below.

326.    According to a Schedule 13E-3 filed by JA Solar with the SEC on July 16, 2018, the Merger "became effective" on that day.  This is referred to by JA Solar as the "Effective Time."  JA Solar explained that as of the Effective Time, each share of its stock, including shares represented by ADS, was "cancelled and ceased to exist in exchange for the right to receive US$1.51 (the 'Per Share Merger Consideration') and each ADS issued and outstanding immediately prior to the Effective Time (other than ADSs that represent Rollover Shares and Dissenting Shares) was cancelled in exchange for the right to receive US$7.55 (the 'Per ADS Merger Consideration')."

327.    Through the Merger, Defendants JA Solar and Jin purchased the shares that were sold by Class members through the Merger.  As laid out in Section 2.04(a) of the Merger Agreement, which was approved at the Extraordinary Shareholders Meeting held on March 12, 2018, and which was signed by Defendants JA Solar, Jin, and Jia, the Parent Parties were responsible for depositing the Merger funds with a "paying agent" who would distribute the funds to the Class members for their JA Solar Securities that were purchased by the Parent Parties through the Merger.  Section 2.04 of the Merger Agreement further describes how JA Solar (including in its surviving form following the Merger) and the Parent Parties would coordinate the paying agent's exchange of the Merger consideration for JA Solar shares.

328.    Furthermore, the Final Proxy Statement describes how "[a]t or prior to the Effective Time, the Parent Parties will deposit, or cause to be deposited, with a bank or trust company reasonably acceptable to the Company to act as paying agent, an amount in cash equal to the aggregate merger consideration to which all holders of Shares (including Shares

represented by ADSs but not including Excluded Shares) become entitled under the Merger Agreement."

329.    At the Effective Time, upon purchasing the shares thereafter, and all times during the Class Period, Defendants JA Solar and Jin were in possession of material non-public information about the relisting plan and the fact that JA Solar's operations were far better than what Defendants described in the Proxy Materials.  Furthermore, Defendants JA Solar and Jin were aware of the truth regarding each of the misstatements described herein and were aware of the material omissions detailed herein.

330.    By virtue of possessing material non-public information, Defendants JA Solar and Jin had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with JA Solar's investors.

331.    Moreover, Cayman Islands corporations, like JA Solar, have a duty to provide investors with sufficient information to adequately understand the Merger that they are called upon to consider.

332.    By failing to disclose the material non-public information prior to trading, Defendants JA Solar and Jin caused selling investors in JA Solar Securities to suffer economic losses.  In addition, by trading with JA Solar Securityholders who were acting in reliance on the material misrepresentations made by JA Solar and Jin described throughout this Amended Complaint, they caused selling investors in JA Solar Securities to suffer economic loss.  By purchasing the JA Solar Securities from Lead Plaintiffs and other Class members, Defendants

experienced an unlawful and unjust enrichment, since they were able to acquire these securities for less than their fair value.

## X.     NO SAFE HARBOR

333.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint. As the Company acknowledged within the Proxy Materials, the Merger was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Transaction are not subject to the PSLRA's safe harbor.  *See* 15 U.S.C.A. § 78u-5(b)(E). Furthermore, even if the statements were not covered by this exemption, the statements at issue would not be protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

334.    First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor.  Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

335.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners and former owners of JA Solar Securities who sold shares, and were damaged thereby, during the period from November 20, 2017 through July 16, 2018, inclusive, and all owners and former owners of JA Solar Securities who owned shares as of the Effective Time of the Merger and have tendered those shares for the Merger consideration, except as excluded below (the "Class").

336.    For the avoidance of doubt, the Class includes those who held JA Solar ADS on November 20, 2017 or purchased JA Solar ADS any time after November 20, 2017, redeemed those ADS for JA Solar common stock during the Class Period, and then tendered those shares for the Merger consideration, in accordance with the instructions that Defendants provided in the Merger on July 16, 2018.

337.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of the Individual Defendants and the directors and officers of JA Solar; (iii) any entity in which Defendants have a controlling interest; (iv) any person who was an officer or director of JA Solar during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph.

338.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, JA Solar had approximately 238 million ordinary shares outstanding. The number of outstanding ADS during the Class Period is not publicly available but the most recent number reported on Bloomberg shows 47.585 million ADS outstanding as of July 16, 2018.  JA Solar's ADS actively traded on the NASDAQ.

339.   While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained either by JA Solar or by the Depository of JA Solar's ADS and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

340.   Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

341.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

342.   There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, without limit:

(a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)   whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)      whether defendants acted with the intent to defraud class members regarding the true value of the JA Solar Securities;

(g)      whether Defendants' fraudulent conduct depressed the price of JA Solar stock during the Class Period;

(h)      whether JA Solar was in possession of material non-public information at the time of the Merger;

(i)      whether Class members sold their securities contemporaneously with Defendants JA Solar's and Jin's purchase of those shares;

(j)      whether the Individual Defendants were controlling persons of JA Solar;

(k)      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

(l)      whether and to what extent JA Solar Securityholders suffered losses due to Defendants' fraudulent conduct.

343.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET AND *AFFILIATED UTE* PRESUMPTIONS

344.    Lead Plaintiffs and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

345.    In the alternative, Lead Plaintiffs and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    JA Solar's ADS were actively traded on the NASDAQ, an informationally efficient market, under the ticker symbol "JASO," throughout the Class Period;

(d)    JA Solar's ADS traded at high volumes during the Class Period;

(e)    as the sponsor of its ADS, which are registered with the SEC, JA Solar filed periodic public reports with the SEC;

(f)    JA Solar communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(g)     the JA Solar Securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, though many of these firms discontinued coverage after the announcement of the proposed Transaction.  Each of these reports was publicly available and entered the public marketplace;

(h)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the JA Solar Securities; and

(i)     without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class sold JA Solar Securities between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

346.    As a result of the foregoing, the market for JA Solar stock and ADS promptly digested current information regarding JA Solar from publicly available sources and reflected such information in JA Solar's stock price.

