UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ODS CAPITAL LLC, Individually and on      :      18-cv-12083-ALC
Behalf of All Others Similarly Situated,    :

                                      :      **ECF Case**

                            Plaintiff,    :

                                 :

       v.    :

                                 :

JA SOLAR HOLDINGS CO., LTD.,    :
BAOFANG JIN, and SHAOHUA  JIA,    :

                               :

                     Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<br>

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS JA SOLAR HOLDINGS CO., LTD. AND BAOFANG JIN'S
### <u>MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>

<br><br>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

*Attorneys for Defendants JA Solar
Holdings Co., Ltd. and Baofang Jin*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 4

      A.     JA Solar .............................................................................................. 4

      B.     In 2015, the Buyer Group Makes an Offer To Take JA Solar Private .................... 4

      C.     In June 2017, the Buyer Group Submits a Revised Offer ........................................ 5

      D.     In November 2017, Houlihan Lokey Concludes the Offer
             Is "Fair," the Special Committee Recommends the
             Going-Private Transaction and the Board Approves It ............................................. 5

      E.     In November and December 2017, the Special Committee Conducts
             Another Market Check But Again Receives No Alternative Proposals ................. 6

      F.     Between December 2017 and February 2018, JA Solar Issues
             and Amends the Proxy Materials for the Going-Private Transaction ..................... 7

      G.     In March 2018, Shareholders Overwhelmingly Approve the Going Private
             Transaction, While Some (But Not Plaintiffs) Dissent and Seek an Appraisal ....... 9

      H.     In April 2018, JA Solar Releases Its Fourth Quarter and
             Full Year 2017 Financial Results, Which Exceed Earlier Projections ................. 10

      I.     In July 2018, the Going Private Transaction Closes and JA Solar Then
             Begins to Explore the Possibility of a Subsequent Relisting in China ................. 11

      J.     In December 2018, This Lawsuit Is Filed .............................................................. 11

      K.     Throughout 2018 and 2019, Tianye and JA Solar Continue to Negotiate a
             Potential Merger, Which Ultimately Is Not Completed Until December 2019 ..... 12

ARGUMENT ................................................................................................................. 13

I.     PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED ........................... 13

      A.     Plaintiffs Fail To Allege Any Actionable Misstatement or Omission ................. 13

            1.     The Relisting Statements Were Not False or Misleading .......................... 14

            2.     The Fairness Statements Were Not False or Misleading .......................... 17

3.      The Intent to Update Statement Was Not False or Misleading ................19

B.     Plaintiffs Fail To Allege a Strong Inference of Scienter........................................20

C.     Plaintiffs Fail To Allege Loss Causation ................................................................22

D.     Plaintiffs Fail To Allege Reliance for the Cancelled Shareholders ......................24

II.     PLAINTIFFS' SECTION 20A CLAIM SHOULD BE DISMISSED ..............................25

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

*In re 3Com Shareholders Litigation*,
    No. CIV.A. 5067-CC, 2009 WL 5173804 (Del. Ch. Dec. 18, 2009) ...............................19

*Barnard v. Verizon Communications, Inc.*,
    No. CIV.A. 10-1304, 2011 WL 294027 (E.D. Pa. Jan. 31, 2011), *aff'd*,
    451 F. App'x 80 (3d Cir. 2011) ...........................................................................................25

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................................24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................4

*Chan v. New Oriental Education & Technology Group Inc.*,
    No. CV-169279, 2019 WL 2865452 (D.N.J. July 3, 2019).................................................21

*In re China Valves Technology Securities Litigation*,
    979 F. Supp. 2d 395 (S.D.N.Y. 2013)................................................................................19

*In re Citigroup Auction Rate Securities Litigation*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)................................................................................23

*In re Cosi, Inc. Securities Litigation*,
    379 F. Supp. 2d 580 (S.D.N.Y. 2005)................................................................................21

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ...............................................................................13

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................................................13, 20

*Elliott Associates, L.P. v. Hayes*,
    141 F. Supp. 2d 344 (S.D.N.Y. 2000), *aff'd*,
    26 F. App'x 83 (2d Cir. 2002) ...........................................................................................20

*Faulkner v. Verizon Communications, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001)................................................................................21

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002), *aff'd*,
    40 F. App'x 624 (2d Cir. 2002) .........................................................................................16

*Hensley v. IEC Electronics Corp.*,
    No. 13-CV-4507 JMF, 2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) .............................16

*In re Investors Funding Corp.*,
    523 F. Supp. 563 (S.D.N.Y. 1980) ...................................................................23

*Jackson National Life Insurance Co. v. Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994).............................................................................25

*In re Jumei International Holding Ltd. Securities Litigation*,
    No. 14-cv-9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ...................................3, 15, 21

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................20

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)............................................................................22

*In re Lululemon Securities Litigation*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*,
    604 F. App'x 62 (2d Cir. 2015) ........................................................................14

*Morrison v. National Australia Bank*,
    561 U.S. 247 (2010)......................................................................................24

*Nutis v. Penn Merchandising Corp.*,
    615 F. Supp. 486 (E.D. Pa. 1985), *aff'd*,
    791 F.2d 919 (3d Cir. 1986)...........................................................................23

*O'Brien v. National Property Analysts Partners*,
    719 F. Supp. 222 (S.D.N.Y. 1989) ...................................................................18

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)................................................................................16

*Omnicare, Inc. v. Laborers District Council Construction Industries Pension Fund*,
    575 U.S. 175 (2015)......................................................................................17

*Pennsylvania Avenue Funds v. Borey*,
    No. C06-1737RAJ, 2009 WL 902070 (W.D. Wash. Mar. 30, 2009),
    *judgment entered*, 2010 WL 842362 (W.D. Wash. Mar. 8, 2010) ....................................25

*Salinger v. Projectavision, Inc.*,
    934 F. Supp. 1402 (S.D.N.Y. 1996)..................................................................17

*Scibelli v. Roth*,
    No. 98 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000)...............................................15

*In re Shanda Games Securities Litigation*,
    No. 18-cv-2463-ALC (S.D.N.Y.), Order dated Sept. 30, 2019 (ECF No. 57) .......... *passim*

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) ........................................................................21

*In re SunEdison, Inc. Securities Litigation*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018)..............................................................5

*Tellabs v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................20

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009), *aff'd sub nom.*
    *Thesling v. Bioenvision, Inc.*,
    374 F. App'x 141 (2d Cir. 2010) ....................................................................15

Defendants JA Solar Holdings Co., Ltd. ("JA Solar" or the "Company") and Baofang Jin (together, the "Moving Defendants") respectfully submit this memorandum of law in support of their motion to dismiss this Action in its entirety pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and Section 101(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").

