UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  November 30, 2020

| | |
|---|---|
| ODS CAPITAL LLC ET AL, | |
| Plaintiffs, | |
| -against- | 18-CV-12083 (ALC) |
| JA SOLAR HOLDINGS CO. LTD ET AL, | <u>MEMORANDUM AND ORDER</u> |
| Defendants. | |

**ANDREW L. CARTER, JR., District Judge:**

ODS Capital LLC and Altimeo Asset Management commenced this securities action on December 20, 2018 against JA Solar Holdings Co. Ltd, Boafang Jin, and Shaohua Jia ("Defendants") alleging that Defendants participated in a scheme to defraud JA Solar's ADS holders into selling their securities at a price artificially depressed below its fair value. (ECF No. 1). Defendants now move to dismiss the amended complaint. (ECF No. 54.) For the reasons that follow, the Court grants Defendants' motion to dismiss.

## FACTUAL BACKGROUND

Plaintiffs purport to bring claims on behalf of two distinct classes of Plaintiffs. The first class of Plaintiffs covers Shareholders who sold their JA Solar Securities during the Class Period and prior to the completion of the Merger ("Seller Shareholders"), and the second class of Plaintiffs concerns Shareholders who held their JA Solar Securities through the close of the class period and ultimately sold/tendered their securities in the Merger for either $7.55 per American Depositary Share ("ADS") or $1.51 per common share ("Tenderer Shareholders"). Am. Compl. at ¶¶ 320, 323.

*Defendant JA Solar*

JA Solar is a Chinese solar power company founded by Boafang Jin ("Jin") in 2005. Am. Compl. ¶ 53, 55. JA Solar's ADS were listed on the NASDAQ, which would remain JA Solar's only publicly traded securities from the time of its IPO through the completion of the Merger. *Id.* Initially, JA Solar's primary business had been the manufacturing and sale of solar cells. *Id.* at ¶ 56. However, in 2009, 2013, and 2015, JA Solar expanded its business, manufacturing silicon wafers and solar modules and engaging in project development and the sale of electricity. *Id.* at ¶¶ 56–67. JA Solar sells its products in over 90 countries, and for the years ending on December 31, 2015, 2016, and 2017, JA Solar generated approximately $2 billion, $2.3 billion, and $2.9 billion in total revenue respectively. *Id.* at ¶ 58.

*Defendant Jin*

Plaintiffs allege Defendant Jin had multiple ties to JA Solar, including controlling the Jinglong group of entities, which owned the largest stake in JA Solar prior to the Merger and were part of the Buyer Group that continued to own a substantial stake in the Company after the Merger; did substantial business with JA Solar in related transactions; and facilitated the relisting transaction following the Merger. *Id.* at ¶ 59. Specifically, Jinlong BVI, part of the Jinlong group of entities, was JA Solar's largest shareholder prior to the Merger, owning approximately 16.3% of the Company before and after the Merger. *Id.* at ¶ 60. Defendant Jin owned approximately 32.96% of Jinlong BVI and served as its sold director. *Id.* Additionally, Jin controlled Hebei Jinlong as the largest shareholder, owning 74.85% of the Company. *Id.* at ¶ 62.

*Defendant Jia*

Defendant Jia was a member of JA Solar's Board of Directors and Chairman of the two-person Special Committee, who ultimately recommended that the Board approve the Merger.

*The Instant Merger*

On June 5, 2014, the Buyer Group initially submitted a preliminary proposal letter to JA Solar's Board of Directors, indicating an intention to acquire all of the outstanding shares of the Company that was not presently owned by the Buyer Group in a go private transaction for $9.69 per ADS in cash. *Id.* at ¶ 67. The Board of Directors then established a Special Committee to consider the proposal, including "the power and authority to . . . (i) investigate, evaluate, discuss, and negotiate the Proposed Transaction, (ii) make reports and recommendations to the Board as the Special Committee considers appropriate with respect to the Proposed Transaction, (iii) retain any advisors . . . and outside counsel, as the Special Committee deems appropriate . . . and (iv) exercise any other power that may be otherwise exercised by the Board and that the Special Committee may determine is necessary or advisable to carry out and fulfill its duties and responsibilities through the abandonment or completion of the Proposed Transaction." *Id.* at ¶ 68.

The Special Committee obtained Houlihan Lokey ("Houlihan") as its independent financial advisor and Gibson, Dunn & Crutcher LLP as its independent U.S. Legal advisor. *Id.* at ¶ 69. The go private transaction was then put on hold from October 27, 2015 to May 3, 2017 because the Buyer Group failed to secure adequate financing for the transaction. *Id.* at ¶ 70.

On June 6, 2017, the Buyer Group submitted a new proposal for the go private transaction and offered $6.80 per ADS in cash. *Id.* As justification for the lowered offer, the Buyer Group cited "(i) significant volatility in global financial markets hindering the Buyer Group's ability to secure financing, (ii) poor short term outlook for the solar industry, (iii) increased uncertainty in trade policy and government subsidies affecting the Company's growth prospects, and (iv) economic slowdown and challenges in China." *Id.* at ¶ 71. Negotiations ensued with the Special

Committee, and on October 27, 2017, the Buyer Group offered $7.55 per ADS and $1.51 per share as its best and final offer. *Id.* at ¶ 72.