347.    Lead Plaintiffs are not only entitled to a presumption that they relied on the market price when deciding whether to and how to vote their JA Solar Securities, whether to sell their JA Solar Securities, whether to hold those JA Solar Securities, or whether to seek appraisal; Lead Plaintiffs also in fact did rely on that market price when engaging in those activities.

348.    Under these circumstances, all sellers of JA Solar stock and ADS during the Class Period suffered similar injury through their sale of JA Solar stock and ADS at artificially deflated prices and the presumption of reliance applies.

**COUNT I**

**Violation of § 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

349.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

350.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

351.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

352.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose (under both U.S. and Cayman Islands law) and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

353.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who sold JA Solar Securities.

354.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially deflate and maintain the prices of JA Solar Securities; and (iii) cause Lead Plaintiffs and members of the Class to sell JA Solar Securities at artificially deflated prices.

355.    The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

356.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for JA Solar stock and ADS, Lead Plaintiffs and other members of the Class sold JA Solar Securities at artificially deflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have sold JA Solar Securities at such artificially deflated prices.

357.    The members of the Class that sold their JA Solar Securities in the Merger would have avoided doing so either by voting against the Merger or objecting to and dissenting from the Merger under Cayman Islands law.

358.    By selling the JA Solar Securities at these artificially deflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

359.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20A of the Exchange Act
### Against Defendants JA Solar and Jin

360.    Lead Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

361.    This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants JA Solar and Jin, on behalf of Lead Plaintiffs and all members of the Class who sold JA Solar Securities through the Merger and contemporaneously with JA Solar's and Jin's purchase of those securities in connection with the Merger that was completed on July 16, 2018.

362.    As alleged herein, JA Solar and Jin bought the JA Solar Securities while knowingly in possession of material positive and non-public information concerning the Company.  Among this information was the knowledge that the Proxy Materials understated the Company's value and that the relisting was already being planned and would be announced within days of the Merger being completed.

363.    As set forth in the PSLRA certification (*see* Dkt. Nos. 10, Ex. A and 13, Ex. C), Lead Plaintiffs held many of their JA Solar Securities until the close of the Class Period.  By doing so they sold those JA Solar Securities to JA Solar and Jin through the Merger.  JA Solar's and Jin's purchase and Lead Plaintiffs' sale were contemporaneous within the meaning of Section 20A of the Exchange Act. Numerous members of the Class also sold JA Solar Securities contemporaneous with JA Solar's and Jin's purchase in connection with the Merger.

364.    By virtue of possessing material non-public information, JA Solar and Jin had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with JA Solar's investors.

365.     Accordingly, under Section 20A of the Exchange Act, JA Solar's and Jin's purchase of the JA Solar Securities while knowingly in possession of material, positive, and non-public information during the Class Period makes them liable to Lead Plaintiffs and the Class for all profits gained and losses avoided as a result of such stock sales.

366.     JA Solar and Jin are required to account for all such stock sales and disgorge their profits or ill-gotten gains.

## COUNT III

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

367.     Lead Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein.

368.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

369.     As alleged above, JA Solar violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (i) making false and misleading statements and omitting material information in connection with the purchase and sale of the JA Solar Securities and (ii) participating in a fraudulent scheme and course of business or conduct throughout the Class Period.   Also as alleged above, JA Solar violated Section 20A of the Exchange Act by purchasing the Class members' JA Solar Securities through the Merger and while in possession of material non-public information.

370.     This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its

scheme during the Class Period. Thus, JA Solar is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

371. As set forth above, the Individual Defendants were controlling persons of JA Solar during the Class Period, due to their senior executive positions with the Company, positions on the Board and Special Committee, significant control over the Company's stock, and control over entities that did substantial business with the Company. Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations and the Merger process.

372. By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of JA Solar, including the content of its public statements with respect to, among other things, the Merger.

373. The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who sold JA Solar Securities during the Class Period.

374. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for JA Solar Securities, Lead Plaintiffs and other members of the Class sold JA Solar Securities at artificially deflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have sold JA Solar Securities at such artificially deflated prices. By selling the JA Solar Securities at these artificially deflated prices the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

375.    By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiffs and the members of the Class as controlling persons of JA Solar in violation of Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

376.    WHEREFORE, Lead Plaintiff respectfully prays for judgment against the Defendants as follows:

(a)     Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Pomerantz LLP and Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)     Awarding Lead Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## XIV.   DEMAND FOR JURY TRIAL

377.    Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated:  June 14, 2019

**LABATON SUCHAROW LLP**

*/s/ Carol Villegas*           
Carol Villegas
Jake Bissell-Linsk
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
Email: cvillegas@labaton.com
Email: jbissell-linsk@labaton.com


*Counsel for Co-Lead Plaintiff ODS Capital*
*LLC and Co-Lead Counsel for the Class*

**POMERANTZ LLP**

*/s/ Michael Grunfeld*       
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 66108665
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, IL  60603
Telephone:  312/377-1181
312/377-1184 (fax)
Email:  pdahlstrom@pomlaw.com

*Counsel for Co-Lead Plaintiff*
*Altimeo Asset Management and*
*Co-Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael Grunfeld*
Michael Grunfeld