## PRELIMINARY STATEMENT

This case is an untimely shareholder appraisal suit masquerading as a federal securities class action and should be dismissed for failure to state a claim. Plaintiffs are former investors in JA Solar, one of the world's leading solar energy companies, whose American Depositary Shares ("ADS") were previously traded on the NASDAQ. In 2018, JA Solar was taken private by a consortium (the "Buyer Group") led by JA Solar's Chief Executive Officer, Defendant Mr. Jin. The going-private price of $7.55 per ADS represented a nearly 20 percent *premium* over the prior average trading price, and the deal was approved by a special committee of JA Solar's independent directors and by more than 90% of shareholders who voted on the deal. Any shareholders who believed the going-private price was too low had the right to dissent from the transaction before the shareholder vote and seek an appraisal of their shares in the Cayman Islands (where JA Solar is incorporated). Plaintiffs chose not to do so.

Instead, Plaintiffs commenced this putative securities fraud class action six months after the going-private transaction closed, claiming that the consideration they received was not "fair" because another company—Tianye—subsequently agreed to acquire the private JA Solar entity ("New JA"), which had by then acquired significant new assets, at a higher valuation. Attempting to recast this as a disclosure-based securities claim, Plaintiffs argue that Defendants artificially depressed both JA Solar's ADS price and the going-private price by making purportedly false or misleading statements in the going-private transaction's proxy materials

regarding the fairness of the transaction and the Buyer Group's plans for New JA if the transaction was completed. Plaintiffs assert claims under Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") for securities fraud, control personal liability and insider trading, respectively. But Plaintiffs' wish that the going-private price had been higher or that they somehow could have profited from the later sale of New JA does not state any cognizable claim under the Exchange Act for multiple independent reasons.

*First*, Plaintiffs fail to allege any misrepresentation. The crux of Plaintiffs' claims is that the Proxy Materials falsely stated that the Buyer Group had no "present plans" to resell JA Solar or to relist it on a foreign exchange. But Plaintiffs allege no facts whatsoever showing that any such plan was in place ***at the time the proxy materials were issued*** between December 2017 and February 2018. Moreover, the proxy materials expressly disclosed that the Buyer Group might pursue a merger or relisting after the going private transaction. Plaintiffs' insistence that such a plan "must have been" underway at the time of the proxy materials is a quintessential attempt to plead fraud by hindsight, which the Second Circuit, this Court and countless others have repeatedly rejected. Notably, the Tianye merger was not completed until December 2019, and the parties did not even agree on a price for the transaction until January 2019—long after the going-private transaction and related proxy materials that Plaintiffs now challenge. Plaintiffs also cannot state a claim based on Defendants' opinion that the going-private price was "fair," as this Court recently held. *See In re Shanda Games Sec. Litig.*, No. 18-cv-2463, Order (ECF No. 57) at 13 (S.D.N.Y. Sept. 30, 2019) (Carter, J.) (hereinafter the "*Shanda* Order") (dismissing securities fraud claims challenging fairness of going-private transaction because "fairness statements constitute inactionable opinion statements").

*Second*, Plaintiffs fail to allege facts giving rise to the requisite strong inference of scienter.  Plaintiffs make the unremarkable observation that Mr. Jin, as leader of the Buyer Group, had an interest in taking JA Solar private at as low a price as possible.  But without more, such generic motivations—applicable to anyone in Mr. Jin's position—do not suffice.  Plaintiffs' only other scienter allegations are circular and speculative.  They argue that *if* the Tianye merger was underway at the time of the proxy materials, then Mr. Jin "must have known" about it.  But, again, Plaintiffs do not allege any facts showing the Tianye merger *was* underway at that time.

*Third*, Plaintiffs fail to allege loss causation.  They claim that Defendants artificially depressed JA Solar's ADS price, yet upon the announcement of the going-private transaction, the ADS price *rose* more than 8 percent.  It rose again when the Proxy Materials were issued. Plaintiffs' suggestion that the ADS price might have increased *even more* if Defendants had made different disclosures is pure speculation.  As is their contention that the going-private price could have been higher.  In fact, Plaintiff acknowledge that $7.55 per ADS was the Buyer Group's "best and final" offer, which it made after extensive negotiations with the special committee.  Plaintiffs also do not allege that Tianye—or any other buyer—would have paid more to acquire JA Solar as a U.S. public company.  Indeed, Tianye ultimately acquired New JA only after it restructured and acquired several other companies.

*Finally*, Plaintiffs fail to allege reliance.  Because the going-private price was negotiated at arm's length, not set by an efficient market, Plaintiffs cannot invoke a presumption of reliance—as this Court recently held on nearly identical allegations in *Shanda*.  *See Shanda* Order at 17.  And Plaintiffs do not even attempt to allege actual reliance, nor could they.

For at least these reasons, all of Plaintiffs' claims should be dismissed with prejudice. [1]

---

[1]   While Defendant Mr. Jia has not yet been served, the Court still can dismiss this Action in its entirety.  *See In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 149826, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

## STATEMENT OF FACTS[2]

**A.**    **JA Solar**

Defendant JA Solar, a Cayman Islands corporation with its principal executive offices in the People's Republic of China ("PRC" or "China"), is a holding company that formerly owned a variety of solar power companies operating under the "JA Solar" brand.  (*See* Consolidated Amended Complaint (ECF No. 32) (the "Amended Complaint" or "CAC") ¶ 38.)  JA Solar is one of the world's largest manufacturers of high-performance solar power products and was founded by Mr. Jin in 2005.  (CAC ¶¶ 6-7.)  From February 2007 to July 2018, JA Solar's ADS were listed and traded on the NASDAQ.  (*Id.* ¶¶ 7, 38.)  From 2015 to 2017, JA Solar generated between $2 and 3 billion in annual revenue.  (*Id.* ¶¶ 6, 58.)

**B.**    **In 2015, the Buyer Group Makes an Offer To Take JA Solar Private**

On June 5, 2015, the Buyer Group submitted a preliminary non-binding proposal to JA Solar's board of directors (the "Board") to acquire all of the outstanding shares of JA Solar in a going private transaction for $9.69 per ADS in cash (the "Going-Private Transaction").  (Ex. A (Final Proxy) at 18; CAC ¶¶ 46, 67.)  In response, JA Solar created a special committee of independent and disinterested directors (the "Special Committee") to evaluate the proposal.  (Ex. A (Final Proxy) at 18; CAC ¶¶ 44, 68.)  The Special Committee engaged Houlihan Lokey (China) Limited ("Houlihan Lokey") as its independent financial advisor and Gibson, Dunn & Crutcher LLP as its independent U.S. legal advisor.  (Ex. A (Final Proxy) at 18-19; CAC ¶ 69.)