Thereafter, Houlihan determined that the consideration of $7.55 per ADS was fair. *Id.* at ¶ 73. The Special Committee relied on Houlihan's analysis in reaching their conclusion that the Merger was fair and their recommendation to the Board that they should authorize and approve the Merger. *Id.* at ¶ 90. JA Solar provided information to Houlihan for his analysis, and Houlihan "relied upon and assumed, without independent verification, the accuracy and completeness of all data . . . made available" to him. *Id.* at ¶ 91. Specifically, Houlihan accepted the financial, economic, market conditions provided and assumed that they were prepared in good faith, expressing no opinion with respect to such projections or the assumptions on which they are based. *Id.*

On October 27, 2017, the Special Committee approved the proposed Merger and recommended that the Company's Board of Directors approve the transaction. *Id.* at ¶ 75. Shareholders that exercised their right to dissent from the Merger under Cayman Islands Law, and the shares of the Rollover Shareholders that were a part of the Buyer Group were excluded from receiving the Merger consideration. *Id.* at ¶ 76. The Board, excluding Defendant Jin, unanimously approved the proposed Merger, concluding that it was "fair and in the best interests of the Company and Unaffiliated Security Holders. *Id.* at ¶ 77. On November 17, 2017, the Company and Buyer Group executed the Merger agreement for the proposed transaction. *Id.* at ¶ 78.

Plaintiffs allege that the Special Committee and the Board promoted the Merger as advisable based on alleged poor economic conditions of JA Solar and the market. *Id.* at ¶ 79.

*Proxy Materials*

Plaintiffs allege that the Proxy Materials were misleading. *Id.* at ¶ 84. As the Merger approval would require at least two-thirds of the Company's shares that were present and voting, between November 17, 2017 and February 1, 2018, plaintiffs allege that "Defendants authorized the filing of materially false and misleading Proxy Materials with the SEC." *Id.* For instance, Shareholders had the right to dissent from the proposed Merger and exercise their appraisal rights to receive payment of the fair value of their shares. *Id.* at ¶ 85. According to Plaintiffs, exercising the right to dissent was discouraged. *Id.* The Proxy Materials warned that dissenting was risky as the fair value of the shares determined by Cayman Islands Companies Law was uncertain and could be less than the Shareholder would receive pursuant to the Merger Agreement. *Id.* Consequently, the Proxy Materials instructed that Cayman Islands Companies Law was technical and complex and advised Shareholders to consult Cayman Islands legal counsel if they wished to exercise dissenters' rights. *Id.* Plaintiffs further allege that dissenting was more difficult for ADS holders because the Proxy Materials advised ADS holders would have to go through "extra complicated procedural steps and bear the extra costs of doing so." *Id.* at ¶¶ 86–87. Due to the misleading Proxy Materials, Plaintiffs state that most JA Solar Securityholders were convinced not to take the risk of dissenting from the Merger. *Id.* at ¶ 89.

Additionally, Plaintiffs allege that the Proxy Materials made assurances that no transaction to relist in China was under consideration; expressly disclaimed that any such transaction was in the works; and affirmed that there was no viable alternative to the proposed sale of the Company to the Buyer Group *Id.* at ¶¶ 99–102. JA Solar made further assurances in December 2017 through their website, posting a notice that again assured investors that there were no plans to relist its shares in China. *Id.* at ¶ 103. On January 11, 2018 and February 1, 2018, JA Solar published the

Amended Proxy Materials and the Second Amended Proxy Materials, reproducing statements concerning the Buyer Group's intention not to relist its shares in China. *Id.* at ¶¶ 105–106. A final amendment would be issued on July 16, 2018, following the completion of the Merger. *Id.* at ¶ 118.

*Shareholder Vote*

Approval of the Merger required an affirmative vote of Securityholders representing at least two-thirds of JA Solar's shares that were present and voting. *Id.* at ¶ 82. On March 12, 2018, 90% of the Company's total outstanding ordinary shares presenting in person or by proxy voted in favor of the Merger. *Id.* at ¶¶ 107–108. Approximately 56.5% of the Company's total outstanding ordinary shares presented in person or by proxy at the meeting. *Id.* Additionally, 10% of the Company's ordinary shares exercised their dissenting rights and objected to the Merger. *Id.* at ¶ 109. Since 10% of the Company's ordinary shares objected to the Merger, the Company and the Parent Parties had the right to terminate the transaction unless the Parent Parties irrevocably waived that condition within 10 business days. *Id.* at ¶ 110. The Company stated that it would "update its shareholders if and when it receives from the Parent Parties their decision with respect to their granting of the waiver in due course." *Id.* at ¶ 111. The Company never updated the Shareholders, and the Merger closed with neither the Company nor the Buyers terminating the transaction. *Id.*

Following the Merger, Defendant Jin's stake in the Company increased from 5.4% to 79.8%, Defendant Jin would continue to serve as the Chairman of the Board and CEO of the surviving Company, and Jinglong BVI, which Defendant Jin owned a 32.96% stake in, had an ownership interest of 16.3%. *Id.* at ¶¶ 13, 116. According to Plaintiffs, the plan for the Merger was to allow JA Solar insiders to take over 100% of JA Solar for far below the Company's actual value.

*Id.* at ¶ 114. Notwithstanding Defendant Jin, other members of Buyer Group kept their same standing in the Company. *Id.* at ¶ 115.  Plaintiffs, however, allege that those members would benefit from the plan to relist the Company in China at a higher valuation.

On July 16, 2018, the Merger was completed, and JA Solar no longer existed as publicly traded and became a subsidiary of an entity owned by the Buyer Group. *Id.* at ¶ 117. The previous Company's ordinary shares were canceled in exchange for the right to receive $1.51 in cash per share and the Company's ADS was cancelled in exchange for the right to receive $7.55 in cash per ADS. *Id.*

### Post Shareholder Vote and Merger

On April 30, 2018, after the shareholder vote, JA Solar released its Annual Report for 2017. *Id.* at ¶ 120. Despite the projections in the Proxy Materials, JA Solar reported the revival of industry demand, as well as expected growth in 2017 and 2018 due to developing and emerging markets such as India and China. *Id.* at ¶ 121. Additionally, regarding JA Solar's finances, the Company reported a total revenue of $3.022 billion and a net income of $46 million. *Id.* at ¶ 125.