In September 2015, the Special Committee conducted a pre-signing market check, in which Houlihan Lokey contacted 25 potential buyers (10 financial buyers and 15 strategic

---

[2]    The facts described here are based on the well-pled facts in the Amended Complaint, which are assumed to be true for the purpose of this motion only, and the documents incorporated by reference therein or otherwise integral to Plaintiffs' allegations.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007) (on a motion to dismiss, court assumes all well-pled facts are true but not conclusory assertions or legal conclusions).

buyers) to ascertain interest in an alternative transaction to the Buyer Group's proposal.  (Ex. A (Final Proxy) at 19.)  None was interested.  (*Id.* at 20.)  Shortly thereafter, despite the lack of any alternative proposals, the Going-Private Transaction was put on hold because the Buyer Group could not secure adequate financing.  (*Id.*; CAC ¶ 70.)

**C.**     **In June 2017, the Buyer Group Submits a Revised Offer**

On June 6, 2017, after securing an adequate financing source, the Buyer Group submitted a revised proposal for the Going-Private Transaction at a price of $6.80 per ADS.  (Ex. A (Final Proxy) at 20; CAC ¶ 71.)  This revised price represented a 5.5 percent premium over the average ADS price for the prior three months.  (*See generally* Ex. J (Stock Price) at 1-2.)  Over the next few months, the Special Committee and Buyer Group negotiated the price and other terms of the proposed deal.  (*See* Ex. A (Final Proxy) at 20-25; CAC ¶ 72.)  On October 27, 2017, the Buyer Group submitted a "best and final" offer of $7.55 per ADS.  (Ex. A (Final Proxy) at 25; CAC ¶ 72.)  This represented a 17.2 percent premium over the average ADS price for the three months prior to the first revised proposal on June 6, 2017.  (*See generally* Ex. J (Stock Price) at 1-2.)

**D.**     **In November 2017, Houlihan Lokey Concludes the Offer Is "Fair," the Special Committee Recommends the Going-Private Transaction and the Board Approves It**

On November 16, 2017, Houlihan Lokey opined that the consideration of $7.55 per ADS was "fair[] from a financial point of view."  (Ex. A (Final Proxy) at 25; *id.* at Annex F (full fairness opinion); CAC ¶¶ 73, 98.)  Houlihan Lokey's opinion "relied only on a discounted cash flows analysis while also presenting analyses with respect to selected companies and selected transactions for informational purposes only."  (Ex. A (Final Proxy) at 32-33; CAC ¶ 96.)  However, Houlihan Lokey concluded "the results derived from the selected companies analysis and selected transactions analysis d[id] not provide a meaningful comparison[.]"  (*Id.*)  The Special Committee approved and recommended the Going-Private Transaction.  (Ex. A (Final Proxy) at

26; CAC ¶ 75.)  The Board, excluding Mr. Jin, then met and unanimously approved the deal as

well (with two abstentions), concluding it was "fair to and in the best interests of the Company

and the Unaffiliated Security Holders."  (Ex. A (Final Proxy) at 26, 71; CAC ¶ 77.)

On November 17, 2017, JA Solar and the Buyer Group executed the merger agreement

and related documentation for the Going-Private Transaction (the "Merger Agreement").  (Ex. A

(Final Proxy) at 26; CAC ¶ 78.)  JA Solar announced the Merger Agreement in a press release

the same day, which it later filed with the SEC.  (Ex. C (Going-Private Announcement); CAC ¶

175.)  The press release highlighted the significant premium ADS-holders would receive and

noted that the Going-Private Transaction was still subject to shareholder approval.  (Ex. C

(Going-Private Announcement) at 1; CAC ¶ 175.)  JA Solar's ADS price jumped 8.44 percent

upon the announcement.  (*See* Ex. J (Stock Price) at 4.)

Two days later, on November 19, 2017, Mr. Jin gave a public speech at the International

Exhibition Center in Beijing, where he stated that he ultimately hoped to relist JA Solar on the

Chinese capital markets within the next two or three years.  (CAC ¶ 130.)  As Plaintiffs note,

these "remarks were by no means a definitive statement of the Company's plans."  (*Id.* ¶ 131.)

**E.      In November and December 2017, the Special Committee Conducts
         Another Market Check But Again Receives No Alternative Proposals**

To further protect JA Solar's shareholders, the Merger Agreement contained a "go-shop"

provision, pursuant to which the Special Committee had the right to actively initiate, solicit and

encourage alternative acquisition proposals.  (Ex. B (Merger Agreement) § 6.04.)  The go-shop

period ran from November 17, 2017, to January 1, 2018.  (Ex. A (Final Proxy) at 26.)  During

that time, Houlihan Lokey, on behalf of the Special Committee, contacted 21 potentially

interested buyers, including 12 strategic buyers and 9 financial buyers.  (*Id.*)  Again, none

expressed interest.  (*Id.*)

**F.      Between December 2017 and February 2018, JA Solar Issues
         and Amends the Proxy Materials for the Going-Private Transaction**

JA Solar first issued its proxy materials on December 11, 2017 (the "Preliminary Proxy

Materials"), which it amended on January 11, 2018 (the "Amended Proxy Materials"), and again

on February 1, 2018 (the "Final Proxy Materials").  (CAC ¶¶ 100, 105-06.)  As relevant here, the

Preliminary, Amended and Final Proxy Materials (collectively, the "Proxy Materials") are

substantially similar.  The Proxy Materials disclosed, among other things, the lengthy

negotiations with the Buyer Group since 2015, Houlihan Lokey's fairness opinion and valuation

methodology (including the methodologies on which Houlihan Lokey did not rely) the terms of

the Merger Agreement, the risks of the Going-Private Transaction and the Buyer Group's

motivations and plans for taking the Company private.  (*See generally* Ex. A (Final Proxy).)

At the heart of this litigation are the Proxy Materials' disclosures about the Buyer

Group's future plans for the privately-held Company and about potential future transactions:

> **Plans for the Company after the Merger**
>
> . . .
>
> Other than as described in this proxy statement and transactions already
> under consideration by the Company, ***there are no present plans or proposals that
> relate to or would result in an extraordinary corporate transaction involving the
> Company's corporate structure, business, or management***, such as a Merger,
> reorganization, liquidation, relocation of any material operations, or sale or transfer
> of a material amount of assets. ***However, the Buyer Group will continue to
> evaluate the Company's entire business and operations from time to time, and
> may propose or develop plans and proposals which they consider to be in the best
> interests of the Company and its equity holders***, including the disposition or
> acquisition of material assets, alliances, joint ventures, and other forms of
> cooperation with third parties or other extraordinary transactions, ***including the
> possibility of relisting the Company or a substantial part of its business on
> another internationally recognized stock exchange***. . . .
>
> Following the completion of the Merger, the Surviving Company's
> management and its board will continuously evaluate and review the Surviving
> Company's business and operations and may propose or develop new plans and
> proposals, including any of the foregoing actions . . . .