In the Proxy Materials released on January 11, 2018 and February 1, 2018, the Company projected a total revenue for 2017 of $2.596 billion and an estimated net income of $39 million. Plaintiffs allege that JA Solar's financial projections were 16% and 18% lower than their total revenue and net income estimates for 2017, and that the projections were crucial in JA Solar Securityholders' decision to vote in favor of the Merger. *Id* .at ¶ 125. Additionally, Houlihan relied exclusively on his financial analysis in determining the Merger's fairness, which was based on underestimated projections provided by the Company. *Id.* at ¶ 128.

Plaintiffs allege the Securityholders approved the Merger based on the recommendation and/or fairness determinations provided by the Proxy Materials, the Board, Houlihan, and the

Buyer Group, which relied upon projections and misleading characterizations of the Company's business conditions.

*Relisting Rumors and Confidential Witnesses*

Despite assuring investors that there were no plans to relist, Plaintiffs allege that there was actually a present plan in place for JA Solar to relist its shares. Plaintiffs identify a statement from Jin on November 19, 2017 and four confidential witnesses ("CWs") that they allege are indicative the Company's plan to relist its shares following the Merger. *Id.* at ¶ 131. First, Plaintiffs allege that Jin stated at the "2017 Entrepreneur 'To conscience' (Beijing) Forum" that JA Solar had plans to return to the Chinese capital Markets in a publicly traded forum within the following two or three years. *Id.* Plaintiffs further state that the informal marks were by no means a definitive statement of the Company's plans. *Id.*

Plaintiffs' first CW was a sales manager in JA Solar's Shanghai office from before the start of the Class Period in 2018; reported to a senior member of the Sales group for Mainland China; and recalled hearing about the relisting plan at the beginning of 2018. *Id.* at ¶ 133.

CW 2 was a financial analyst with the Beijing office from 2015 until after the Merger closed in July 2018; reported to a senior member of the financial analysis team; and stated that he first heard about the delisting plan sometime in 2017 and heard that the Company probably would be relisted on the A-shares Market after hearing about the delisting plan. *Id.* at ¶ 135.

CW 3 worked on financial analysis in the Beijing Office from before the start of the class period to 2018; reported to a senior member of JA Solar's financial analysis group; and recalled seeing a message on JA Solar's website telling people not to believe the rumors regarding the relisting and that even after this message, the rumors regarding the relisting persisted. *Id.* CW 3 further explained that in May or June of 2018 an audit team from BDO China came to the Beijing

office, and CW 3 inquired about which capital market the Company was going to be relisted in, and one of the auditors replied that it was not decided. *Id.* Plaintiffs allege that this shows that by May or June of 2018, JA Solar was far enough in its relisting plans to have its Chinese auditor begin its audit that would be necessary for the transaction to take place, which would normally not occur until the final stages of the process. *Id.* at ¶ 136.

CW 4 worked on JA Solar's sales staff from 2016 to 2018. CW 4 heard about the delisting plan in Spring of 2018 and heard from a colleague that JA Solar wanted to go back to Mainland China. *Id.* at ¶ 138.

*JA Solar Announces the Relisting*

On July 19, 2018, three days after the Merger closed, JA Solar and Tianye Tonglian ("Tonglian") signed their agreement for Tonglian to acquire JA Solar by issuing 100% of JA Solar's equity. *Id.* at ¶ 140. This deal operated as a backdoor listing, which is "a way for a company to go public without the hassle and costs of a traditional initial public offering" and allowed JA Solar to return to the stock market at "multiple of the value of which it was taken private" by relisting on the Shenzhen Stock Exchange. *Id.* at ¶¶ 140, 144.

Thereafter on July 23, 2018, Tonglian published a "Public Notice on Material Asset Restructurings Agreement," announcing the intent to conduct the backdoor listing of JA Solar through Tonglian purchasing a 100% stake in JA Solar. *Id.* at ¶ 142. After the transaction, the letter of intent stated that Defendant Jin would become the controller of the listed Company. *Id.* On November 4, 2018, January 21, 2019, and January 22, 2019, the national financial media in China, Bloomberg, and China Business News reported the deal, estimating that JA Solar could place an estimated $1 billion worth of net assets into Tonglian, which was multiple times the value at which JA Solar went private. *Id.* at ¶ 146, 147, 149. Bloomberg further reported that purchase of JA

Solar's equity for 1.1 billion is around 11 times JA Solar's net profit in 2017 and it is also more than three times JA Solar's earlier valuation. *Id.* at ¶ 150.

Plaintiffs allege that this higher valuation in China was Defendant Jin's and the Buyer Group's primary motivation for completing the Merger. *Id.* at ¶ 148. Plaintiffs further allege that in the restructuring report that JA Solar and Tonglian issued regarding the relisting, JA Solar reported operating income for 2015 through 2017 that exceeds what was reported in the Proxy Materials and other SEC filings when it was listed on the NASDAQ. *Id.* at ¶ 152. Plaintiffs allege that these projections in the Proxy Materials were deflated in comparison to the figures that JA Solar reported in China in connection with the relisting. *Id.* at ¶ 153. Presently, the relisting continues to progress through the Chinese regulatory approval process. *Id.* at ¶ 156.