**Alternatives to the Merger**

. . . In light of (i) the express intention of certain members of the Buyer Group not to sell the Shares they own to any third party and the beneficial ownership of the Buyer Group of approximately 25.7% of the entire issued and outstanding Shares (as of the date of this proxy statement) and (ii) the fact that, *since the announcement of the proposed transaction and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction* with the Company, the Special Committee determined that *there was no viable alternative to the proposed sale of the Company to the Buyer Group*.

(*Id.* at 53 (emphases added).)

In other words, the Proxy Materials disclosed that, as of February 1, 2018 (six weeks before the shareholder vote and five months before the Going-Private Transaction would ultimately close), the Buyer Group had no present plan for an extraordinary transaction involving the future privately-held company, but might later propose or develop such plans, including specifically a possible relisting of the Company on another international stock exchange. This was consistent with the lack of interest in the Company from any outside buyers during the recent go-shop period.

Around the same time, a JA Solar subsidiary in China similarly posted on its website:

JA Solar Co. Ltd. currently does not have plans to list domestically. JA Solar Co. Ltd. and its related parties have not and will not issue any fundraising notices, announcements, or internal messages in relation to a relisting, much less will it take any public placement actions in relation to a relisting. Any fundraising behavior in relation to a relisting by JA Solar Co. Ltd. is not being done by JA Solar Co. Ltd. or Jinglong Industrial Group Co. Ltd. and does not have their approval. Such fundraising behavior may be committing the crimes of illegal fundraising or fraud. We ask that society and the public not allow themselves to be cheated.

(CAC ¶ 103.) This warning, which is consistent with the Proxy Materials, was issued to protect investors following rumors that individuals posing as brokers were trying to solicit money in China purportedly on behalf of JA Solar.

**G.      In March 2018, Shareholders Overwhelmingly Approve the Going Private
Transaction, While Some (But Not Plaintiffs) Dissent and Seek an Appraisal**

On March 12, 2018, JA Solar held an extraordinary general meeting of shareholders,
where the Going-Private Transaction was overwhelmingly approved.  (CAC ¶ 107.)  Pursuant to
the Merger Agreement, the Going-Private Transaction was conditioned on at least two-thirds of
the shares that were present and voting (as opposed to total outstanding shares) approving the
deal.  (Ex. B (Merger Agreement) § 6.02; CAC ¶ 82.)  At the meeting, more than 90 percent of
the shares voting approved the deal.  (Ex. D (Approval Announcement) at 1; CAC ¶ 108.)

In addition to the shareholder approval requirement and the go-shop, another important
safeguard for investors was their right to dissent and seek an appraisal "to receive payment of the
fair value of their Shares."  (CAC ¶ 85.)  In order to do so, as the Proxy Materials explained,
shareholders had to deliver a written objection before the shareholder vote and subsequently
comply with all procedures and requirements of Section 238 of the Cayman Islands Companies
Law.  (Ex. A (Final Proxy) at 63, 99-100.)  The Proxy Materials cautioned that "[t]he fair value
of their Shares as determined under the Cayman Islands Companies Law could be more than, the
same as, or less than the merger consideration they would receive pursuant to the Merger
Agreement[.]"  (*Id.* at 63.)  Ultimately, certain shareholders—***but not Plaintiffs here***—did
exercise their dissent rights and commenced an appraisal action in the Grand Court of the
Cayman Islands on August 23, 2018.  (CAC ¶ 112.)  That action remains ongoing.

Because the dissenters held more than 10 percent of JA Solar's stock, both JA Solar and
the Buyer Group[3] each had the right to terminate the Merger Agreement (the "Dissenting

---

[3]     Technically, the Merger Agreement provided this right to the "Parent Parties," which was the group of entities
that would acquire all of JA Solar's shares and were ultimately owned and controlled by the Buyer Group.  For
simplicity, references in this brief to the Buyer Group include the Parent Parties.

Shareholder Condition"). (*Id.* ¶ 110.) JA Solar disclosed this in its press release announcing the shareholder vote and stated that it "intends to update its shareholders if and when it receives" the Buyer Group's decision regarding whether it would waive the Dissenting Shareholder Condition. (Ex. D (Approval Announcement) at 1; CAC ¶ 111.)

**H.    In April 2018, JA Solar Releases Its Fourth Quarter and Full Year 2017 Financial Results, Which Exceed Earlier Projections**

On April 30, 2018, JA Solar released its financial results and Annual Report for 2017. (CAC ¶ 119.) JA Solar reported total revenue for the year of $3.022 billion and net income of $46 million. (Ex. E (2017 Annual Report) at 4; CAC ¶ 125.) These results exceeded previous projections for 2017 that Houlihan Lokey, the Special Committee and the Board had used to evaluate the Going-Private Transaction in the fall of 2017, which were disclosed in detail in the Proxy Materials. (*See* Ex. A (Final Proxy) at 40; CAC ¶ 124.) The Proxy Materials expressly cautioned, however, that those prior financial projections were based on "management's estimates of the Company's future financial performance *as of the date provided*" and "generally do not take into account any circumstances or events occurring *after the date that they were prepared*." (Ex. A (Final Proxy) at 39 (emphasis added).) Accordingly, the Proxy Materials warned that "actual results may be significantly different from those contained in the projections" and "shareholders are cautioned not to place undue reliance on the prospective financial information." (*Id.*) Significantly, the Proxy Materials also emphasized in bold capital letters that JA Solar would not update the 2017 projections based on events that occurred after their preparation:

> **BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF ITS INTERNAL FINANCIAL PROJECTIONS, THE COMPANY UNDERTAKES NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE PROJECTIONS,**

**EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE, EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAW.**

(*Id.* at 40-41 (emphasis in original).)

**I.     In July 2018, the Going Private Transaction Closes and JA Solar
        <u>Then Begins to Explore the Possibility of a Subsequent Relisting in China</u>**

On July 16, 2018, the Going-Private Transaction was completed.  (CAC ¶ 117.)  As a result, JA Solar ceased to be a publicly traded company and became a wholly owned subsidiary of an entity ultimately owned by the Buyer Group.  (*Id.*)  JA Solar's ADSs were immediately cancelled in exchange for the right to receive $7.55 in cash per ADS.  (*Id.*)

On July 19, 2018, Mr. Jin signed a letter of intent with Tianye regarding a potential acquisition of New JA (the "Tianye Merger").  (Ex. F (Letter of Intent); CAC ¶ 140.)  Tianye is a Chinese manufacturer of heavy equipment and is publicly traded on the Shenzhen Stock Exchange in China.  (CAC ¶ 52.)  The letter of intent contemplated a possible transaction whereby Tianye would issue shares in exchange for 100% of New JA's equity.  (Ex. F (Letter of Intent) at 1.)  At this time, the parties had not agreed on a price or transaction structure and did not undertake any binding obligations to complete any transaction.  (*See id.*)

**J.     <u>In December 2018, This Lawsuit Is Filed</u>**

On December 20, 2018, Plaintiff ODS Capital LLC—who did not dissent or seek an appraisal—commenced this putative securities fraud class action alleging separate theories on behalf of two subclasses: (i) investors who sold their ADS in the open market prior to the Going-Private Transaction (the "Selling Shareholders"); and (ii) investors whose ADS were cancelled in the Going-Private Transaction in exchange for the right to receive $7.55 per ADS (the "Cancelled Shareholders").  (ECF No. 1.)  The complaint asserted that, based on the letter of intent with Tianye (signed ***after*** the Going-Private Transaction), the Proxy Materials' statement

*four months earlier* that there was no relisting plan in place *at that time* must have been false. (*Id.* ¶ 24.)  Notably, when this Action was filed, New JA and Tianye still had not agreed on a price or entered into any definitive agreement.