### *Timing of the Relisting*

Plaintiffs allege that the relisting could only have been announced after a lengthy period of deal making, but state that the exact details of JA Solar's deal making is largely unknown. *Id.* at ¶¶ 157, 160. Plaintiffs rely on an expert in Chinese M&A and capitals market transactions in explaining the steps it would take to reach the stage of announcing the relisting to the public. *Id.* at ¶¶ 157–160. Plaintiffs allege that hiring a financial advisor or investment Bank and a Legal advisor; identifying a potential transaction counterparty; finding the appropriate relisting shell; auditing and accounting compliance; performing diligence on potential transaction counterparty; conducting regulatory assessments; negotiating preliminary transaction terms; removal of variable interest entity structure; and divesting the shell Company of its assets would normally take more than 12 months for a Company to agree to announce an asset restructuring deal. *Id.* at ¶¶ 161–171. Therefore, plaintiffs allege that the relisting must have been underway by July 2017, before the

announcement of the Merger in November 2017 and the publication of the preliminary Proxy Materials on December 11, 2017. *Id.* at ¶ 172.

*False and Misleading Statements and/or Omissions*

Plaintiffs allege that Defendants made several materially false and misleading statements and omissions during the class periods, including statements in the Preliminary, Amended, and Second Amended Proxy Materials, and JA Solar's website concerning an intention not to relist; statements in the Preliminary, Amended, and Second Amended Proxy Materials that presented the transaction as fair; statements in the Preliminary, Amended, and Second Amended Proxy materials regarding the Special Committee's, the Board's, and the Buyer Group's determination that the transaction was fair; statements regarding the triggering of the dissenting shareholder condition where JA Solar stated it intended to update Shareholders regarding the Parent Parties decision whether to terminate the Merger Agreement.

*Scienter*

Plaintiffs allege that Jin and Jia acted with scienter in making the materially false and misleading statements and omissions as they had actual knowledge that the statements and omissions were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. *Id.* at ¶ 292.

Plaintiffs further allege Defendant Jin had the motive and opportunity to commit the fraud as he had the ability to influence information contained in the Proxy Materials; had the opportunity to vote his substantial amount of shares as he saw fit to further cement the Merger; and stood to own 79.8% of the Company following the Merger. *Id.* at ¶ 293. Due to the aforementioned, Plaintiffs allege Defendant Jin had the motivation to complete the transaction at the lowest price possible, and thus by deflating the value of the JA Solar Securities through the fraudulent scheme,

Defendant Jin subsequently reduced the money he needed to spend to acquire JA Solar. *Id.* at ¶ 294. Through the defrauding of JA Solar Securities, Plaintiffs allege Defendant Jin received a windfall of at least $440 million. *Id.*

According to Plaintiffs, Defendant Jin and Defendant Jia, by virtue of their position and control of the company, would have been involved and apprised of the backdoor listing negotiations that predated and coincided with the Merger process. *Id.* at ¶¶ 301–302.

*Loss Causation*

Plaintiffs allege that through Defendants' scheme to deceive the market by misrepresenting the facts and making certain omissions, Class members relied on the misrepresentations and on the market price of JA Solar Securities during the Class Period and sold their shares at a depressed price. *Id.* at ¶ 319. Plaintiffs allege that the Class members did not receive fair value for their shares in the Merger, and the that the true value of the ADS far exceeded the Merger consideration. *Id.* Plaintiffs state that this is supported by the value of the company during the relisting, the eventual disclosure of financial results that were significantly higher than the projections used to evaluate the transaction. *Id.*

Plaintiffs additionally state that Class members who sold their shares during the Class period suffered economic loss as their shares were sold at a depressed value and were deprived of fair value of their shares through the false and misleading statements. *Id.* at ¶ 320. The false and misleading statements deterred Shareholders from making an informed decision in exercising their right to dissent and seek appraisal. *Id.* at ¶ 322. As to the Plaintiffs who held their JA Solar Securities through the close of the Class Period sold their JA Solar Securities for either $7.55 per ADS or $1.51 per common share; however, Plaintiffs allege these shares were worth far more than

the transaction price as evidenced by the relisting in China which valued JA Solar at multiple times the Merger price. *Id.* at ¶ 323.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on December 20, 2018. (ECF No. 1.) On March 8, 2019, the Court appointed Altimeo Asset Management and ODS Capital LLC as Co-lead Plaintiffs. (ECF No. 15.) On June 14, 2019, Plaintiffs filed an amended complaint, (ECF No. 32), and on February 28, 2020, Defendant moved to dismiss the amended complaint. (ECF No. 54.)

## LEGAL STANDARD

### I.        Motion to Dismiss

When deciding a motion to dismiss, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"
*Id.* (quoting *Twombly*, 550 U.S. at 557).

## II.      Federal Rules of Civil Procedure 9(b)

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings must contain only "a
short and plain statement" of the basis for the court's jurisdiction and of the claim showing that
the pleader is entitled to relief, and a demand for the relief sought. Fed. R. Civ P. 8(a). However,
where, as here, Plaintiffs allege fraud claims under § 10(b) of the Exchange Act, the complaint is
subject to the heightened pleading requirements of Federal Rules of Civil Procedure 9(b) and the
Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the
complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the
particularity requirement, a complaint must "(1) detail the statements (or omissions) that the
plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements
(or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin.
Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities Plaintiffs to an even more stringent pleading standard.
Under the PSLRA, Plaintiffs must "(1) specify each statement alleged to have been misleading
[and] the reason or reasons why the statement is misleading; and (2) state with particularity facts
giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs,
Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation
marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong,
the court must decide whether "a reasonable person would deem the inference of scienter cogent
and at least as compelling as any opposing inference one could draw from the facts
alleged." *Tellabs*, 551 U.S. at 324.

**DISCUSSION**

**III.    Section 10(b) of the Securities Exchange Act and Rule 10b-5**

To state a claim under both Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must show: "(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of security; (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). *See also* 15 U.S.C. § 78u–4(b). Plaintiffs, here, allege a scheme to depress the market by misrepresenting JA Solar's financial position and withholding a plan to relist JA Solar after the Merger, thereby allowing Defendants to purchase JA Solar at the depressed price at the expense of Plaintiffs. Defendants argue that Plaintiffs' Amended complaint should be dismissed as Plaintiffs fail to state claim under Section 10(b) of the Exchange Act and Rule 10b-5.