**K.    Throughout 2018 and 2019, Tianye and JA Solar Continue to Negotiate <u>a Potential Merger, Which Ultimately Is Not Completed Until December 2019</u>**

In January 2019, six months after the letter of intent, New JA and Tianye agreed on a price of approximately $1.1 billion.  (Ex. H (Jan. 21, 2019 Bloomberg Article) at 1; CAC ¶ 147.) By that time (and after going private), New JA had undergone a significant restructuring and acquired several other companies.  As a result, New JA no longer comprised the same assets as JA Solar did when it went private the prior year.  In addition, as industry analysts observed: "Valuations of these Chinese solar companies were too low in the U.S. while they're likely to increase if the companies are listed in China."  (Ex. G (July 24, 2018 Bloomberg Article) at 1; CAC ¶ 143.)  Similarly, when the Tianye Merger price was announced, another industry analyst noted: "China has relatively higher valuations for solar manufacturers, prompting overseas-listed producers to return."  (Ex. H (Jan. 21, 2019 Bloomberg Article) at 1; CAC ¶ 147.)

After agreeing on a price, New JA and Tianye continued to work on finalizing the deal terms, obtaining the necessary regulatory approvals and completing the transaction.  As Plaintiffs noted, as of the filing of the Amended Complaint on June 14, 2019, the Tianye Merger still was not complete.  (CAC ¶ 156.)  Indeed, it was not until December 13, 2019—eighteen months after the letter of intent and nearly two years after the Final Proxy Materials for the Going-Private Transaction—that the Tianye Merger was completed.  (Ex. I (Relisting Announcement) at 1.)

Plaintiffs now contend that Defendants concealed the future Tianye Merger at the time the Proxy Materials were issued and that the Buyer Group should have paid more than $7.55 per ADS because Tianye later paid more than that to acquire New JA.

## ARGUMENT

## I.   PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED

To state a claim under Section 10(b), Plaintiffs must allege "(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of security; (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 802 (S.D.N.Y. 2018) (Carter, J.) (dismissing securities fraud claim). The PSLRA also requires Plaintiffs to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

Plaintiffs' Section 10(b) claim suffers from at least four fatal defects. Plaintiffs fail to allege (1) any actionable misstatement or omission; (2) facts giving rise to the requisite strong inference of scienter; (3) loss causation; and (4) reliance. As shown below, each of these deficiencies independently warrants dismissal as a matter of law.

## A.   Plaintiffs Fail To Allege Any Actionable Misstatement or Omission

Plaintiffs' Section 10(b) claim fails because the Amended Complaint does not allege any actionable misstatement or omission. Plaintiffs point to three purported misstatements: (1) the Proxy Materials' statements that there was no present plan at that time to relist JA Solar on another exchange; (2) the Proxy Materials' statements that $7.55 per ADS was "fair" consideration and based on reasonable projections and assumptions; and (3) the Company's statement in its March 12, 2018 press release that it intended to update shareholders when the Buyer Group decided whether it would waive the Dissenting Shareholder Condition. But Plaintiffs fail to allege facts showing that any of these statements was false when made.

13

### 1.     The Relisting Statements Were Not False or Misleading

Plaintiffs' primary theory is that Defendants misled investors by "expressly disclaim[ing] that any [relisting] was in the works."  (CAC ¶¶ 21, 99, 100.)  In support, Plaintiffs point to cherry-picked excerpts from the Proxy Materials—including that "[i]f the Merger is completed, the Company will continue its operations as a privately held company"; "the buyer group anticipates that the Company's operations will be conducted substantially as they are currently being conducted"; and "other than as described in this proxy statement and transactions already under consideration . . . there are no present plans or proposals that would result in an extraordinary corporate transaction."  (*Id.* ¶ 100.)  Plaintiffs claim these statements were false because "the Buyer Group had already taken steps to proceed with the relisting."  (*Id.* ¶ 173(a).)

This theory fails as a matter of law because Plaintiffs do not allege any particularized facts to support their conclusory assertion that Defendants already had a relisting plan when the Proxy Materials were issued between December 2017 and February 2018.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[W]ithout *contemporaneous* falsity, there can be no fraud."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  Plaintiffs do not—and cannot—allege any facts showing a relisting plan was in place at that time, contrary to the Company's disclosures.  Instead, Plaintiffs' theory is based purely on hindsight and the speculation that because Mr. Jin signed a letter of intent with Tianye in ***July 2018*** and New JA ultimately completed a relisting in ***December 2019***, the Tianye Merger "must have been" underway in ***February 2018*** when the Proxy Materials were finalized.  (CAC ¶ 172.)  But "[c]ourts have previously rejected similar efforts to 'ask the Court to assume that Defendants <u>must</u> have known because something did in fact occur later' as 'simply inadequate pleading.'"  *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 149826, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) (rejecting

argument defendants must have had a plan to exit a business line at the time of the allegedly false statements because the "[c]omplaint sets forth no facts . . . to support that inference—i.e. that any Defendant knew about the exit plan . . . a full four months before the exit occurred"); *see also Scibelli v. Roth*, No. 98 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) (rejecting argument that defendant  must have known of undisclosed market concerns based on timing of later disclosure).[4]

More generally, there is no duty to disclose mere merger negotiations under the securities laws in any event. *See Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) ("There is no specific duty to disclose merger negotiations under SEC rules *until they become definitive agreements*.") (emphasis added), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) ("[N]o express duty requires the disclosure of merger *negotiations*, as opposed to a definitive merger *agreement*.") (collecting cases).