Since there is no dispute that Plaintiffs allege a connection with the purchase or sale of a security and economic loss, the Court does not address those elements.

**A.  Material Misrepresentations or Omissions**

Here, Plaintiffs allege that Defendants made materially false and misleading statements and omissions in the Preliminary, Amended, and Second Amended Proxy Materials and JA Solar's website regarding JA Solar's intention not to relist; the Special Committee's, the Board's, and the Buyer Group's determination that the transaction was fair; and the intent to update Shareholders regarding the Parent Parties decision whether to terminate the Merger Agreement. Plaintiffs have adequately pleaded material misrepresentations or omissions.

Rule 10b-5 "renders it unlawful to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Levy v. Maggiore*, 48 F. Supp. 3d

428, 444 (E.D.N.Y. 2014) (citation and internal quotation marks omitted). "A statement is considered materially misleading under § 10(b) when its representations, viewed as a whole, would have misled a reasonable investor." *Id.* (citations and internal quotation marks omitted). It is not sufficient to allege that the investor might have considered the misrepresentation or omission important, nor is it necessary to assert that the investor would have acted differently if an accurate disclosure was made. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Materiality is a mixed question of law and fact, and accordingly at the motion to dismiss stage "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (citation and internal quotation marks omitted); *see also In re CannaVest Corp. Secs. Litig.*, 307 F. Supp. 3d 222, 237 (S.D.N.Y. 2018) (quoting *Ganino*, 228 F.3d at 161) ("At the pleading stage, a plaintiff satisfies the material requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions.").

i.      *Statements Regarding JA Solar's Intention not to Relist*

Plaintiffs allege that JA Solar made materially false and misleading statements regarding their intention not to relist JA Solar after the Merger as discussions with Tonglian were well underway prior to the announcement of the Merger and the publishing of the Preliminary Proxy Materials. Specifically, Plaintiffs allege that the Preliminary, Amended, and Second Amended Proxy Materials stated that there were no "present plans or proposals" of an "extraordinary corporate transaction involving the Company's corporate structure . . . such as a Merger[.] See Am. Compl at ¶¶ 100, 186, 23, 258. Additionally, Plaintiffs allege as materially false or misleading a December 2017 statement on JA Solar's website that read "JA Solar Co. Ltd. Currently does not

have plans to list domestically . . . much less will it take any public placement actions in relation to relisting." *Id.* at ¶ 227. To support these allegations, Plaintiffs rely on four CWs with purported knowledge of the plans to relist.

"The case law examining facts attributed to unidentified witnesses reflects the need to view such attributions with caution and care." *Long Miao v. Fanhua, Inc.*, 42 F. Supp. 3d 774, 797 (S.D.N.Y. 2020). The Second Circuit addressed confidential sources in a securities fraud action in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). There, the Court stated:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

*Novak*, 216 F.3d at 314.

Where a securities fraud complaint relies on uncorroborated CWs, Courts in this District resolve the adequacy of such complaints as facially pled, and "will credit confidential source allegations, generally, in two situations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011). First, "when 'independent [adequately pled] factual allegations' corroborate a confidential source's statements, the requirement of a description of the source's job is loosened." *Id.* (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 n.10 (S.D.N.Y. 2004)). Second, in the absence of such well-pled corroborative facts, the Court will credit confidential sources when "those sources' positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Id.* (citation omitted).

As a threshold matter, the Court does not credit Plaintiffs' CWs. The CWs that Plaintiffs identify base their allegations on secondhand accounts in which they heard about relisting plans from a colleague; recalled hearing employees discuss rumors regarding relisting; or heard about internal rumors. *See* Am. Compl. 131–138. Notably, the confidential witnesses fail to identify any concrete plan to relist. Rather, the confidential witnesses merely reiterate the allegations in the amended complaint regarding the relisting. *Id.* Courts have generally been hostile to non-particular allegations from CWs. *See*, *e.g.*, *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067, 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020) (disregarding the allegations of CWs that were insufficiently particularized and failed to substantiate the allegations in the complaint); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305–06 (S.D.N.Y. 2019) (rejecting "[g]eneric and conclusory allegations" from Plaintiffs' CWs as "so vague as to be meaningless"); *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014)*, aff'd,* 604 F. App'x 62 (2d Cir. 2015) ("general allegations" regarding quality control issues "do not render the [defendants'] statements described herein, considered in context, false or misleading," where the complaint does not also "contain the . . . required specific factual allegations (by CWs or otherwise)"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) ("[P]laintiffs have not satisfied the heightened pleading requirements for their channel-stuffing claim . . . [because the CW on whom they rely] merely parrots the conclusory allegations contained in the complaint.").

Moreover, the CWs' employment descriptions in the amended complaint–financial analysts, sales manager, and sales staff–do not suggest that these CWs were in a position to be relayed plans to relist by corporate management or have access to concrete plans to relist JA Solar, and in fact, as discussed *supra,* the CWs described no concrete plans to relist. *See, e.g.*, *Qihoo*, 2020 WL 4734989, at *14; *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp.

3d 196, 223 (S.D.N.Y. 2018); *In re Lehman Bros. Sec. & Erisa Litig.*, No. 10 Civ. 6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (disregarding CWs who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting allegations of "low-level, rank-and-file employees or outside contractors" who the complaint did not indicate had any "access to aggregated data regarding [the company's] credit risk" or contact with the individual defendants*), aff'd*, 430 F. App'x 63 (2d Cir. 2011). Accordingly, the Court finds that the CWs fail to put forth particularized allegations to satisfy the PSLRA.