Plaintiffs' supposed "expert" and confidential witnesses ("CWs") do not fill this pleading void.  Plaintiffs cite an anonymous "expert in Chinese M&A and capital markets" who purports to outline an "ordinary" timeline for a transaction like the Tianye Merger.  (CAC ¶¶ 157-72.) But this "expert" does not claim to have ***any*** knowledge of the actual Tianye Merger or its timeline.  In fact, Plaintiffs concede that "the exact details of JA Solar's behind-closed-doors deal-making are largely unknown."  (*Id.* ¶ 160.)  Similarly, Plaintiffs also cite anonymous CWs who claim to have heard "internal rumors" of a relisting.  (*Id.* ¶¶ 133-36, 138.)  But these CWs provide no factual basis for or details about such "rumors."  Speculation cannot support a fraud

---

4    Plaintiffs' claim that the notice on a JA Solar's website (in Chinese) falsely "assured investors that it had no plans to relist" fails for the same reason: Plaintiffs allege no facts showing that statement was false when it was made.  (CAC ¶ 103.)  Indeed, Plaintiffs do not allege that JA Solar *ever* "[took] any public placement actions in relation to a relisting," contrary to the statement on the website.  (*See id.*))

claim.  *See Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 JMF, 2014 WL 4473373, at *7

(S.D.N.Y. Sept. 11, 2014) (rejecting allegations by "confidential witness [who] lacks any

personal knowledge of Defendants' actions during the Class Period").[5]

Contrary to Plaintiffs' suggestion, the Proxy Materials also are consistent with Mr. Jin's

earlier remarks in November 2017 that he ultimately hoped to relist a private JA Solar on the

Chinese capital markets within the next two or three years.  (CAC ¶ 130.)  As Plaintiffs

acknowledge, these "remarks were by no means a definitive statement of the Company's plans."

(*Id.* ¶ 131.)  Moreover, the Proxy Materials expressly disclosed that, while "there [we]re no

***present*** plans" for a relisting, in the future the Buyer Group "may propose or develop plans and

proposals . . . ***including the possibility of relisting the Company or a substantial part of its***

***business on another internationally recognized stock exchange***[.]"  (Ex. A (Final Proxy) at 53

(emphasis added).)  This language is neither vague nor generic and discloses the very possibility

that Plaintiffs now claim was concealed.  *See Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5

(2d Cir. 1996) (affirming dismissal of securities claims because the "prospectuses warn[ed]

investors of exactly the risk the plaintiffs claim was not disclosed"); *see also Halperin v.

eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002) (dismissing 10(b) claims because

"statements about possible future registration [we]re qualified by the immediately proceeding

sentences," and thus "[a] reasonable investor" had "notice that, at the very least, registration

[wa]s not guaranteed"), *aff'd*, 40 F. App'x 624 (2d Cir. 2002).  Accordingly, Plaintiffs fail to

plead that the relisting statements were false or misleading when made.

---

[5]   The same is true for allegations about two purported "translated resumes," which Plaintiffs claim show "work[]
on an audit of a JA subsidiary" in connection with an "IPO listing" before the Going-Private Transaction.
(CAC ¶¶ 139, 299, 307.)  These references do not remotely demonstrate that a merger plan was in place when
the Proxy Materials were issued, and like the supposed "internal rumors," Plaintiffs do not allege any facts
showing that the authors of these resumes had personal knowledge of the Buyer Group's plans or any future
deal with Tianye.  Indeed, Plaintiffs do not even claim to have spoken with the authors of the resumes.

## 2.    The Fairness Statements Were Not False or Misleading

Next, Plaintiffs argue that Defendants falsely "presented the transaction in a positive light, or as 'fair,'" because (i) in Plaintiffs' view, $7.55 per ADS was not fair, and (ii) the Company's actual performance ended up exceeding the financial projections and assumptions that Houlihan Lokey relied on in reaching its fairness opinion.  (CAC ¶¶ 173(b), 201-22.)  But Defendants' opinions about the fairness of the Going-Private Transaction and their projections of the Company's future performance are inactionable under well-settled law, including this Court's recent decision in *Shanda*.  *See Shanda* Order at 8-9 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)).[6]

First, Plaintiffs' subjective view that $7.55 per ADS was not a fair price does not render Defendants' (and Houlihan Lokey's) contrary opinion false or misleading.  This Court recently rejected this exact argument in *Shanda*.  There, as here, former ADS-holders brought securities fraud claims following a going-private transaction, alleging that misstatements in the proxy materials resulted in inadequate consideration.  *See Shanda* Order at 1-2.  The *Shanda* plaintiffs (represented by the same counsel as Plaintiffs here) argued that Shanda's fairness opinion was false and misleading because the company subsequently outperformed the projections on which the opinion was based.  *Id.* at 12-13.  This Court rejected that theory as an attempt to plead fraud by hindsight because plaintiffs did "not allege facts that indicate that the Defendant Shanda believed the deal was not fair," or "that the facts supporting the belief that the deal was fair are untrue—this is true even if the projections were faulty—or that the Defendant Shanda omitted information that would make fairness statements about the deal misleading."  *Id.* at 13.

---

[6]    As a general matter, Plaintiffs cannot maintain a fraud claim based on statements that "presented the Transaction in a positive light" (CAC ¶ 173(b)) because "[c]orporations are not required to characterize either possible results or their operations in a pejorative manner merely to cover all the bases should things turn out worse than expected."  *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1415 (S.D.N.Y. 1996).

That holding is squarely applicable here.  Plaintiffs similarly do not allege facts that indicate that Defendants believed the deal was not fair, that the facts supporting thier belief that the deal was fair are untrue (even if the projections were faulty), or that Defendants omitted information that would make fairness statements about the deal misleading.[7]  *See id.*  That Tianye later paid a higher price for New JA does not mean that the prior Going-Private Transaction was unfair.  Notably, this Court held that Shanda's opinion that its going-private price was "fair" was not false or misleading even though—unlike here—a Cayman appraisal action had determined the price should have been 35% higher.  *See id.* at 2.

For similar reasons, the projections that management provided to Houlihan Lokey in the fall of 2017 (and on which its fairness opinion was based) were not false or misleading simply because JA Solar's actual performance later exceeded the projections.  (CAC ¶¶ 173, 211.)  Plaintiffs allege no facts showing that Defendants did not believe the projections were reasonable at the time they were made.  *See Shanda* Order at 9 ("Plaintiff has failed to allege any facts to suggest the Defendant Shanda believed the revenue figures were false."); *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 227 (S.D.N.Y. 1989) (dismissing 10(b) claim because "plaintiffs have failed to articulate how the reports and projections . . . were false and misleading").  Moreover, the Proxy Materials disclosed the projections and expressly warned that they were only "estimates of the Company's future financial performance ***as of the date provided***," that "actual results may be significantly different" and that the Company would not update the projections based on subsequent developments (such as actual performance).  (Ex. A (Final Proxy) at 39-40 (emphasis added).)

---

[7]    To the extent the CAC alleges that Houlihan Lokey's fairness opinion was false or misleading because it did not utilize Plaintiffs' preferred valuation method (CAC ¶¶ 94-98), that claim is belied by the Proxy Materials themselves, which describe in detail the methods Houlihan Lokey used, as well as the methods it did not rely on and why.  Thus, the basis for any objection Plaintiffs now have with Houlihan Lokey's valuation methodology was known to the market at least five months before the Going-Private Transaction closed.