Even assuming *arguendo* that the Court credited Plaintiffs' CWs, Plaintiffs' assertion that JA Solar's statements not to relist the Company represent material misrepresentations or omissions is unavailing. Two recent cases in this Court have addressed similar claims regarding a company concealing plans to relist following a private transaction and instruct the Court's analysis here. *See Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, No. 19 Civ. 1654, 2020 WL 6063539, at *5 (S.D.N.Y. Oct. 14, 2020); *Qihoo*, 2020 WL 4734989, at *1. In both cases, the Court held that because Defendants disclosed the possibility of relisting after the go private transaction, Plaintiffs could not survive a motion to dismiss absent some plausibly alleged facts that Defendants failed to disclose an actual, concrete plan to relist. *WuXi*, 2020 WL 6063539, at *5; *Qihoo*, 2020 WL 4734989, at *16.

Similarly, in the present case, Defendants disclosed the possibility of relisting in the future. Specifically, the Final Proxy Materials provided:

> "The Buyer Group will continue to evaluate the Company's entire business and operations from time to time, and may propose or develop plans and proposals which they consider to be in the best interests of the Company and its equity holders, including the disposition or acquisition of material assets, alliances, joint

ventures, and other forms of cooperation with third parties or other extraordinary
transactions, including the possibility of relisting the Company or a substantial part
of its business on another internationally recognized stock exchange[.]"

Defs.' Ex. A at 53.

As Defendants disclosed that they may potentially relist on "another internationally recognized stock exchange," Plaintiffs must plausibly allege that there was an actual, concrete plan to relist that Plaintiffs failed to disclose. In order to support their claim that there was a relisting plan that Defendants failed to disclose, Plaintiffs cite the allegations from CWs; an analysis from their expert in Chinese M&A transactions who explains the timeline for backdoor listings; and a speech Defendant Jin made on November 19, 2017 where he stated that he had plans to return to the Chinese capital markets in a publicly traded form within the following two or three years. Pls.' Mem. of Law at 9–12.

As discussed *supra*, Plaintiffs' CWs fail to put forth particularized allegations to satisfy the PSLRA. Moreover, Defendant Jin's November 19, 2017 statement revealed a hope to relist in the future; however, that statement is not indicative of a present plan to list, and in fact, Plaintiffs concede in the amended complaint that the statement was by no means a definitive statement of the Company's plans. Am. Compl. at ¶ 131.

Regarding the agreement to relist JA Solar three days after the Merger was officially completed, Plaintiffs' expert witness on Chinese M&A transactions explained that it takes at least one year before the parties are able to agree on the type of backdoor listing that JA Solar and Tonglian entered into. Therefore, Plaintiffs allege that there must have been a present plan to relist JA Solar. Plaintiffs' expert is unavailing. Plaintiffs' arguments regarding the general time it takes to agree to a backdoor listing requires the Court to make inferential leaps regarding a hypothetical plan to relist that has not been plausibly alleged. Similar to the allegations in *Qihoo* and *WuXi*,

"the allegations . . . are far too conclusory, insufficiently particular, and devoid of details confirming their reliability" to support a plausible inference that JA Solar had a concrete plan to relist before the before the Merger. *Qihoo*, 2020 WL 4734989, at *16; *WuXi*, 2020 WL 6063539, at *6. Accordingly, Plaintiffs have failed to plausibly allege a material misrepresentation of Defendants' statements regarding JA Solar's plans to relist.

        ii.    *Fairness Statements*

        Plaintiffs argue that Defendants falsely misrepresented the Merger as fair by expressly adopting Houlihan's fairness evaluation that was based on distorted financial information provided by JA Solar that presented poor business conditions for JA Solar. Am. Compl. at ¶¶ 308–317. Specifically, Plaintiffs allege that the 2017 annual report and financial results that were released on April 30, 2018 significantly deviated from the projections Defendants provided to Houlihan, and despite having actual data that contradicted the projections, they were published in the Proxy Materials released on December 11, 2017, January 11, 2018, February 1, 2018, and July 16, 2018. Defendants' projections for total revenue and net income for 2017 were 16% and 18% lower than their actual total revenue and net income for 2017. *Id.* at ¶ 125. Plaintiffs state that it's significant that when the projections were given to Houlihan, the first three quarters of the 2017 year were already complete. *Id.* at ¶ 126.

        In the Second Circuit, "statements about a 'company's projections [are treated as] opinions rather than guarantees.'" *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 480 (S.D.N.Y. 2018) (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011)). Accordingly, the Court must consider the framework set forth in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, to determine whether Plaintiff has sufficiently pleaded actionable misstatements and omissions concerning the projections. 135 S. Ct. 1318. "Pursuant to the safe

harbor, 'a defendant is not liable [for a forward-looking statement] if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.'" *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). In *Omnicare*, the Supreme Court established that opinions can be misleading if "(1) 'the speaker d[oes] not hold the belief . . . professed'; (2) the 'fact[s] [ ] supplied' in support of the belief professed are 'untrue'; or (3) the speaker 'omits information' that 'makes the statement misleading to a reasonable investor.'" *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092–1096 (1991).

Plaintiffs have adequately pleaded that Defendants' statements regarding the fairness of the Merger were misleading. Plaintiffs distinguish the present case from the Court's decision in *In re Shanda Ltd. Sec. Litig.*, No. 18 Civ. 2463 (ALC), 2020 WL 5813769, at *1 (S.D.N.Y. Sept. 30, 2020), by alleging that unlike in *Shanda*, Plaintiffs here have plausibly alleged that Defendants could not have possibly believed that the projections JA Solar provided were accurate. Pls.' Mem. of Law at 13–14. Defendants allege that the claims here are similar to *Shanda* as Plaintiffs have failed to plausibly allege that Defendants knew the projections were false. The Court disagrees.