At bottom, if Plaintiffs thought the going-private price was too low (despite being a significant premium over the recent ADS price), then the appropriate course was to dissent and seek an appraisal in the Cayman Islands—precisely as the Proxy Materials advised and as other shareholders have done. They chose not to do so, and instead now effectively seek an appraisal under the disclosure-based U.S. securities laws. But "quibbles with a financial advisor's work simply cannot be the basis of a *disclosure* claim." *In re 3Com S'holders Litig.*, No. 5067-CC, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (emphasis added) (rejecting claim that financial advisor's "fairness opinion [in proxy statement] deviated from conventional practice," because "[p]laintiffs' quibbles with Goldman's methodologies (and inputs into those methodologies), if they are serious, can be resolved via an appraisal action").

### 3.    The Intent to Update Statement Was Not False or Misleading

Finally, JA Solar's statement that it "*intends* to update its shareholders *if and when* it receives" the Buyer Group's decision regarding whether it would waive the Dissenting Shareholder Condition was not false and misleading at the time simply because the Company ultimately never provided the update. (Ex. D (Approval Announcement) at 1 (emphasis added); CAC ¶ 111.) As a threshold matter, Plaintiffs do not allege if and when the Buyer Group ever informed the Company of its decision and thus when the Company supposedly should have updated shareholders. Regardless, Plaintiffs do not allege any facts even suggesting that JA Solar did not *intend* to provide an update when it made the statement. Instead, their theory (once again) is pure fraud by hindsight, which is insufficient as a matter of law. *See In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 412 (S.D.N.Y. 2013) (dismissing 10(b) claim because "[t]he fact that the Company did not ultimately retain a Big Four audit firm does not permit an inference that it did not intend or attempt to do so at the time [it said it intended to]").

**B.**     <u>**Plaintiffs Fail To Allege a Strong Inference of Scienter**</u>

Plaintiffs' Section 10(b) claim independently fails because they do not allege

particularized facts giving rise to the requisite "strong inference" of scienter.  In order "to qualify

as a 'strong inference,' the inference of scienter must be 'more than merely plausible or

reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent.'"  *ECA & Local 134*, 553 F.3d at 198 (quoting *Tellabs Inc. v. Makor Issues

& Rights Ltd.*, 551 U.S. 308, 322 (2007)).

Plaintiffs do not allege facts showing scienter by anyone at the Company.  As to Mr. Jin,

Plaintiffs argue that, as the leader of the Buyer Group, he had the "motive and opportunity" to

take JA Solar private at a relatively low price and later sell or relist it at a higher price.  (CAC ¶¶

293-96.)  But generalized allegations of corporate motivation, such as the desire to complete a

transaction on favorable terms, are insufficient to establish a "strong inference" of scienter.  *See

Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ("[T]he desire to achieve the most lucrative

acquisition proposal can be attributed to virtually every company seeking to be acquired. Such

generalized desires do not establish scienter."); *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d

344, 359 (S.D.N.Y. 2000) ("[A]llegations of generic motivations typically held by similarly-

positioned executives are insufficient to establish motive.").[8]

Plaintiffs' remaining scienter allegations concerning Mr. Jin are nothing more than

speculative "must have knowns"—i.e., that he must have known of the Tianye Merger when the

Proxy Materials were issued between December 2017 and February 2018.  (CAC ¶¶ 294-99.)

---

[8]     Although this Court held that plaintiffs in *Shanda* adequately alleged scienter, the defendant there conceded that "errors in the projections were uncovered during the [Cayman] appraisal action" and "that its executives knew about the projections."  Def's Br. in Supp., at 19-20, (ECF No. 41).  No such errors or knowledge are alleged here.  Moreover, Defendants' forthright disclosure of the very possibility Plaintiffs claim was hidden—the "possibility of relisting the Company . . . on another internationally recognized stock exchange" (Ex. A (Final Proxy) at 53)—gives rise to a more compelling inference of non-fraudulent intent.  *See Tellabs*, 551 U.S. at 322.

But courts have consistently rejected "must have known" allegations like these, particularly those premised solely on timing. *See, e.g.*, *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) ("The District Court correctly concluded that [plaintiff] *had not* sufficiently pleaded scienter based on what [defendant] 'must have known.'"); *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 396 (S.D.N.Y. 2001) ("[W]e reject plaintiffs' argument that an inference of scienter must arise because of the temporal proximity between Verizon's November 14, 2000 statement and its sudden termination of the merger on November 29, 2000."); *Jumei*, 2017 WL 95176, at *5 (refusing "to assume knowledge and fraudulent intent on August 18, 2014 simply because [defendant] began its exit from the third-party marketplace several weeks later"); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005) (no "strong inference" of scienter where "plaintiffs allege only that [defendant] had researched the possibility of franchising for two months before the Prospectus was issued, and do not allege that . . . any affirmative steps had been taken to implement a franchising plan").

As to Mr. Jia, the chairman of the Special Committee, Plaintiffs do not contend he had any motive to depress JA Solar's stock price (or the going-private price) nor any interest in JA Solar after it went private.  Indeed, the only scienter allegation regarding Mr. Jia is that he "***would*** also have been apprised of the[] backdoor listing negotiations . . . ."  (CAC ¶ 302 (emphasis added).)  But Plaintiffs provide no factual basis for this speculative assertion.  As shown above, Plaintiffs do not allege any specific negotiations with Tianye before the Going-Private Transaction was completed, much less that Mr. Jia was "apprised" of any such negotiations.  To the contrary, by asserting only that Mr. Jia "would" have known, Plaintiffs implicitly concede they cannot allege he actually knew.  *See Chan v. New Oriental Educ. & Tech. Grp. Inc.*, No. CV-169279, 2019 WL 2865452, at *12 (D.N.J. July 3, 2019) ("[s]tatements

that management 'must have known' amount to a 'concession' that 'they have no facts to say that management did know.'").  Thus, Plaintiffs' claims fail for lack of scienter.

## C.   Plaintiffs Fail To Allege Loss Causation

Plaintiffs also fail to allege loss causation—"the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).  Plaintiffs offer distinct theories for their two putative subclasses: (i) that the purported misstatements supposedly depressed JA Solar's ADS price while the Company was still public, thereby harming the Selling Shareholders, who sold their ADS before the Going-Private Transaction; and (ii) that the purported misstatements supposedly resulted in a lower going-private price, thereby harming the Cancelled Shareholders who received $7.55 per ADS in exchange for their cancelled ADS after the Going-Private Transaction.  (CAC ¶¶ 320, 323.)  Neither theory withstands scrutiny.