In *Shanda*, only the first quarter of 2015 was complete when the financial projections were provided, and the Court relied on this fact when determining that Defendant's fairness statements constituted "inactionable opinion statements." *Id.* at 6–7. Here, the first three quarters of 2017 were complete when the projections were provided to Houlihan, and Plaintiffs have alleged that the projections for the fourth quarter were vastly different than what was provided. Notably,

Plaintiffs also allege that the actual results for the first three quarters of 2017 far exceeded even what was reported in the Proxy Materials, and Plaintiffs have additionally alleged that the restructuring report JA Solar and Tonglian issued in connection with its relisting provided operating income for 2015 through 2017 that far exceeded what was reported in the Proxy Materials and SEC filings when JA Solar was publicly traded on the NASDAQ. Am. Compl. at ¶ 152. Taking the allegations as true, at the very least the 2015 and 2016 operating income was understated and misrepresented in the Proxy Materials and information furnished to Houlihan, who used the information to form his opinion that the Merger was fair.

Thus, construing the allegations in the amended complaint in the light most favorable to Plaintiffs–as the Court must on a motion to dismiss–Plaintiffs' allegations plausibly allege that Defendants' statements regarding the fairness of the Merger and JA Solar's financial position were misleading. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ( "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."); *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ( "[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.")

### iii.     *The Intent to Update the Shareholders*

Plaintiffs claim that Defendants misrepresented the dissenting shareholder condition when they failed to update the Shareholders regarding the intent of the Parent Parties decision whether to terminate the Merger Agreement. This claim is insufficient. This alleged misstatement is "so

obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman*, 754 F.2d at 1067. Thus, Plaintiffs' claim regarding the intent to update the Shareholders fails to meet the standard for materiality. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

### B.  Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)). To satisfy the PSLRA's pleading requirements for scienter, Plaintiffs must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). In evaluating whether either of these showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311 (internal cross references omitted). When examining these factors, a court must be mindful that the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

Plaintiffs have adequately pleaded that JA Solar and Defendant Jin had a motive an opportunity to commit fraud. Regarding Defendant Jin, Plaintiffs have demonstrated that Jin had

a significant stake in JA Solar, was a member of the Board of Directors, increased his ownership stake in the Company to 79.8%, and received $440 million following the Merger. Additionally, Defendant Jin owned 32.96% of Jinlong BVI, which was JA Solar's largest shareholder prior to the Merger, owning approximately 16.3% of the Company before and after the Merger. Am. Compl. at ¶ 60. Plaintiffs have demonstrated that Defendant Jin stood to gain in a concrete and personal way by materially misrepresenting the financial position of the Company that resulted in approval of the Merger at a price favorable to Defendant Jin.

Conversely, Plaintiffs fail to plead a strong inference of scienter as to Defendant Jia. Defendant Jia was the Chairman and Director of the two-person special committee that approved the proposed Merger and recommended that the Board approve the Merger as well. Plaintiffs allege that Defendant Jia, due to his position, would have known that the statements were materially false and misleading statements. This is insufficient. Plaintiffs have offered nothing more than general allegations regarding Defendant Jia and ask the Court to presume, primarily because his position, that he must have known the statements were materially false or misleading. The Court considers such broad allegations insufficient to support an inference of Scienter. *See Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 76 (2d Cir. 2008); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

As Plaintiffs fail to plead a strong inference of scienter as to Defendant Jia, the Court grants Defendants' motion to dismiss the amended complaint's claims against Defendant Jia.

Regarding JA Solar, generally, courts in this District have held that "'management level' employees can serve as proxies for the corporation in suits filed under them Exchange Act." *Thomas v. Shiloh Indus., Inc.*, No. 15 CV 7449, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017). Although courts have "not developed a bright-line rule to determine when an executive is

sufficiently senior such that his or her scienter can be attributed to the entity[,] . . . courts typically consider the individual's relative seniority at the issuing entity and the connection between the executive's role and the fraudulent statements." *Barrett v. PJT Partners Inc.*, No. 16 Civ. 2841, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017). In the present case, defendant Jin was the single largest shareholder of JA Solar, a member of the Board of Directors, and was a part of the Buyer Group. Based on Defendant Jin's seniority position within JA Solar and his pivotal role within the Buyer Group, the Court concludes that Defendant Jin's scienter may be imputed to Defendant JA Solar. *See Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 276 (S.D.N.Y. 2013).

### C. Reliance

Plaintiffs allege reliance for two separate classes of Plaintiffs, the Seller Shareholders and the Tenderer Shareholders. Am. Compl. at ¶¶ 320, 323. Defendants fail to challenge Plaintiffs' assertion of reliance for the Seller Shareholders who sold their ADS during the Class Period and focus entirely on the Tenderer Shareholders who held their Securities through the close of the class period. As the Court agrees with Plaintiffs that they have adequately pleaded reliance for the Seller Shareholders, The Court's analysis shall focus on the Plaintiffs who held their Securities through the close of the class period.

The traditional way a Plaintiff demonstrates reliance is "by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) (quoting *Amgen*, 133 S.Ct. at 1192). However, in some circumstances, Plaintiffs may invoke a "rebuttable presumption of reliance." *Id.* at 268. This presumption rests on the "fraud-on-the-market' theory" which states "that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Id.*

(quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).  Because "the typical 'investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price'— the belief that it reflects all public, material information— . . . his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action.' " Id. (quoting *Basic*, 485 U.S. at 247, 108 S.Ct. 978). But the presumption, as its name suggests, is rebuttable. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption ...." *Id.* (quoting *Basic*, 485 U.S. at 248) (alteration omitted).