With respect to the Selling Shareholders, Plaintiffs offer no factual basis for their speculative assertion that the Proxy Materials' statements about the relisting plans or the fairness of the proposed transaction price depressed JA Solar's ADS price.  To the contrary, not only did the ADS price ***increase more than 8%*** on November 17, 2017, when JA Solar announced the Going-Private Transaction, the price also increased slightly when the Preliminary Proxy Materials were issued on December 11, 2017—the day that Defendants supposedly committed their "biggest act of deception" (CAC ¶ 99)—and again on February 1, 2018, when the Final Proxy Materials were issued.  (*See* Ex. J (Stock Price) at 5-6.)  Plaintiffs' suggestion that the ADS price would have increased ***even more*** if the Proxy Materials had made different disclosures is pure speculation.  There is no corrected market price against which Plaintiffs can compare the Going Private price to demonstrate (much less quantify) a loss caused by the

challenged disclosures.  *See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307

(S.D.N.Y. 2009) ("Plaintiff has failed to allege that he suffered any specific economic harm as

result of Defendants' conduct" where "[p]laintiff does not specifically allege that . . . the interest

rates set through Defendants' allegedly manipulative conduct were lower than they would have

been absent such conduct."); *In re Inv'rs Funding Corp.*, 523 F. Supp. 563, 566 (S.D.N.Y. 1980)

("In order to maintain an action for damages under Section 10(b), a plaintiff must have actually

suffered injury as a consequence of the acts of the defendant complained of."). [9]

Plaintiffs' causation theory with respect to the Cancelled Shareholders is even weaker.

Plaintiffs merely complain that, because Tianye later paid more for the privately-held New JA,

the Buyer Group should have paid more to take the Company private in the first place.  This

theory of loss causation has no basis in the federal securities laws.  *See Nutis v. Penn Merch.*

*Corp.*, 615 F. Supp. 486, 490 (E.D. Pa. 1985) ("The bulk of [plaintiffs'] damage claim rests on

their 'inability to share in the profitability of Old Penn' after the projected merger date.

Plaintiffs' disappointment in the outcome of a speculative series of trades is not a sufficient basis

for the serious securities violations alleged."), *aff'd*, 791 F.2d 919 (3d Cir. 1986).  Plaintiffs

allege no facts whatsoever to show that the Proxy Materials' disclosures actually depressed the

going-private price, or that any higher price would have been available had the disclosures been

different.  To the contrary, Plaintiffs allege that $7.55 per ADS was the Buyer Group's "best and

final" offer, which came after months of negotiations with the Special Committee and multiple

increases in the offer.  (CAC ¶ 72.)  Likewise, Plaintiffs do not allege that Tianye—or any other

buyer—would have paid more than $7.55 per ADS for JA Solar when it was a public company.

---

[9]    Additionally, Plaintiffs do not even contend that Defendants made any misstatement before the Preliminary
Proxy Materials, so even under Plaintiffs' own theory there is no basis for the putative class period to begin
three weeks earlier on November 20, 2017.

Again to the contrary, the Special Committee received **no interest** in an alternative transaction

when it conducted its market check during the go-shop.  Plaintiffs' belated desire for an appraisal

of their former shares does not state a **_disclosure_**-based injury under the U.S. securities laws.

### D.       Plaintiffs Fail To Allege Reliance for the Cancelled Shareholders

Finally, Plaintiffs' Section 10(b) claim on behalf of the Cancelled Shareholders also fails

for lack of reliance.  Plaintiffs try to invoke the presumption of reliance under *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 247 (1988), but, as this Court held in *Shanda*, the *Basic* presumption

does not apply to going-private transactions.  *See Shanda* Order at 17 (granting dismissal on this

basis).  As this Court explained, the "sale of shares through a merger does not constitute an

efficient market;" rather, "the share price [i]s negotiated as opposed to being driven by trading

volume or external analysis or reporting."  *Id.*  As in *Shanda*, the consideration that the

Cancelled Shareholders received here was negotiated at arm's length between the Buyer Group

and Special Committee, not set by an efficient market.  Thus, *Basic* does not apply.[10]

Unable to invoke a presumption of reliance, Plaintiffs must plead facts showing that each

Cancelled Shareholder actually relied on some material misstatement to his or her detriment.

Plaintiffs have not even attempted to do so.  Accordingly, the Cancelled Shareholders' Section

10(b) claim should be dismissed for this reason as well.[11]

---

[10]   The presumption of reliance under *Affiliated Ute*, which applies only to cases involving primarily a failure to disclose, also does not apply here because Plaintiffs' claims are based on purported affirmative misstatements, not omissions.  (*See, e.g.*, CAC ¶¶ 2, 84, 99 148.)  *See Shanda* Order at 16 n.2.

[11]   Although this Court held otherwise in *Shanda,* JA Solar respectfully submits that the Cancelled Shareholders' claims are also barred by *Morrison v. National Australia Bank*, 561 U.S. 247 (2010), because the Going-Private Transaction did not take place on a U.S. exchange and was given legal effect in China and the Cayman Islands.

## II.    PLAINTIFFS' SECTION 20A CLAIM SHOULD BE DISMISSED

Plaintiffs' Section 20A claim against JA Solar and Mr. Jin also fails as a matter of law for multiple reasons.  "The elements of a Section 20A action are: '(1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Exchange Act.'"  *Barnard v. Verizon Commc'ns, Inc.*, No. CIV.A. 10-1304, 2011 WL 294027, at *7 (E.D. Pa. Jan. 31, 2011), *aff'd*, 451 F. App'x 80 (3d Cir. 2011).

*First*, Plaintiffs' Section 20A claim fails because they do not allege a predicate Section 10(b) violation.  *See Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994) (affirming dismissal of § 20A claim because plaintiff failed to plead § 10(b) claim).[12]  *Second*, Plaintiffs do not allege any contemporaneous trading in JA Solar's securities.  In the Going-Private Transaction, "each share of JA Solar stock, including shares represented by ADS, was 'cancelled and ceased to exist in exchange for the right to receive [the going-private consideration].'"  (CAC ¶ 326.)  So when Plaintiffs received $7.55 per ADS that they formerly held, those were not trades in JA Solar's securities (which no longer existed).  *See Pennsylvania Ave. Funds v. Borey*, No. C06-1737RAJ, 2009 WL 902070, at *13 (W.D. Wash. Mar. 30, 2009) (dismissing Section 20A claim where Plaintiff "fail[ed] to allege that it traded at all" and instead alleged only that "it held . . . shares at the time of the merger").[13]  *Finally,* Plaintiffs fail to allege that JA Solar or Mr. Jin possessed any material, nonpublic information.  *See supra* § I.A.

## <u>CONCLUSION</u>

For at least these reasons, all of Plaintiffs' claims should be dismissed with prejudice.

---

[12]    Plaintiffs' control person claim under Section 20(a) fails for the same reason.  *See Shanda* Order at 17.

[13]    In any event, JA Solar was not a party to those transactions.

Dated:  New York, New York
        February 28, 2020

Respectfully submitted,

/s/ Robert A. Fumerton
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000
Fax:  (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Attorneys for Defendants JA Solar
Holdings Co., Ltd. and Baofang Jin*