Both Plaintiffs and Defendants make much of the Court's decision in *Shanda*, 2019 WL 11027710, at *1. Defendants allege that the Court in *Shanda* held that the *Basic* presumption does not apply to go private transactions. Defs.' Mem. of Law at 30. As an initial matter, *Shanda* does not stand for the proposition that the *Basic* presumption could never apply to a go private transaction. Rather, the Court opined that generally go private transactions are treated as inefficient. Additionally, in the motion for reconsideration, the Court held that the unique facts presented in *Shanda* failed to support an efficient market. *In re Shanda Ltd. Sec. Litig.*, No. 18 Civ. 2463 (ALC), 2020 WL 5813769, at *1 (S.D.N.Y. Sept. 30, 2020).

Turning to the present case, the Court finds that Plaintiffs' allegations for the Tenderer Shareholders also fail to support an efficient market. "[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296  n.133 (S.D.N.Y. 2008)*; see also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 650–51 (S.D.N.Y.2012) (holding that an efficient market is one that is open, developed, and large number of persons can buy or sell); *In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 221

(S.D.N.Y. 2002); *Reingold v. Deloitte Haskins & Sells, Yarwood Vane*, 599 F. Supp. 1241, 1264 (S.D.N.Y.1984) (declining to apply the fraud on the market theory to inefficient markets). By contrast, generally, IPOs and private transactions are treated as inefficient. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006), decision clarified on denial of reh'g sub nom. *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) ("the market for IPO shares is not efficient"); *Sable v. Southmark/Envi Capital* Corp., 819 F. Supp. 324, 339 (S.D.N.Y. 1993) ("there is no such justification for a presumption of reliance here, because the partnerships were offered privately and were not traded actively in a large public market."). While the Court does not hold that a go private transaction could never be treated as efficient, Plaintiffs allegations here regarding the Tenderer Shareholders fail to demonstrate the open and developed market that would support market efficiency under the *Basic* presumption.

As Plaintiffs fail to adequately plead reliance on behalf of the Tenderer Shareholders, the Court grants Defendants' motion to dismiss Plaintiffs' amended complaint for failure to state a § 10(b) and rule 10b-5 claim on behalf of the Tenderer Shareholders.

**D.  Loss Causation**

The Court finds that Plaintiffs fail to adequately plead loss causation on behalf of the Seller Shareholders. Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To plead loss causation, Plaintiffs must "link the defendant's purported material misstatements or omissions with the harm ultimately suffered." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). If the relationship between the loss and the information concealed or misstated by the defendant is "sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the

alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Bristol Myers*, 586 F. Supp. 2d at 163 (citation omitted). Allegations of loss causation "are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Rather, courts in this District have made it clear that if the complaint connects the Defendants' fraud with Plaintiffs' purported loss within the short and plain statement standard of Rule 8(a)," then nothing further is needed at this stage of the litigation. *Bristol Myers Squibb*, 586 F. Supp. 2d at 163 (alterations, quotation marks, and citations omitted); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 559 (S.D.N.Y. 2010).

Plaintiffs allege that the Seller Shareholders suffered economic loss as their shares were sold at a depressed value, and they were subsequently deprived of the fair value of their shares through the false and misleading statements. *Id.* at ¶ 320.The Court has found that Plaintiffs have adequately pleaded that Defendants made misleading statements regarding the fairness statements in the Proxy Materials.

However, the Court finds that the amended complaint fails to establish a causal connection between (1) the misleading statements in the Proxy Materials and (2) the value of the Seller Shareholders' Securities during the class period. *See ATSI Commc'ns, Inc.*, 493 F.3d at 106; *Dura*, 544 U.S. at 346. Plaintiffs have failed to adequately plead that the misleading statements regarding JA Solar's financial position kept the price of the Seller Shareholders' Securities artificially low at the time they sold their shares. Plaintiffs' allegations that JA Solar depressed the price of JA Solar Securities during the class period are bellied by the fact that JA Solar's stock price rose or remained roughly the same during the relevant class period.

JA Solar's ADS price rose when the Merger was announced; rose once the Preliminary Proxy Materials were released; remained roughly the same when the Amended Proxy Materials

were released; and rose again when the Final Proxy Materials were released. *See* Defs.' Ex. J*; Collier v. Aksys Ltd.*, No. 04 Civ. 1232, 2005 WL 1949868 (D. Conn. Aug. 15, 2005), *aff'd* 179 Fed. Appx. 770 (2d Cir. 2006) (finding claims that Defendants artificially deflated the stock price defeated by the stock price actually rising). The Court notes that Plaintiffs allege that the stock was rising less than it should have due to the misleading statements in the Proxy Materials; however, "[s]entiment simply is not enough to sufficiently plead loss causation" and "speculation and conjecture, even a well-educated guess, in the context of market prognostication does not suffice to establish a fact." *See Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 477 (4th Cir. 2011)).

As Plaintiffs fail to adequately plead loss causation on behalf of the Seller Shareholders, the Court grants Defendants' motion to dismiss Plaintiffs' amended complaint for failure to state a § 10(b) and rule 10b-5 claim on behalf of the Seller Shareholders.

## IV.   Section 20(a) and Section 20A Claims

As Plaintiffs have failed to adequately allege their § 10(b) claim, their claims under §§ 20(a) and 20A fail as a matter of law. Both require a predicate violation of the Exchange Act, which the amended complaint does not adequately plead. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014); *Qihoo*, 2020 WL 4734989.

## Conclusion

Plaintiffs fail to adequately plead violations of the Exchange Act on behalf of the Seller Shareholders and Tenderer Shareholders. Therefore, the Court grants Defendants' motion to dismiss the amended complaint for failure to state a claim under both § 10(b) of the Exchange Act and Rule 10b-5. Plaintiffs' claims under §§ 20(a) and 20A are dismissed as well.

**SO ORDERED.**

**Dated:**  November 30, 2020
        **New York, New York**

_____

**ANDREW L. CARTER, JR.**
**United States District Judge**